1  RICHARD C. EYMANN
   Eymann Allison Hunter Jones, P.S.
2  2208 West Second Avenue
   Spokane, WA 99201-5417
3  (509) 747-0101

4  STEPHEN L. NORDSTROM
   Nordstrom & Nees, P.S.
5  323 South Pines Road
   Spokane, WA 99206
6  (509) 924-9800

7  Attorneys for Plaintiff

8           UNITED STATES DISTRICT COURT FOR THE

9             EASTERN DISTRICT OF WASHINGTON

10 THOMAS A. WAITE,            No. CV-05-399-EFS

11                  Plaintiff,    **PLAINTIFF'S SPECIFIC FACTS**

12    vs.                    **RELIED UPON IN SUPPORT OF**
                               **PLAINTIFF'S MOTION FOR**

13 THE CHURCH OF JESUS CHRIST OF    **PARTIAL SUMMARY**
   LATTER DAY SAINTS d/b/a          **JUDGMENT RE: AFFIRMATIVE**

14 CORPORATION OF THE PRESIDING    **DEFENSES (LR 56.1(a))**
   BISHOP OF THE CHURCH OF JESUS

15 CHRIST OF LATTER DAY SAINTS, a
   Utah corporation, d/b/a

16 CORPORATION OF THE PRESIDENT
   OF THE CHURCH OF JESUS CHRIST

17 OF LATTER DAY SAINTS, a Utah
   corporation; DONALD C. FOSSUM;

18 and STEVEN D. BRODHEAD,

19                    Defendants.

20       The following specific facts are relied upon by plaintiff Thomas A. Waite in

21 support of plaintiff's Motion for Partial Summary Judgment Re: Affirmative

22 Defenses. The pertinent facts are as follows:

23       1. Plaintiff was a missionary for the Church of Jesus Christ of Latter Day

24 Saints. Attachment A (Thomas A. Waite deposition, p. 39, ln. 14-25; p. 40, ln.

25 1-16.)

26
PLAINTIFF'S SPECIFIC FACTS RELIED UPON IN
27 SUPPORT OF PLAINTIFF'S MOTION FOR PARTIAL
   SUMMARY JUDGMENT RE: AFFIRMATIVE
28 DEFENSES (LR 56.1(a))- 1
   (specific facts in sup of plaintiff psj mot re affirmative defenses.wpd)

**EYMANN ALLISON HUNTER JONES P.S.**

2208 WEST SECOND AVENUE• SPOKANE, WA 99201-5417
TELEPHONE: (509) 747-0101 • FAX: (509) 458-5977

Dockets.Justia.com

2. Missionaries were required to sign a "Driving Contract." Attachment B (Donald C. Fossum deposition, p. 43, ln. 24-25; p. 44, ln. 1-25; p. 45, ln. 1-2; Fossum deposition, Exhibit 1).

3. Plaintiff signed a "Driving Contract." Attachment C (Waite deposition, p. 98, ln. 8-25; Exhibit 3).

4. The "Driving Contract" required that missionaries wear seatbelts whenever riding in a vehicle. Attachment B (Fossum deposition, Exhibit 1).

5. At the time of the motor vehicle collision plaintiff was riding without a seatbelt in the bed of a church-owned pickup. Attachment D (Declaration of James T. Ross, p. 1, ln. 27-32; p. 2, ln. 1-22); and Attachment E (Mark Tyler Ryan deposition, p. 12, ln. 4-25; p. 13, ln. 1).

DATED this 30th day of January, 2007.

EYMANN ALLISON HUNTER JONES, P.S.

By:      s/Richard C. Eymann
RICHARD C. EYMANN, WSBA #7470
Co-Counsel for Plaintiff

NORDSTROM & NEES, P.S.

By:      *Telephonically Approved 1/30/07*
STEPHEN L. NORDSTROM, WSBA #11267
Co-Counsel for Plaintiff

PLAINTIFF'S SPECIFIC FACTS RELIED UPON IN
SUPPORT OF PLAINTIFF'S MOTION FOR PARTIAL
SUMMARY JUDGMENT RE: AFFIRMATIVE
DEFENSES (LR 56.1(a))- 2
(specific facts in sup of plaintiff psj mot re affirmative defenses.wpd)

EYMANN ALLISON HUNTER JONES  P.S.

2208 WEST SECOND AVENUE• SPOKANE, WA 99201-5417
TELEPHONE:  (509) 747-0101 • FAX: (509) 458-5977

1

# CERTIFICATE OF SERVICE

2       I, RICHARD C. EYMANN, hereby certify that on the 30th day of January,
   2007, I electronically filed the foregoing with the Clerk of the Court using the
3  CM/ECF System which will send notification of such filing to the following
   participants:

4

5  Brian T. Rekofke
   Witherspoon Kelley Davenport & Toole
   1100 U.S. Bank Building
6  422 W. Riverside Avenue
   Spokane, WA 99201

7

8  Andrew C. Smythe
   Paine Hamblen Coffin Brooke & Miller
   717 W. Sprague Avenue, Suite 1200
9  Spokane, WA 99201

10

11                    ___s/Richard C. Eymann___
                      **RICHARD C. EYMANN**

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26
PLAINTIFF'S SPECIFIC FACTS RELIED UPON IN
27  SUPPORT OF PLAINTIFF'S MOTION FOR PARTIAL
    SUMMARY JUDGMENT RE: AFFIRMATIVE
28  DEFENSES (LR 56.1(a))- 3
    (specific facts in sup of plaintiff psj mot re affirmative defenses.wpd)

**EYMANN ALLISON HUNTER JONES P.S.**

2208 WEST SECOND AVENUE● SPOKANE, WA 99201-5417
TELEPHONE:  (509) 747-0101 ● FAX: (509) 458-5977

# Attachment A

4

1

2                    UNITED STATES DISTRICT COURT

3              FQR THE EASTERN DISTRICT OF WASHINGTON

4

5    THOMAS A. WAITE,

6              Plaintiff,

7    vs.        No.  CV-05-399-EFS

8    THE CHURCH OF JESUS CHRIST OF LATTER DAY SAINTS d/b/a/

9    CORPORATION OF THE PRESIDING BISHOP OF THE CHURCE OF

10   JESUS CHRIST OF LATTER DAY SAINTS, a Utah corporation,

11   d/b/a/ CORPORATION OF THE PRESIDENT OF THE CHURCH OF

12   JESUS CHRIST OF LATTER DAY SAINTS, a Utah corporation,

13   et al.,

14              Defendants.

15   _____

16

17            DEPOSITION OF THOMAS A. WAITE

18         Taken on Behalf of the Defendants

19              Tuesday, October 17, 2006

20      DEPOSITION OF THOMAS A. WAITE, taken on behalf of

21   the Defendants, at 1500 South Raymond Avenue, Fullerton,

22   California, commencing at 9:18 A.M. on Tuesday, October

23   17, 2006, before PATRICIA L. HUBBARD, CSR #3400, a

24   Certified Shorthand Reporter in and for the State of

25   California, pursuant to Notice.

Page 37

1  did you go to school every day or were you -- or
2  did you have home studies? Or do you recall how
3  that worked?
4      A. I don't recall how that worked.
5      Q. Well, let me ask you this. Did you
6  always, when you were -- aside from the La Sierra
7  High School experience, is it your recollection
8  that while you attended Fullerton you'd get up
9  and physically go to -- to Fullerton High School
10 every day and attend classes?
11     A. I think there was a brief period
12 where before going to La Sierra we tried to do
13 home schooling.
14     Q. Okay. And do you recall when that
15 was?
16     A. I can't say for certain --
17     Q. Was it --
18     A. -- when that was.
19     Q. Okay. Was it through -- was it --
20 was it home schooling through Fullerton or in
21 conjunction with Fullerton, or was it home
22 schooling just done independently of Fullerton?
23     A. My mom and dad set that up. I wasn't
24 really aware of how it all worked.
25     Q. Okay. And how did this -- were your

Page 38

1  parents teaching you at home or was -- how was
2  that program set up when you didn't actually
3  physically attend at Fullerton High School but
4  were undergoing the education process at home?
5      A. I can't remember for certain how that
6  was conducted.
7      Q. When all was said and down, how were
8  your high school grades? Do you recall?
9      A. They were pretty good.
10     Q. Okay. I think you were like me.
11     You didn't exactly excel in math?
12     A. Yeah.
13     Q. Okay. Let me ask you a little bit
14 about the accident that occurred in August of
15 2003 in Spokane which brings us here today.
16     I'm certainly not trying to dredge up
17 any bad memories, but that's part of my -- my job
18 here.
19     First of all, do you have any
20 recollection of the accident?
21     A. I have no recollection of what took
22 place on the date of the accident.
23     Q. Okay. What's the last memory you
24 have before the accident?
25     The accident's August 21. I know

Page 39

1  your birthday is August 16th.
2      Do you remember your birthday, for
3  instance?
4      A. No.
5      MR. NORDSTROM: What was the date you
6  mentioned? I missed that.
7      MR. REKOFKE: 20 -- August 21 was the
8  day of the accident.
9      Q. And then your birthday was five days
10 before that?
11     A. Yeah. I don't remember that at all.
12     Q. Okay. Do you have any
13 recollection --
14     Well, when did you start your -- your
15 mission in Spokane the first go-around?
16     When did you arrive in Spokane as a
17 new missionary?
18     A. I can't remember the specific date.
19 I reported to the missionary training center in
20 Utah December --
21     Q. December of 2002?
22     A. Yeah. I guess so.
23     Q. Okay. And then after a few weeks at
24 the missionary training center, then you went
25 from the training center --

Page 40

1      A. Right.
2      Q. -- to Spokane?
3      A. Right, yes.
4      Q. So were you in place --
5      MR. NORDSTROM: Make sure he finishes
6  his question before you answer. All right?
7  BY MR. REKOFKE:
8      Q. So you were in Spokane either
9  December of '02 or January of 2003 to start your
10 mission?
11     A. Yes.
12     Q. Okay. Do you have recollection of --
13 of being in place as a -- as a new missionary in
14 Spokane in January of 2003?
15     Do you recall events that occurred?
16     A. Yes.
17     Q. Okay. Why don't you tell me a little
18 bit about just what you -- what you recall about
19 the early experiences as a -- as a new missionary
20 in Spokane, what did you do, those types of
21 things.
22     A. My first area was Troy, Idaho. And
23 that's where I was trained.
24     Q. Do you recall about how long you were
25 in Troy?

6 (Pages 37 to 40)



**NAEGELI REPORTING CORPORATION**

**800.528.3335**
www.NaegeliReporting.com
503.227.7123 FAX

Portland, OR          Seattle, WA          Spokane, WA          Coeur d'Alene, ID
503.227.1544          206.622.3376          509.838.6000          208.667.1163

Court Reporting      Trial Presentation      Videoconferencing      Videography

6

# Attachment B

7

# CONDENSED TRANSCRIPT

## UNITED STATES DISTRICT COURT FOR THE
## EASTERN DISTRICT OF WASHINGTON

THOMAS A. WAITE,                    :    No. CF-05-399-EFS
                                    :
          Plaintiff,                :    **Videotaped Deposition of:**
                                    :
vs.                                 :    **DONALD C. FOSSUM**
                                    :
THE CHURCH OF JESUS CHRIST          :
OF LATTER-DAY SAINTS dba            :
CORPORATION OF THE PRESIDING        :
BISHOP OF THE CHURCH OF             :
JESUS CHRIST OF LATTER-DAY          :
SAINTS, a Utah corporation,         :
dba CORPORATION OF THE              :
PRESIDENT OF THE CHURCH OF          :
JESUS CHRIST OF LATTER-DAY          :
SAINTS, a Utah corporation;         :
DONALD C. FOSSUM; and STEVEN        :
D. BRODHEAD,                        :
                                    :
          Defendants.               :



November 9, 2006 - 1:08 p.m.


Location:  Kirton & McConkie
1800 Eagle Gate Tower
60 East South Temple
Salt Lake City, Utah  84111


Reporter:  Teri Hansen Cronenwett
Certified Realtime Reporter, Registered Merit Reporter
Notary Public in and for the State of Utah



## GARCIA & LOVE
### COURT REPORTING AND VIDEOGRAPHY

36 South State Street • Suite 1220 • Salt Lake City, UT 84111 • 801.538.2333 • Fax 801.538.2334

8

**Page 41**

1  A.  That's correct.
2  Q.  How often before this time?
3  A.  I don't know.  I didn't keep track.
4  Q.  All right.  Every time you had a district meeting?
5  A.  Not every time.  It all depended on their schedule
6  and what they wanted to do and everything.
7  Q.  All right.  But you had -- had you ever carried
8  more than six in a pickup before?
9  A.  I believe so, yes.
10  Q.  All right.  And would the number more than six or
11  more than four all be in the bed of the pickup?
12  A.  It just depended on size.
13  Q.  Well, did you put anybody more than four in the cab
14  of the pickup?
15  A.  We have, but those were three smaller gentlemen.
16  Q.  Okay.  But this is the pickup you are driving now
17  in Spokane, correct?
18  A.  That's correct.
19  Q.  And how many seatbelts are in the front of the
20  Dakota that you were driving?
21  A.  I don't know.
22  Q.  Did it have bucket seats or a bench seat?
23  A.  It's a good question.
24  Q.  And again, I'm talking about your driver's seat and
25  the passenger seat.  Were those bucket seats, or was that a

**Page 42**

1  bench seat?
2  A.  I don't recall.
3  Q.  Okay.  Was it a stick or automatic?
4  A.  Automatic.
5  Q.  All right.  The back seat, do you know whether it
6  had more than two seatbelts available?
7  A.  I don't know.  I never got back there.
8  Q.  As the designated driver, what were your
9  responsibility -- any -- did you have any responsibility
10  regarding seatbelts?
11  A.  I had the responsibility to wear my own and also to
12  encourage others to wear theirs, but as 18, 19, 20-year-old
13  men, I figured that we could all be responsible for our own
14  actions.
15  Q.  And that's the way you felt when you were back in
16  June, July and August of 2003?
17  A.  They were adults, correct?
18  Q.  Well, I guess I am asking you the question, though.
19  Is that the way you felt back then?
20  A.  Yes, sir.  They were adults.  They had
21  responsibility over themselves, and they could make their
22  decision whether they wanted to wear it or not.
23  Q.  Had anybody, anyone in the mission field, advised
24  you not to carry missionaries in the bed of a pickup?
25  A.  It was mentioned once in passing from an assistant

**Page 43**

1  to the president, and it was basically, you know, if we get
2  caught, we're going to get in trouble.  But that was about
3  it.
4  Q.  And was that before August of 2003?
5  A.  I believe so.
6  Q.  Was -- could it have been after 2003?  I mean,
7  after August of 2003?
8  A.  I believe it was before the accident.
9  Q.  Okay.  Do you know that as you sit here?
10  A.  Do I know it?  No.  That's why I said I believe.
11  Q.  Okay.  What's the basis for that belief?
12  A.  Because it wouldn't make sense for them to tell me
13  after because the pickup was nonexistent after that.
14  Q.  Okay.  So you may have had an assistant to the
15  president sometime tell you specifically you could get in
16  trouble by carrying somebody in the bed of the pickup?
17  A.  That's correct.
18  Q.  Okay.  Did you pass that information on to any one
19  of the elders who rode in the bed the pickup?
20  A.  We all knew it, sir.
21  Q.  Can you tell me, so did -- strike this.  Was
22  anybody present with you when the assistants told you that?
23  A.  I don't remember.
24  Q.  Well, can you tell me how you knew that everybody
25  knew that they weren't to ride in the bed of the pickup?

**Page 44**

1  A.  Because we all signed a document that said we would
2  wear our seatbelts.
3  Q.  And that's why they knew they weren't supposed to
4  be in the bed.  Is that what you're telling me?
5  A.  That's what I would assume.
6  Q.  Okay.  So you're telling me this was an assumption
7  on your part that everybody else knew.  Is that correct?
8  A.  They all signed a document, so I feel it's a pretty
9  safe assumption, sir.
10  Q.  I understand, but that's what you -- but you're
11  saying you assumed that they knew, correct?
12  A.  Well, I guess they did know because they signed the
13  document.  So no, I am not saying they -- I am assuming.  I
14  guess I am saying I know.
15  Q.  Okay.  So you know that they signed a document?
16  A.  That's correct.
17  Q.  Did that document indicate they would not ride in a
18  bed of a pickup?
19  A.  No.  It said they would wear their seatbelt at all
20  times when in a vehicle.
21  Q.  All right.  Let me show you what's going to be
22  marked as Exhibit 1.
23  (Deposition Exhibit No. 1 was marked.)
24  Q.  (By Mr. Nordstrom)  Do you recognize this document?
25  A.  Yes, sir.

9

**Page 45**

    Q.  Okay.  What's it called?

    A.  **Driving contract.**

    Q.  Would you read the first sentence for me, please.

    A.  **"In exchange for the privilege of being allowed to drive or ride in a mission-owned car while serving in the Washington Spokane mission."**

    Q.  Okay.  Then it says, I, and do you remember printing your name there?

    A.  **Yes, sir.**

    Q.  Okay.  And at the very beginning it says mission-owned car.  Is that correct?

    A.  **That's correct.**

    Q.  All right.  At any place does it say pickup?

    A.  **Nope, it doesn't.**

    Q.  Okay.  Then it changes, and under -- where -- and show me where it says that you wear a seatbelt.

    A.  **That would be B.**

    Q.  Would you read that one, please.

    A.  **"Wear a seatbelt at all times while the vehicle is moving."**

    Q.  Okay.  So the contract heads out starting a car, correct, and then we have wear a seatbelt, right, the vehicle is moving, correct?

    A.  **Yes, sir, but also I do believe that most people would consider a pickup a car because we don't very often**

**Page 46**

    **make that distinction.**

    Q.  I will move to strike, nonresponsive on that.  Let me just make sure I understand, though.  Have you ever had any specific conversation with any other missionary on what -- how they interpreted this document?

    A.  **No, sir.**

    Q.  And so everything you are talking about is an assumption on your part regarding other missionaries riding in that pickup, correct?

    A.  **That's correct.**

    VIDEOGRAPHER:  Ten minutes, Counsel.

    Q.  (By Mr. Nordstrom) Show you what's marked -- would you mark that as two?

    (Deposition Exhibit No. 2 was marked.)

    Q.  (By Mr. Nordstrom) Showing you what's been marked as Exhibit 2, do you ever recall seeing that document?

    A.  **What was the question again?**

    Q.  Do you recall ever seeing this document before?

    A.  **No, I don't.**

    Q.  It indicates in this document, "Missionaries should always wear seatbelts and never have more people in the car than there are seatbelts for."  As a designated driver, were you ever given that instruction?

    A.  **Where is that?**

    Q.  It's about midway in the document.  It says:

**Page 47**

Missionaries should.

    A.  **I believe it might have been talked about in a zone meeting.**

    Q.  Okay.  Does it refer any place on that document that you have looked over to pickups?

    A.  **It says driving other vehicles, so vehicle would assume a pickup.  Again, vehicle.  Again, it refers to vehicle down underneath both missionaries share the responsibility and, again, it says, stand outside the vehicle.**

    Q.  I understand.  If you could just look.  Do you see any place that refers to pickups?

    A.  **Well --**

    MR. REKOFKE:  He's answering the question, so go ahead and answer.

    A.  **That's -- I mean, a pickup is a vehicle, so therefore, yes, it does refer to a pickup as well as a car.**

    Q.  (By Mr. Nordstrom)  Does that have that language in there that you have just referred to?  Doesn't it say on the document -- and I just want to make sure I'm clear.  It says, "Always wear seatbelts and never have more people in the car than there are seatbelts."  Does it mention pickup anywhere?

    MR. REKOFKE:  In that sentence?

    Q.  (By Mr. Nordstrom)  In any sentence on that document, does it mention pickup anywhere?

**Page 48**

    MR. REKOFKE:  Objection, asked and answered, but go ahead and answer it again.

    A.  **Again, vehicle is assuming anything that moves with four wheels.**

    Q.  (By Mr. Nordstrom)  Just a minute.  I'll move to strike as nonresponsive.  My question again is, can you see the word pickup listed anywhere on that document, Elder Ross -- I mean, Elder Fossum?

    MR. REKOFKE:  Objection.  I think if you want to ask him what he understands the document, he is telling you that.  If you want him to ask, does the word pickup say that?  I think those are two different questions.  That's my objection.

    Q.  (By Mr. Nordstrom) Yeah.  Well, I think I asked the question, do you see the word pickup referenced any place on this document?

    A.  **Those specific words, no.**

    Q.  Okay.  Thank you.

    VIDEOGRAPHER:  Five minutes, Counsel.

    Q.  (By Mr. Nordstrom)  I just want to go over the first paragraph again.  It says driving other vehicles.  Have you got it there?

    A.  **Yep.**

    Q.  Second paragraph, you can only drive vehicles assigned to him.  Is that the missionaries, correct?

# DRIVING CONTRACT

In exchange for the privilege of being allowed to drive or ride in a mission-owned car while serving in the Washington Spokane Mission,

I, _____

(PRINT NAME HERE)

agree to:

    a. Obey all mission vehicle rules.

    b. Wear a seat belt at all times while the vehicle is moving.

    c. Submit all reports on time.

    d. *Not* tamper with odometers.

    e. Use defensive driving principles.

    f. Obey all local traffic laws.

    g. Drive mission vehicles only.

    h. *Not* transport unauthorized people in the vehicle.

    i. Only use the vehicle for approved mission business within my assigned area.

Signed: _____

Date: _____

WASHINGTON SPOKANE MISSION



DEPOSITION
EXHIBIT
*Fossum*

1 JANUARY 2000

//

# Attachment C

12

```
 1
 2                  UNITED STATES DISTRICT COURT
 3              FQR THE EASTERN DISTRICT OF WASHINGTON
 4
 5   THOMAS A. WAITE,
 6             Plaintiff,
 7   vs.       No.  CV-05-399-EFS
 8   THE CHURCH OF JESUS CHRIST OF LATTER DAY SAINTS d/b/a/
 9   CORPORATION OF THE PRESIDING BISHOP OF THE CHURCE OF
10   JESUS CHRIST OF LATTER DAY SAINTS, a Utah corporation,
11   d/b/a/ CORPORATION OF THE PRESIDENT OF THE CHURCH OF
12   JESUS CHRIST OF LATTER DAY SAINTS, a Utah corporation,
13   et al.,
14             Defendants.
15   _____
16
17              DEPOSITION OF THOMAS A. WAITE
18            Taken on Behalf of the Defendants
19                Tuesday, October 17, 2006
20       DEPOSITION OF THOMAS A. WAITE, taken on behalf of
21   the Defendants, at 1500 South Raymond Avenue, Fullerton,
22   California, commencing at 9:18 A.M. on Tuesday, October
23   17, 2006, before PATRICIA L. HUBBARD, CSR #3400, a
24   Certified Shorthand Reporter in and for the State of
25   California, pursuant to Notice.
```

13

**Page 97**

1   A. In the sense that it had little
2 pockets I could put things in, that's -- and it
3 held my name tag in place. I don't know how to
4 explain --
5   Q. I'm just talking about the little
6 book.
7   A. Right. Well, me, too. Just -- this
8 is how I found it helpful, like carrying around
9 with me.
10   Q. Yeah.
11   A. You could put your name tag -- if you
12 only have your name tag on your shirt pocket,
13 it's kind of flimsy, it could come out easy. If
14 you attach it with both the book and the pocket,
15 it's hard to come out.
16   Q. So it was useful in several ways?
17   A. Yeah.
18   Q. It had some information in it and it
19 held your name tag on better?
20   A. Yeah.
21   Q. Okay. Is there a section, to your
22 recollection, in the missionary handbook about
23 car safety?
24   A. I guess so.
25   Q. Okay. I'm just asking if you recall.

**Page 98**

1   A. Well, I know we read it, but it was
2 just kind of a routine thing.
3   Q. Okay. And that's right. If you
4 don't have any specific recollection of that,
5 then that's a fine -- that's a fine answer.
6   It says what it says. So I'm not --
7 I'm just curious if you had any recollection.
8   Okay. Let me hand you Exhibit 3.
9   (Whereupon the document referred
10   to was marked Defendants'
11   Exhibit-3 by the Certified
12   Shorthand Reporter and is attached
13   hereto.)
14 BY MR. REKOFKE:
15   Q. And again to move this along, that
16 across the top it says "Driving Contract."
17   A. Uh-huh, yes.
18   Q. Okay. And is that your name printed
19 in there after the first paragraph?
20   A. Correct.
21   Q. And is that your signature at the
22 bottom of that?
23   A. Affirmative.
24   Q. And it's dated January 8th of 2003?
25   A. Yes.

**Page 99**

1   Q. Okay. And what -- under that
2 contract, why don't you go ahead and read into
3 the record what -- what you agreed to do.
4   A. Okay.
5   Q. It says, "I Thomas Waite agreed to,"
6 and then go ahead and read those?
7   A. "Obey all mission vehicle rules; wear
8 a seatbelt at all times while the vehicle is
9 moving; submit all reports on time; not tamper
10 with odometers; use defensive driving principles;
11 obey all local traffic laws; drive mission
12 vehicles only; not transport unauthorized people
13 in the vehicle; only use the vehicle for approved
14 mission business within my assigned area."
15   Q. Okay. So, do you have a recollection
16 of -- of reading this and signing this on
17 January 8th?
18   A. No.
19   Q. Okay. You understood the rules that
20 are -- that are set forth there, though?
21   A. I understood the rules?
22   Q. Yeah. You under --
23   A. I understand them.
24   Q. Okay. You understand them now,
25 obviously?

**Page 100**

1   A. Right.
2   Q. You understood them then?
3   A. I'm sure I read them, but given my
4 current situation and then myself at that time,
5 obviously not to the same degree of appreciation
6 or --
7   Q. Okay. Do you think it's reasonable
8 to have you agree to wear a seat belt at all
9 times while the vehicle was moving?
10   A. Yes.
11   Q. And obviously if you're in the back
12 of a truck that's moving, in the bed of the truck
13 there's no seat belt?
14   A. Correct.
15   Q. Okay. You -- in the first go-around
16 in the Spokane mission you were paired with Elder
17 Ross; is that right?
18   A. Yes.
19   Q. Okay.
20   A. Or -- in the Spokane mission?
21   Q. The Spokane mission, yes.
22   A. Oh, in my first area with my trainer?
23   Q. Yeah. Let me walk through it?
24   A. Okay.
25   Q. Who -- let's do it this way. I'll

21 (Pages 97 to 100)



**NAEGELI REPORTING CORPORATION**

**800.528.3335**
**www.NaegeliReporting.com**
**503.227.7123 FAX**

Portland, OR    Seattle, WA    Spokane, WA    Coeur d'Alene, ID
503.227.1544    206.622.3376    509.838.6000    208.667.1163

Court Reporting      Trial Presentation      Videoconferencing      Videography

14

# DRIVING CONTRACT

In exchange for the privilege of being allowed to drive or ride in a mission-owned car while serving in the Washington Spokane Mission,

I, _THOMAS     WAITE_

(PRINT NAME HERE)

agree to:

 a. Obey all mission vehicle rules.

 b. Wear a seat belt at all times while the vehicle is moving.

 c. Submit all reports on time.

 d. *Not* tamper with odometers.

 e. Use defensive driving principles.

 f. Obey all local traffic laws.

 g. Drive mission vehicles only.

 h. *Not* transport unauthorized people in the vehicle.

 i. Only use the vehicle for approved mission business within my assigned area.

Signed: _____

Date: _8 JAN 2003_

WASHINGTON SPOKANE MISSION

1 JANUARY 2000

EXH. NO. 3 FOR ID
DATE: 10-19-06
WITNESS: T. WAITE
PATRICIA L. HUBBARD
CSR NO 340



# Attachment D

16

)
)
)
)
)          DECLARATION OF
)          JAMES T. ROSS
)
)
)
)

    I, James T. Ross, under the penalty of perjury of the laws of the State of Washington, hereby declare and state:

    That I was a missionary for the Church of Jesus Christ of Latter Day Saints from May of 2002 to May of 2004 at which time I received a honorable release. I served in the Spokane, Washington mission and held the positions of Senior Companion, Trainer, District Leader, Zone Leader, and Assistant to the President.

    On or about August 21, 2003 I was involved in a motor vehicle collision with six other Elders including my companion, Elder Thomas Waite. At that time I was also a Zone Leader as well as Elder Waite's Senior Companion. Elder Waite and I had been companions for approximately two weeks. That morning Elder Donald Fossum and Elder Cesar Porras, the Elders to which the 2003 Dakota pickup was assigned, picked us up for either a zone or district

DECLARATION OF JAMES T. ROSS - I

NORDSTROM & NEES, P.S.
ATTORNEYS AT LAW
323 South Pines Road
Spokane Valley, Washington 99206
(509) 924-9800
Fax (509) 924-9923

/7

meeting. We were the last Elders to be picked up and since there were already four Elders sitting inside the cab of the pickup (two in the front seat, two in the extended cab seats), Elder Waite and I climbed into the bed of the canopied pickup. I, as well as other Elders had frequently ridden in the bed of the pickup and did so to most weekly district meetings unless another ride was available. Following the meeting we stopped off at the Subway restaurant on 32nd Avenue. After lunch Elder Fossum, Elder Porras, Elder Hansen and I got into the cab of the pickup, and Elder Ryan and Elder Waite who came out of the restaurant last, climbed into the bed.

I had been in this particular area for approximately eight weeks, living at the same apartment and was familiar with the route down Adams Road and the four-way stop at the intersection of 8th Avenue. On the day of the collision I was in the front passenger seat and Elder Fossum was driving the pickup. Elders Porras and Hansen were in the back seat. I recall specifically that Elder Fossum stopped at the stop sign on Adams Road. There is a big pine tree which blocks our view to the west on 8th and I was unable to see any car approaching from that direction until we began moving forward pass the stop sign. I am not sure exactly where the pickup was in relation to the intersection but the next thing I recall is hearing the screeching of tires. I then looked and saw a vehicle traveling at a high rate of speed coming towards us down 8th Avenue. I then pointed my finger toward the speeding car to get Elder Fossum's attention and yelled "oh crap". Elder Fossum looked and saw the car coming and responded by pushing the accelerator to the floor. The next thing I knew the car hit the side of the pickup knocking us approximately 180 degrees.

After the pickup stopped I looked in the rear and saw that the canopy and both Elder Ryan and Elder Waite were missing. I exited the pickup and found both Elder Ryan and Elder Waite lying on the pavement. Elder Waite was not only unconscious but he was not breathing. He also had blood coming from his nose and ears. Elder Waite finally began to breathe and at some point in time I recall the ambulance arriving.

I do not recall any actual conversations with anyone although I know that I did talk with the other Elders. We did kneel down and say a prayer for Elder Waite and Elder Ryan and also called President Ludlow to inform him what had happened.

DECLARATION OF JAMES T. ROSS - 2

NORDSTROM & NEES, P.S.
ATTORNEYS AT LAW
323 South Pines Road
Spokane Valley, Washington 99206
(509) 924-9800
Fax (509) 924-9828

18

# Attachment E

UNITED STATES JUDICIAL DISTRICT COURT

FOR THE EASTERN DISTRICT OF WASHINGTON

\* \* \*

THOMAS A. WAITE,                )
                                )
          Plaintiff,            )  CIVIL NO. CV-05-399-EFS
                                )
     vs.                        )  VIDEO DEPOSITION OF:
                                )
THE CHURCH OF JESUS CHRIST )  MARK TYLER RYAN
OF LATTER DAY SAINTS, dba  )
CORPORATION OF THE         )
PRESIDING BISHOP OF THE    )
CHURCH OF JESUS CHRIST OF  )
LATTER DAY SAINTS, a Utah  )
corporation, dba           )
CORPORATION OF THE         )
PRESIDENT OF THE CHURCH    )
OF JESUS CHRIST OF LATTER  )
DAY SAINTS, a Utah         )
corporation; DONALD C.     )
FOSSUM; and STEVEN D.      )
BRODHEAD,                  )
                                )
          Defendants.           )


\* \* \*

November 10, 2006
10:11 a.m.


Offices of Kirton & McConkie
60 East South Temple, Suite 1800
Salt Lake City, Utah

\* \* \*

RENEE L. STACY
Registered Professional Reporter

20

Page 10

1  stuff, but, like, it's been four and a half years
2  since I was in the MTC, and right now I don't recall
3  at the actual Missionary Training Center, but before
4  we entered in our normal mission, we were trained in
5  safety habits.
6      Q    Would this be first aid-type safety in
7  addition to other types of safety?
8      A    I really don't remember.  I really don't
9  remember.
10     Q    That brings up a good point.  In this
11  accident, did you suffer an injury?  And I'm speaking
12  of the accident that occurred where the Honda hit the
13  vehicle that was being driven by Mr. Fossum?
14     A    Was I injured?  Yes.
15     Q    And can you just tell us briefly what the
16  nature of your injuries were?
17     A    Just -- I had a major concussion, bleeding.
18  My head was bleeding.  I lost a lot of my hair.  Just
19  scratches, like, I just have -- you know, I have
20  little scars on my body.  I still have them.  They're
21  -- nothing major happened.  I was not major injured.
22  No major injuries, like no...
23     Q    At some point in time during this impact or
24  immediately after impact, were you unconscious?
25     A    Yes.

Page 11

1      Q    Okay.  Your answer to that was "yes"?
2      A    Yes.
3      Q    And do you know how long you might have
4  been unconscious?
5      A    I have no clue of the time frame.  I would
6  assume under five minutes.
7      Q    When you woke up, can you tell us where you
8  were, if you remember?
9      A    I -- I recall -- I do recall, like, being
10  out of breath.  I can't tell you where I was at.  I
11  was obviously on the road.  I was crawling, and then
12  I remember passing out, and then I woke up a second
13  time and I was just -- I was on my -- the left side
14  of my face, that I remember, and my head was on the
15  curb, and kind of -- well, kind of in the grass, but
16  my body was on the curb, and I just was covered in
17  blood, and I remember Elder Hansen -- I can't
18  remember Elder -- Dillon Hansen was waving his hands
19  and trying to get me, you know, to wake up.  Other
20  than that...
21     Q    Okay.  And I'll cover a little bit more of
22  that later.  I'm wondering, do you think -- except
23  for that which you cannot remember, do you think any
24  of your memory has been affected by this particular
25  accident?  In other words, your ability to remember

Page 12

1  what you did in training or what you did as a
2  missionary prior to this accident.
3      A    No.
4      Q    What is the -- and just to -- so, to put
5  this in perspective, what is the last thing you
6  remember prior to the impact of the vehicles?
7      A    Just the car -- the screeching tires.
8      Q    Okay.  So you remember that?
9      A    Yeah.
10     Q    All right.
11     A    I even remember where Elder Waite was
12  sitting, as opposed to where I was sitting, in the
13  back of the pickup truck.
14     Q    Okay.  Well --
15     A    How I was sitting.
16     Q    Since you've mentioned that, why don't you
17  tell us where you remember him sitting -- Elder Waite
18  was sitting and where you were sitting.  And this is
19  in the bed of the vehicle, correct?
20     A    Yes.  If I remember right, we were facing
21  north, and I was on the left side of the car, and I
22  was sitting against the wheel well that got hit.  My
23  arms were like this.  I just remember being spread
24  out.  And Elder Waite was to my right, facing me, and
25  his arm was on the -- his arm was on the gate, his

Page 13

1  left arm was on the gate and he was leaning.
2       We were talking.  I don't recall what we
3  were talking about.
4      Q    Was the gate up?
5      A    The gate was up.  Everything -- the gate
6  was up and the window was closed.
7      Q    And the canopy was on the vehicle?
8      A    Until my head took it off, yes.
9      Q    And do you remember -- do you -- you said
10  you remember sitting in the vehicle and hearing
11  screeching tires.  Do you remember actually hitting
12  the canopy?
13     A    You know what?  I don't.  All I -- to my
14  recollection, I only remember the screeching tires.
15  The next thing I know is I'm on the side of the road.
16     Q    I take it from that particular answer that
17  you do not remember anything about the trajectory or
18  where Mr. Waite went.
19     A    No.  No.  I was not -- from what I know, I
20  wasn't conscious when it happened.
21     Q    Do you know in what manner the canopy was
22  attached or bolted down to the pickup?
23     A    It was clamped.  It had clamps on it, and
24  the clamps --
25     Q    Had you ever been involved with that

21