1  RICHARD C. EYMANN
   Eymann Allison Hunter Jones, P.S.
2  2208 West Second Avenue
   Spokane, WA 99201-5417
3  (509) 747-0101

4  STEPHEN L. NORDSTROM
   Nordstrom & Nees, P.S.
5  323 South Pines Road
   Spokane, WA 99206
6  (509) 924-9800

7  Attorneys for Plaintiff

8           UNITED STATES DISTRICT COURT FOR THE

9           EASTERN DISTRICT OF WASHINGTON

10  THOMAS A. WAITE,                    No. CV-05-399-EFS

11                        Plaintiff,    **DECLARATION OF STEPHEN L.
                                        NORDSTROM IN SUPPORT OF**
12      vs.                             **PLAINTIFF'S MOTION FOR
                                        PARTIAL SUMMARY**
13  THE CHURCH OF JESUS CHRIST OF       **JUDGMENT RE: AFFIRMATIVE
    LATTER DAY SAINTS d/b/a             DEFENSES**
14  CORPORATION OF THE PRESIDING
    BISHOP OF THE CHURCH OF JESUS
15  CHRIST OF LATTER DAY SAINTS, a
    Utah corporation, d/b/a
16  CORPORATION OF THE PRESIDENT
    OF THE CHURCH OF JESUS CHRIST
17  OF LATTER DAY SAINTS, a Utah
    corporation; DONALD C. FOSSUM;
18  and STEVEN D. BRODHEAD,

19                        Defendants.

20      I, Stephen L. Nordstrom, declare under penalty and perjury under the laws of

21  the state of Washington that the following is true and correct:

22      1.    I am co-counsel for plaintiff in the above-referenced matter.  I am

23  competent to testify in this matter and I make this affidavit of my own personal

24  knowledge and in support of plaintiff's Motion for Partial Summary Judgment Re:

25  Affirmative Defenses.

26

27  DECLARATION OF STEPHEN L. NORDSTROM IN
    SUPPORT OF MOTION FOR PARTIAL SUMMARY
28  JUDGMENT RE: AFFIRMATIVE DEFENSES - 1
    (dec of sln in sup of psj mot re affirmative defenses.wpd)

2.     Attached hereto and incorporated by reference herein as Exhibit "A" is a true and correct copy of defendant LDS Church's response to plaintiff's Interrogatory No. 11.

3.     Attached hereto and incorporated by reference herein as Exhibit "B" are true and correct copies of pages 1, 39-40 and 98 and Deposition Exhibit 3 ("Driving Contract") from the transcript of the deposition of Thomas A. Waite taken on October 17, 2006 in the above-referenced matter.

4.     Attached hereto and incorporated by reference herein as Exhibit "C" are true and correct copies of pages 1 and 43-45 and Deposition Exhibit 1 ("Driving Contract") from the transcript of the deposition of Donald C. Fossum taken on November 9, 2006 in the above-referenced matter.

5.     Attached hereto and incorporated by reference herein as Exhibit "D" are true and correct copies of pages 1 and 2 of the Declaration of James T. Ross signed on November 27, 2006 in the above-referenced matter.

6.     Attached hereto and incorporated by reference herein as Exhibit "E" are true and correct copies of pages 1 and 12-13 from the transcript of the deposition of Mark Tyler Ryan taken on November 10, 2006 in the above-referenced matter.

7.     Attached hereto and incorporated by reference herein as Exhibit "F" is a proposed Order Granting Plaintiff's Motion for Partial Summary Judgment Re: Affirmative Defenses.

DATED this 30th day of January, 2007 at Spokane, Washington.


_____s/Stephen L. Nordstrom_____
STEPHEN L. NORDSTROM


**EYMANN ALLISON HUNTER JONES P.S.**

DECLARATION OF STEPHEN L. NORDSTROM IN
SUPPORT OF MOTION FOR PARTIAL SUMMARY
JUDGMENT RE: AFFIRMATIVE DEFENSES - 2
(dec of sln in sup of psj mot re affirmative defenses.wpd)

2208 WEST SECOND AVENUE• SPOKANE, WA 99201-5417
TELEPHONE: (509) 747-0101 • FAX: (509) 458-5977

# CERTIFICATE OF SERVICE

I, RICHARD C. EYMANN, hereby certify that on the 30th day of January, 2007, I electronically filed the foregoing with the Clerk of the Court using the CM/ECF System which will send notification of such filing to the following participants:

Brian T. Rekofke
Witherspoon Kelley Davenport & Toole
1100 U.S. Bank Building
422 W. Riverside Avenue
Spokane, WA 99201

Andrew C. Smythe
Paine Hamblen Coffin Brooke & Miller
717 W. Sprague Avenue, Suite 1200
Spokane, WA 99201

_____s/Richard C. Eymann_____
**RICHARD C. EYMANN**

**EYMANN ALLISON HUNTER JONES P.S.**

DECLARATION OF STEPHEN L. NORDSTROM IN
SUPPORT OF MOTION FOR PARTIAL SUMMARY
JUDGMENT RE: AFFIRMATIVE DEFENSES - 3
(dec of sln in sup of psj mot re affirmative defenses.wpd)

2208 WEST SECOND AVENUE• SPOKANE, WA 99201-5417
TELEPHONE:  (509) 747-0101 • FAX: (509) 458-5977

# Exhibit "A"

4

RECEIVED

AUG 2 3 2006

YMANN, ALLISON FENNESSY
HUNTER & JONES P.S

# UNITED STATES DISTRICT COURT FOR THE
## EASTERN DISTRICT OF WASHINGTON

THOMAS A. WAITE,

                Plaintiff,

vs.

THE CHURCH OF JESUS CHRIST OF
LATTER DAY SAINTS d/b/a
CORPORATION OF THE PRESIDING
BISHOP OF THE CHURCH OF JESUS
CHRIST OF LATTER DAY SAINTS, a Utah
corporation, d/b/a CORPORATION OF THE
PRESIDENT OF THE CHURCH OF JESUS
CHRIST OF LATTER DAY SAINTS, a Utah
corporation; DONALD C. FOSSUM; and
STEVEN D. BRODHEAD,

                Defendants.

No. CV-05-399-EFS

**DEFENDANTS'
RESPONSES TO
PLAINTIFF'S FIRST SET
OF INTERROGATORIES
AND REQUEST FOR
PRODUCTION**

## GENERAL OBJECTIONS

Defendants object to the Interrogatories and Document Requests to the extent they purport to impose obligations upon Defendants that are in addition to or inconsistent with the requirements of the Federal Rules of Civil Procedure. Defendants further object to the Interrogatories and Document Requests to the extent they seek information protected by the attorney-client privilege, and/or the attorney work-product protection. Defendants will not voluntarily produce any privileged or protected information, and reserves the right to recover any such information produced inadvertently.

Defendants object to Plaintiff's Interrogatories and Document Requests as unduly burdensome to the extent they requests it to identify documents or information not in its possession, custody, or control.

Defendants object to the Interrogatories and Document Requests to the extent they request information already in Plaintiff's possession or that may be

5

1  INTERROGATORY NO.10:  Had defendant LDS Church's agent

2  Donald C. Fossum, within 24 hours before the incident complained of in the

3  plaintiff's Complaint, ingested any alcohol, medicine or other drug?  If so,

4  describe fully the agent, the amount thereof, and when and where said alcohol,

5  drug or medicine was consumed or ingested.

6      ANSWER:  Defendants object to this interrogatory as compound, overly

7  broad, irrelevant, and not reasonably calculated to lead to the discovery of

8  admissible evidence.  Further, the interrogatory assumes facts which are not in

9  evidence.  Subject to and without waiving these objections: No.

10     INTERROGATORY NO. 11: If defendant LDS Church claims that the

11  negligence or conduct of any other third person(s) contributed to the incident

12  complained of or the damages sought by plaintiff in the Complaint, please state

13  their name(s), address(es) as well as each and every fact which form the basis for

14  your claim that said person(s) contributed to the incident and/or the injuries

15  sustained by plaintiff Thomas Waite.

16     ANSWER: Defendants object to this interrogatory as compound and

17  overly broad.  Further, discovery is ongoing, Defendants have not had the

18  opportunity to determine or identify each and every person who may have

19  contributed to the incident.  Subject to and without waiving these objections: At

20  this time, however, Defendants believe that the negligence and conduct of Steven

21  Brodhead and Thomas Waite contributed to the accident and/or damages

22  complained of.  Specifically, Thomas Waite failed to follow church and mission

23  policies when he breached his agreement not to ride in a motor vehicle without a

24  seatbelt. Discovery is ongoing and these Defendants reserve the right to

25  supplement this answer as discovery continues.

26     INTERROGATORY NO. 12: If defendant LDS Church claims that the

27  negligence or conduct of plaintiff Thomas Waite caused or contributed to the

28  incident complained of or the damages sought by plaintiff in the Complaint,

6

# Exhibit "B"

1

2                    UNITED STATES DISTRICT COURT

3              FOR THE EASTERN DISTRICT OF WASHINGTON

4

5    THOMAS A. WAITE,

6              Plaintiff,

7    vs.        No.  CV-05-399-EFS

8    THE CHURCH OF JESUS CHRIST OF LATTER DAY SAINTS d/b/a/

9    CORPORATION OF THE PRESIDING BISHOP OF THE CHURCE OF

10   JESUS CHRIST OF LATTER DAY SAINTS, a Utah corporation,

11   d/b/a/ CORPORATION OF THE PRESIDENT OF THE CHURCH OF

12   JESUS CHRIST OF LATTER DAY SAINTS, a Utah corporation,

13   et al.,

14              Defendants.

15   _____

16

17             DEPOSITION OF THOMAS A. WAITE

18          Taken on Behalf of the Defendants

19             Tuesday, October 17, 2006

20      DEPOSITION OF THOMAS A. WAITE, taken on behalf of

21   the Defendants, at 1500 South Raymond Avenue, Fullerton,

22   California, commencing at 9:18 A.M. on Tuesday, October

23   17, 2006, before PATRICIA L. HUBBARD, CSR #3400, a

24   Certified Shorthand Reporter in and for the State of

25   California, pursuant to Notice.

**Page 37**

1  did you go to school every day or were you -- or
2  did you have home studies? Or do you recall how
3  that worked?
4      A. I don't recall how that worked.
5      Q. Well, let me ask you this. Did you
6  always, when you were -- aside from the La Sierra
7  High School experience, is it your recollection
8  that while you attended Fullerton you'd get up
9  and physically go to -- to Fullerton High School
10  every day and attend classes?
11      A. I think there was a brief period
12  where before going to La Sierra we tried to do
13  home schooling.
14      Q. Okay. And do you recall when that
15  was?
16      A. I can't say for certain --
17      Q. Was it --
18      A. -- when that was.
19      Q. Okay. Was it through -- was it --
20  was it home schooling through Fullerton or in
21  conjunction with Fullerton, or was it home
22  schooling just done independently of Fullerton?
23      A. My mom and dad set that up. I wasn't
24  really aware of how it all worked.
25      Q. Okay. And how did this -- were your

**Page 38**

1  parents teaching you at home or was -- how was
2  that program set up when you didn't actually
3  physically attend at Fullerton High School but
4  were undergoing the education process at home?
5      A. I can't remember for certain how that
6  was conducted.
7      Q. When all was said and down, how were
8  your high school grades? Do you recall?
9      A. They were pretty good.
10      Q. Okay. I think you were like me.
11  You didn't exactly excel in math?
12      A. Yeah.
13      Q. Okay. Let me ask you a little bit
14  about the accident that occurred in August of
15  2003 in Spokane which brings us here today.
16      I'm certainly not trying to dredge up
17  any bad memories, but that's part of my -- my job
18  here.
19      First of all, do you have any
20  recollection of the accident?
21      A. I have no recollection of what took
22  place on the date of the accident.
23      Q. Okay. What's the last memory you
24  have before the accident?
25      The accident's August 21. I know

**Page 39**

1  your birthday is August 16th.
2      Do you remember your birthday, for
3  instance?
4      A. No.
5      MR. NORDSTROM: What was the date you
6  mentioned? I missed that.
7      MR. REKOFKE: 20 -- August 21 was the
8  day of the accident.
9      Q. And then your birthday was five days
10  before that?
11      A. Yeah. I don't remember that at all.
12      Q. Okay. Do you have any
13  recollection --
14      Well, when did you start your -- your
15  mission in Spokane the first go-around?
16      When did you arrive in Spokane as a
17  new missionary?
18      A. I can't remember the specific date.
19  I reported to the missionary training center in
20  Utah December --
21      Q. December of 2002?
22      A. Yeah. I guess so.
23      Q. Okay. And then after a few weeks at
24  the missionary training center, then you went
25  from the training center --

**Page 40**

1      A. Right.
2      Q. -- to Spokane?
3      A. Right, yes.
4      Q. So were you in place --
5      MR. NORDSTROM: Make sure he finishes
6  his question before you answer. All right?
7  BY MR. REKOFKE:
8      Q. So you were in Spokane either
9  December of '02 or January of 2003 to start your
10  mission?
11      A. Yes.
12      Q. Okay. Do you have recollection of --
13  of being in place as a -- as a new missionary in
14  Spokane in January of 2003?
15      Do you recall events that occurred?
16      A. Yes.
17      Q. Okay. Why don't you tell me a little
18  bit about just what you -- what you recall about
19  the early experiences as a -- as a new missionary
20  in Spokane, what did you do, those types of
21  things.
22      A. My first area was Troy, Idaho. And
23  that's where I was trained.
24      Q. Do you recall about how long you were
25  in Troy?



**NAEGELI**
**REPORTING**
C O R P O R A T I O N

**800.528.3335**
**www.NaegeliReporting.com**
503.227.7123 FAX

Portland, OR          Seattle, WA          Spokane, WA          Coeur d'Alene, ID
503.227.1544        206.622.3376        509.838.6000        208.667.1163

Court Reporting        Trial Presentation        Videoconferencing        Videography

Thomas A. Waite                                          October 17, 2006

Page 97

1      A.  In the sense that it had little
2  pockets I could put things in, that's -- and it
3  held my name tag in place.  I don't know how to
4  explain --
5      Q.  I'm just talking about the little
6  book.
7      A.  Right.  Well, me, too.  Just -- this
8  is how I found it helpful, like carrying around
9  with me.
10     Q.  Yeah.
11     A.  You could put your name tag -- if you
12  only have your name tag on your shirt pocket,
13  it's kind of flimsy, it could come out easy.  If
14  you attach it with both the book and the pocket,
15  it's hard to come out.
16     Q.  So it was useful in several ways?
17     A.  Yeah.
18     Q.  It had some information in it and it
19  held your name tag on better?
20     A.  Yeah.
21     Q.  Okay.  Is there a section, to your
22  recollection, in the missionary handbook about
23  car safety?
24     A.  I guess so.
25     Q.  Okay.  I'm just asking if you recall.

Page 98

1      A.  Well, I know we read it, but it was
2  just kind of a routine thing.
3      Q.  Okay.  And that's right.  If you
4  don't have any specific recollection of that,
5  then that's a fine -- that's a fine answer.
6          It says what it says.  So I'm not --
7  I'm just curious if you had any recollection.
8          Okay.  Let me hand you Exhibit 3.
9          (Whereupon the document referred
10         to was marked Defendants'
11         Exhibit-3 by the Certified
12         Shorthand Reporter and is attached
13         hereto.)
14 BY MR. REKOFKE:
15     Q.  And again to move this along, that
16  across the top it says "Driving Contract."
17     A.  Uh-huh, yes.
18     Q.  Okay.  And is that your name printed
19  in there after the first paragraph?
20     A.  Correct.
21     Q.  And is that your signature at the
22  bottom of that?
23     A.  Affirmative.
24     Q.  And it's dated January 8th of 2003?
25     A.  Yes.

Page 99

1      Q.  Okay.  And what -- under that
2  contract, why don't you go ahead and read into
3  the record what -- what you agreed to do.
4      A.  Okay.
5      Q.  It says, "I Thomas Waite agreed to,"
6  and then go ahead and read those?
7      A.  "Obey all mission vehicle rules; wear
8  a seatbelt at all times while the vehicle is
9  moving; submit all reports on time; not tamper
10  with odometers; use defensive driving principles;
11  obey all local traffic laws; drive mission
12  vehicles only; not transport unauthorized people
13  in the vehicle; only use the vehicle for approved
14  mission business within my assigned area."
15     Q.  Okay.  So, do you have a recollection
16  of -- of reading this and signing this on
17  January 8th?
18     A.  No.
19     Q.  Okay.  You understood the rules that
20  are -- that are set forth there, though?
21     A.  I understood the rules?
22     Q.  Yeah.  You under --
23     A.  I understand them.
24     Q.  Okay.  You understand them now,
25  obviously?

Page 100

1      A.  Right.
2      Q.  You understood them then?
3      A.  I'm sure I read them, but given my
4  current situation and then myself at that time,
5  obviously not to the same degree of appreciation
6  or --
7      Q.  Okay.  Do you think it's reasonable
8  to have you agree to wear a seat belt at all
9  times while the vehicle was moving?
10     A.  Yes.
11     Q.  And obviously if you're in the back
12  of a truck that's moving, in the bed of the truck
13  there's no seat belt?
14     A.  Correct.
15     Q.  Okay.  You -- in the first go-around
16  in the Spokane mission you were paired with Elder
17  Ross; is that right?
18     A.  Yes.
19     Q.  Okay.
20     A.  Or -- in the Spokane mission?
21     Q.  The Spokane mission, yes.
22     A.  Oh, in my first area with my trainer?
23     Q.  Yeah.  Let me walk through it?
24     A.  Okay.
25     Q.  Who -- let's do it this way.  I'll

21 (Pages 97 to 100)

# NAEGELI
# REPORTING
C O R P O R A T I O N

**800.528.3335**
www.NaegeliReporting.com
503.227.7123 FAX

Portland, OR          Seattle, WA          Spokane, WA          Coeur d'Alene, ID
503.227.1544          206.622.3376          509.838.6000          208.667.1163
Court Reporting       Trial Presentation    Videoconferencing     Videography

10

# DRIVING CONTRACT

In exchange for the privilege of being allowed to drive or ride in a mission-owned car while serving in the Washington Spokane Mission,

I, _THOMAS     WAITE_
(PRINT NAME HERE)

agree to:

    a. Obey all mission vehicle rules.

    b. Wear a seat belt at all times while the vehicle is moving.

    c. Submit all reports on time.

    d. *Not* tamper with odometers.

    e. Use defensive driving principles.

    f. Obey all local traffic laws.

    g. Drive mission vehicles only.

    h. *Not* transport unauthorized people in the vehicle.

    i. Only use the vehicle for approved mission business within my assigned area.

Signed: _____

       Date: _8 JAN 2003_

WASHINGTON SPOKANE MISSION

1 JANUARY 2000



EXH. NO. 3 FOR ID
DATE: 10-19-06
WITNESS: T. WAITE
PATRICIA L. HUBBERT
CSR NO 340

//

# Exhibit "C"

12

# CONDENSED TRANSCRIPT

UNITED STATES DISTRICT COURT FOR THE
EASTERN DISTRICT OF WASHINGTON

THOMAS A. WAITE,                          :  No. CF-05-399-EFS
                                          :
          Plaintiff,                      :  **Videotaped Deposition of:**
                                          :
vs.                                       :  DONALD C. FOSSUM
                                          :
THE CHURCH OF JESUS CHRIST                :
OF LATTER-DAY SAINTS dba                  :
CORPORATION OF THE PRESIDING              :
BISHOP OF THE CHURCH OF                   :
JESUS CHRIST OF LATTER-DAY                :
SAINTS, a Utah corporation,              :  
dba CORPORATION OF THE                    :
PRESIDENT OF THE CHURCH OF                :
JESUS CHRIST OF LATTER-DAY                :
SAINTS, a Utah corporation;               :
DONALD C. FOSSUM; and STEVEN              :
D. BRODHEAD,                              :
                                          :
          Defendants.                     :


November 9, 2006 - 1:08 p.m.


Location:  Kirton & McConkie
          1800 Eagle Gate Tower
           60 East South Temple
        Salt Lake City, Utah  84111


Reporter:  Teri Hansen Crönenwett
Certified Realtime Reporter, Registered Merit Reporter
Notary Public in and for the State of Utah



GARCIA & LOVE
COURT REPORTING AND VIDEOGRAPHY

36 South State Street • Suite 1220 • Salt Lake City, UT 84111 • 801.538.2333 • Fax 801.538.2334

13

1     A.   That's correct.
2     Q.   How often before this time?
3     A.   I don't know.  I didn't keep track.
4     Q.   All right.  Every time you had a district meeting?
5     A.   Not every time.  It all depended on their schedule
6   and what they wanted to do and everything.
7     Q.   All right.  But you had -- had you ever carried
8   more than six in a pickup before?
9     A.   I believe so, yes.
10    Q.   All right.  And would the number more than six or
11  more than four all be in the bed of the pickup?
12    A.   It just depended on size.
13    Q.   Well, did you put anybody more than four in the cab
14  of the pickup?
15    A.   We have, but those were three smaller gentlemen.
16    Q.   Okay.  But this is the pickup you are driving now
17  in Spokane, correct?
18    A.   That's correct.
19    Q.   And how many seatbelts are in the front of the
20  Dakota that you were driving?
21    A.   I don't know.
22    Q.   Did it have bucket seats or a bench seat?
23    A.   It's a good question.
24    Q.   And again, I'm talking about your driver's seat and
25  the passenger seat.  Were those bucket seats, or was that a

                                                              41

1   to the president, and it was basically, you know, if we get
2   caught, we're going to get in trouble.  But that was about
3   it.
4     Q.   And was that before August of 2003?
5     A.   I believe so.
6     Q.   Was -- could it have been after 2003?  I mean,
7   after August of 2003?
8     A.   I believe it was before the accident.
9     Q.   Okay.  Do you know that as you sit here?
10    A.   Do I know it?  No.  That's why I said I believe.
11    Q.   Okay.  What's the basis for that belief?
12    A.   Because it wouldn't make sense for them to tell me
13  after because the pickup was nonexistent after that.
14    Q.   Okay.  So you may have had an assistant to the
15  president sometime tell you specifically you could get in
16  trouble by carrying somebody in the bed of the pickup?
17    A.   That's correct.
18    Q.   Okay.  Did you pass that information on to any one
19  of the elders who rode in the bed the pickup?
20    A.   We all knew it, sir.
21    Q.   Can you tell me, so did -- strike this.  Was
22  anybody present with you when the assistants told you that?
23    A.   I don't remember.
24    Q.   Well, can you tell me how you knew that everybody
25  knew that they weren't to ride in the bed of the pickup?

                                                              43

1   bench seat?
2     A.   I don't recall.
3     Q.   Okay.  Was it a stick or automatic?
4     A.   Automatic.
5     Q.   All right.  The back seat, do you know whether it
6   had more than two seatbelts available?
7     A.   I don't know.  I never got back there.
8     Q.   As the designated driver, what were your
9   responsibility -- any -- did you have any responsibility
10  regarding seatbelts?
11    A.   I had the responsibility to wear my own and also to
12  encourage others to wear theirs, but as 18, 19, 20-year-old
13  men, I figured that we could all be responsible for our own
14  actions.
15    Q.   And that's the way you felt when you were back in
16  June, July and August of 2003?
17    A.   They were adults, correct?
18    Q.   Well, I guess I am asking you the question, though.
19  Is that the way you felt back then?
20    A.   Yes, sir.  They were adults.  They had
21  responsibility over themselves, and they could make their
22  decision whether they wanted to wear it or not.
23    Q.   Had anybody, anyone in the mission field, advised
24  you not to carry missionaries in the bed of a pickup?
25    A.   It was mentioned once in passing from an assistant

                                                              42

1     A.   Because we all signed a document that said we would
2   wear our seatbelts.
3     Q.   And that's why they knew they weren't supposed to
4   be in the bed.  Is that what you're telling me?
5     A.   That's what I would assume.
6     Q.   Okay.  So you're telling me this was an assumption
7   on your part that everybody else knew.  Is that correct?
8     A.   They all signed a document, so I feel it's a pretty
9   safe assumption, sir.
10    Q.   I understand, but that's what you -- but you're
11  saying you assumed that they knew, correct?
12    A.   Well, I guess they did know because they signed the
13  document.  So no, I am not saying they -- I am assuming.  I
14  guess I am saying I know.
15    Q.   Okay.  So you know that they signed a document?
16    A.   That's correct.
17    Q.   Did that document indicate they would not ride in a
18  bed of a pickup?
19    A.   No.  It said they would wear their seatbelt at all
20  times when in a vehicle.
21    Q.   All right.  Let me show you what's going to be
22  marked as Exhibit 1.
23         (Deposition Exhibit No. 1 was marked.)
24    Q.   (By Mr. Nordstrom)  Do you recognize this document?
25    A.   Yes, sir.

                                                              44

*14*

1    Q.  Okay.  What's it called?

2    A.  Driving contract.

3    Q.  Would you read the first sentence for me, please.

4    A.  "In exchange for the privilege of being allowed to

5    drive or ride in a mission-owned car while serving in the

6    Washington Spokane mission."

7    Q.  Okay.  Then it says, I, and do you remember

8    printing your name there?

9    A.  Yes, sir.

10   Q.  Okay.  And at the very beginning it says

11   mission-owned car.  Is that correct?

12   A.  That's correct.

13   Q.  All right.  At any place does it say pickup?

14   A.  Nope, it doesn't.

15   Q.  Okay.  Then it changes, and under -- where -- and

16   show me where it says that you wear a seatbelt.

17   A.  That would be B.

18   Q.  Would you read that one, please.

19   A.  "Wear a seatbelt at all times while the vehicle is

20   moving."

21   Q.  Okay.  So the contract heads out starting a car,

22   correct, and then we have wear a seatbelt, right, the vehicle

23   is moving, correct?

24   A.  Yes, sir, but also I do believe that most people

25   would consider a pickup a car because we don't very often

                                                            45

1    make that distinction.

2    Q.  I will move to strike, nonresponsive on that.  Let

3    me just make sure I understand, though.  Have you ever had

4    any specific conversation with any other missionary on

5    what -- how they interpreted this document?

6    A.  No, sir.

7    Q.  And so everything you are talking about is an

8    assumption on your part regarding other missionaries riding

9    in that pickup, correct?

10   A.  That's correct.

11   VIDEOGRAPHER:  Ten minutes, Counsel.

12   Q.  (By Mr. Nordstrom) Show you what's marked -- would

13   you mark that as two?

14   (Deposition Exhibit No. 2 was marked.)

15   Q.  (By Mr. Nordstrom)  Showing you what's been marked

16   as Exhibit 2, do you ever recall seeing that document?

17   A.  What was the question again?

18   Q.  Do you recall ever seeing this document before?

19   A.  No, I don't.

20   Q.  It indicates in this document, "Missionaries should

21   always wear seatbelts and never have more people in the car

22   than there are seatbelts for."  As a designated driver, were

23   you ever given that instruction?

24   A.  Where is that?

25   Q.  It's about midway in the document.  It says:

                                                            46

1    Missionaries should.

2    A.  I believe it might have been talked about in a zone

3    meeting.

4    Q.  Okay.  Does it refer any place on that document

5    that you have looked over to pickups?

6    A.  It says driving other vehicles, so vehicle would

7    assume a pickup.  Again, vehicle.  Again, it refers to

8    vehicle down underneath both missionaries share the

9    responsibility and, again, it says, stand outside the

10   vehicle.

11   Q.  I understand.  If you could just look.  Do you see

12   any place that refers to pickups?

13   A.  Well --

14   MR. REKOFKE:  He's answering the question, so go

15   ahead and answer.

16   A.  That's -- I mean, a pickup is a vehicle, so

17   therefore, yes, it does refer to a pickup as well as a car.

18   Q.  (By Mr. Nordstrom) Does that have that language in

19   there that you have just referred to?  Doesn't it say on the

20   document -- and I just want to make sure I'm clear.  It says,

21   "Always wear seatbelts and never have more people in the car

22   than there are seatbelts."  Does it mention pickup anywhere?

23   MR. REKOFKE:  In that sentence?

24   Q.  (By Mr. Nordstrom)  In any sentence on that

25   document, does it mention pickup anywhere?

                                                            47

1    MR. REKOFKE:  Objection, asked and answered, but go

2    ahead and answer it again.

3    A.  Again, vehicle is assuming anything that moves with

4    four wheels.

5    Q.  (By Mr. Nordstrom) Just a minute.  I'll move to

6    strike as nonresponsive.  My question again is, can you see

7    the word pickup anywhere on that document, Elder

8    Ross -- I mean, Elder Fossum?

9    MR. REKOFKE:  Objection.  I think if you want to

10   ask him what he understands the document, he is telling you

11   that.  If you want him to ask, does the word pickup say that?

12   I think those are two different questions.  That's my

13   objection.

14   Q.  (By Mr. Nordstrom) Yeah.  Well, I think I asked the

15   question, do you see the word pickup referenced any place on

16   this document?

17   A.  Those specific words, no.

18   Q.  Okay.  Thank you.

19   VIDEOGRAPHER:  Five minutes, Counsel.

20   Q.  (By Mr. Nordstrom)  I just want to go over the

21   first paragraph again.  It says driving other vehicles.  Have

22   you got it there?

23   A.  Yep.

24   Q.  Second paragraph, you can only drive vehicles

25   assigned to him.  Is that the missionaries, correct?

                                                            48



# DRIVING CONTRACT

In exchange for the privilege of being allowed to drive or ride in a mission-owned car while serving in the Washington Spokane Mission,

I, _____
(PRINT NAME HERE)

agree to:

    a. Obey all mission vehicle rules.

    b. Wear a seat belt at all times while the vehicle is moving.

    c. Submit all reports on time.

    d. *Not* tamper with odometers.

    e. Use defensive driving principles.

    f. Obey all local traffic laws.

    g. Drive mission vehicles only.

    h. *Not* transport unauthorized people in the vehicle.

    i. Only use the vehicle for approved mission business within my assigned area.

Signed: _____

Date: _____

WASHINGTON SPOKANE MISSION                                    1 JANUARY 2000



DEPOSITION
EXHIBIT
FBINGAD 800-631-6989
Fossum

-16

# Exhibit "D"

)
)
)
)
)          DECLARATION OF
)          JAMES T. ROSS
)
)
)
)

I, James T. Ross, under the penalty of perjury of the laws of the State of Washington, hereby declare and state:

That I was a missionary for the Church of Jesus Christ of Latter Day Saints from May of 2002 to May of 2004 at which time I received a honorable release. I served in the Spokane, Washington mission and held the positions of Senior Companion, Trainer, District Leader, Zone Leader, and Assistant to the President.

On or about August 21, 2003 I was involved in a motor vehicle collision with six other Elders including my companion, Elder Thomas Waite. At that time I was also a Zone Leader as well as Elder Waite's Senior Companion. Elder Waite and I had been companions for approximately two weeks. That morning Elder Donald Fossum and Elder Cesar Porras, the Elders to which the 2003 Dakota pickup was assigned, picked us up for either a zone or district

DECLARATION OF JAMES T. ROSS - 1

NORDSTROM & NEES, P.S.
ATTORNEYS AT LAW
323 South Pines Road
Spokane Valley, Washington 99206
(509) 924-9800
Fax (509) 924-9923

18

meeting. We were the last Elders to be picked up and since there were already four Elders sitting inside the cab of the pickup (two in the front seat, two in the extended cab seats), Elder Waite and I climbed into the bed of the canopied pickup. I, as well as other Elders had frequently ridden in the bed of the pickup and did so to most weekly district meetings unless another ride was available. Following the meeting we stopped off at the Subway restaurant on 32nd Avenue. After lunch Elder Fossum, Elder Porras, Elder Hansen and I got into the cab of the pickup, and Elder Ryan and Elder Waite who came out of the restaurant last, climbed into the bed.

I had been in this particular area for approximately eight weeks, living at the same apartment and was familiar with the route down Adams Road and the four-way stop at the intersection of 8th Avenue. On the day of the collision I was in the front passenger seat and Elder Fossum was driving the pickup. Elders Porras and Hansen were in the back seat. I recall specifically that Elder Fossum stopped at the stop sign on Adams Road. There is a big pine tree which blocks our view to the west on 8th and I was unable to see any car approaching from that direction until we began moving forward pass the stop sign. I am not sure exactly where the pickup was in relation to the intersection but the next thing I recall is hearing the screeching of tires. I then looked and saw a vehicle traveling at a high rate of speed coming towards us down 8th Avenue. I then pointed my finger toward the speeding car to get Elder Fossum's attention and yelled "oh crap". Elder Fossum looked and saw the car coming and responded by pushing the accelerator to the floor. The next thing I knew the car hit the side of the pickup knocking us approximately 180 degrees.

After the pickup stopped I looked in the rear and saw that the canopy and both Elder Ryan and Elder Waite were missing. I exited the pickup and found both Elder Ryan and Elder Waite lying on the pavement. Elder Waite was not only unconscious but he was not breathing. He also had blood coming from his nose and ears. Elder Waite finally began to breathe and at some point in time I recall the ambulance arriving.

I do not recall any actual conversations with anyone although I know that I did talk with the other Elders. We did kneel down and say a prayer for Elder Waite and Elder Ryan and also called President Ludlow to inform him what had happened.

DECLARATION OF JAMES T. ROSS - 2

NORDSTROM & NEES, P.S.
ATTORNEYS AT LAW
323 South Pines Road
Spokane Valley, Washington 99206
(509) 924-9800
Fax (509) 924-9923

19

# Exhibit "E"

UNITED STATES JUDICIAL DISTRICT COURT

FOR THE EASTERN DISTRICT OF WASHINGTON

\* \* \*

THOMAS A. WAITE,                    )
                                    )
        Plaintiff,                  )  CIVIL NO. CV-05-399-EFS
                                    )
    vs.                             )  VIDEO DEPOSITION OF:
                                    )
THE CHURCH OF JESUS CHRIST )  MARK TYLER RYAN
OF LATTER DAY SAINTS, dba  )
CORPORATION OF THE         )
PRESIDING BISHOP OF THE    )
CHURCH OF JESUS CHRIST OF  )
LATTER DAY SAINTS, a Utah  )
corporation, dba           )
CORPORATION OF THE         )
PRESIDENT OF THE CHURCH    )
OF JESUS CHRIST OF LATTER  )
DAY SAINTS, a Utah         )
corporation; DONALD C.     )
FOSSUM; and STEVEN D.      )
BRODHEAD,                  )
                                    )
        Defendants.                 )


\* \* \*

November 10, 2006
10:11 a.m.


Offices of Kirton & McConkie
60 East South Temple, Suite 1800
Salt Lake City, Utah

\* \* \*

RENEE L. STACY
Registered Professional Reporter

21

1 stuff, but, like, it's been four and a half years
2 since I was in the MTC, and right now I don't recall
3 at the actual Missionary Training Center, but before
4 we entered in our normal mission, we were trained in
5 safety habits.
6     Q    Would this be first aid-type safety in
7 addition to other types of safety?
8     A    I really don't remember.  I really don't
9 remember.
10     Q    That brings up a good point.  In this
11 accident, did you suffer an injury?  And I'm speaking
12 of the accident that occurred where the Honda hit the
13 vehicle that was being driven by Mr. Fossum?
14     A    Was I injured?  Yes.
15     Q    And can you just tell us briefly what the
16 nature of your injuries were?
17     A    Just -- I had a major concussion, bleeding.
18 My head was bleeding.  I lost a lot of my hair.  Just
19 scratches, like, I just have -- you know, I have
20 little scars on my body.  I still have them.  They're
21 -- nothing major happened.  I was not major injured.
22 No major injuries, like no...
23     Q    At some point in time during this impact or
24 immediately after impact, were you unconscious?
25     A    Yes.

1     Q    Okay.  Your answer to that was "yes"?
2     A    Yes.
3     Q    And do you know how long you might have
4 been unconscious?
5     A    I have no clue of the time frame.  I would
6 assume under five minutes.
7     Q    When you woke up, can you tell us where you
8 were, if you remember?
9     A    I -- I recall -- I do recall, like, being
10 out of breath.  I can't tell you where I was at.  I
11 was obviously on the road.  I was crawling, and then
12 I remember passing out, and then I woke up a second
13 time and I was just -- I was on my -- the left side
14 of my face, that I remember, and my head was on the
15 curb, and kind of -- well, kind of in the grass, but
16 my body was on the curb, and I just was covered in
17 blood, and I remember Elder Hansen -- I can't
18 remember Elder -- Dillon Hansen was waving his hands
19 and trying to get me, you know, to wake up.  Other
20 than that...
21     Q    Okay.  And I'll cover a little bit more of
22 that later.  I'm wondering, do you think -- except
23 for that which you cannot remember, do you think any
24 of your memory has been affected by this particular
25 accident?  In other words, your ability to remember

1 what you did in training or what you did as a
2 missionary prior to this accident.
3     A    No.
4     Q    What is the -- and just to -- so, to put
5 this in perspective, what is the last thing you
6 remember prior to the impact of the vehicles?
7     A    Just the car -- the screeching tires.
8     Q    Okay.  So you remember that?
9     A    Yeah.
10     Q    All right.
11     A    I even remember where Elder Waite was
12 sitting, as opposed to where I was sitting, in the
13 back of the pickup truck.
14     Q    Okay.  Well --
15     A    How I was sitting.
16     Q    Since you've mentioned that, why don't you
17 tell us where you remember him sitting -- Elder Waite
18 was sitting and where you were sitting.  And this is
19 in the bed of the vehicle, correct?
20     A    Yes.  If I remember right, we were facing
21 north, and I was on the left side of the car, and I
22 was sitting against the wheel well that got hit.  My
23 arms were like this.  I just remember being spread
24 out.  And Elder Waite was to my right, facing me, and
25 his arm was on the -- his arm was on the gate, his

1 left arm was on the gate and he was leaning.
2           We were talking.  I don't recall what we
3 were talking about.
4     Q    Was the gate up?
5     A    The gate was up.  Everything -- the gate
6 was up and the window was closed.
7     Q    And the canopy was on the vehicle?
8     A    Until my head took it off, yes.
9     Q    And do you remember -- do you -- you said
10 you remember sitting in the vehicle and hearing
11 screeching tires.  Do you remember actually hitting
12 the canopy?
13     A    You know what?  I don't.  All I -- to my
14 recollection, I only remember the screeching tires.
15 The next thing I know is I'm on the side of the road.
16     Q    I take it from that particular answer that
17 you do not remember anything about the trajectory or
18 where Mr. Waite went.
19     A    No.  No.  I was not -- from what I know, I
20 wasn't conscious when it happened.
21     Q    Do you know in what manner the canopy was
22 attached or bolted down to the pickup?
23     A    It was clamped.  It had clamps on it, and
24 the clamps --
25     Q    Had you ever been involved with that

# Exhibit "F"

1 │ RICHARD C. EYMANN
Eymann Allison Hunter Jones, P.S.
2 │ 2208 West Second Avenue
Spokane, WA 99201-5417
3 │ (509) 747-0101

4 │ STEPHEN L. NORDSTROM
Nordstrom & Nees, P.S.
5 │ 323 South Pines Road
Spokane, WA 99206
6 │ (509) 924-9800

7 │ Attorneys for Plaintiff

8 │ UNITED STATES DISTRICT COURT FOR THE

9 │ EASTERN DISTRICT OF WASHINGTON

10 │ THOMAS A. WAITE,                          No. CV-05-399-EFS

11 │                          Plaintiff,      **ORDER GRANTING**
                                              **PLAINTIFF'S MOTION FOR**
12 │     vs.                                  **PARTIAL SUMMARY**
                                              **JUDGMENT RE: AFFIRMATIVE**
13 │ THE CHURCH OF JESUS CHRIST OF            **DEFENSES**
LATTER DAY SAINTS d/b/a
14 │ CORPORATION OF THE PRESIDING
BISHOP OF THE CHURCH OF JESUS
15 │ CHRIST OF LATTER DAY SAINTS, a
Utah corporation, d/b/a
16 │ CORPORATION OF THE PRESIDENT
OF THE CHURCH OF JESUS CHRIST
17 │ OF LATTER DAY SAINTS, a Utah
corporation; DONALD C. FOSSUM;
18 │ and STEVEN D. BRODHEAD,

19 │                          Defendants.

20 │       The Court, having reviewed and considered plaintiff's Motion for Partial

21 │ Summary Judgment Re: Affirmative Defenses, and good cause being shown, now,

22 │ therefore,

23 │       IT IS HEREBY ORDERED:

24 │       Plaintiff's Motion for Partial Summary Judgment Re: Affirmative Defenses is

25 │ GRANTED.

26 │
                                              **EYMANN ALLISON HUNTER JONES P.S.**
27 │ ORDER GRANTING PLAINTIFF'S MOTION FOR
PARTIAL SUMMARY JUDGMENT RE:                  2208 WEST SECOND AVENUE• SPOKANE, WA 99201-5417
28 │ AFFIRMATIVE DEFENSES - 1                  TELEPHONE: (509) 747-0101 • FAX: (509) 458-5977
(order on mot for psj re affirmative defenses.wpd)

24

1    DONE IN OPEN COURT this _____ day of _____, 2007.

2

3

4
                        _____
5                       HONORABLE EDWARD F. SHEA
                        U.S. District Court Judge
6    Presented by:

7    EYMANN ALLISON HUNTER JONES, P.S.

8
     BY:___s/Richard C. Eymann_____
9        RICHARD C. EYMANN, WSBA #7470
         Co-counsel for Plaintiff
10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26                              **EYMANN ALLISON HUNTER JONES P.S.**
                                _____
27   ORDER GRANTING PLAINTIFF'S MOTION FOR
     PARTIAL SUMMARY JUDGMENT RE:        2208 WEST SECOND AVENUE• SPOKANE, WA 99201-5417
28   AFFIRMATIVE DEFENSES - 2               TELEPHONE:  (509) 747-0101 • FAX: (509) 458-5977
     (order on mot for psj re affirmative defenses.wpd)

25