# Exhibit A

4

UNITED STATES DISTRICT COURT

FOR THE EASTERN DISTRICT OF WASHINGTON


THOMAS A. WAITE,

     Plaintiff,

vs.     No.  CV-05-399-EFS

THE CHURCH OF JESUS CHRIST OF LATTER DAY SAINTS d/b/a/

CORPORATION OF THE PRESIDING BISHOP OF THE CHURCE OF

JESUS CHRIST OF LATTER DAY SAINTS, a Utah corporation,

d/b/a/ CORPORATION OF THE PRESIDENT OF THE CHURCH OF

JESUS CHRIST OF LATTER DAY SAINTS, a Utah corporation,

et al.,

     Defendants.

_____


DEPOSITION OF THOMAS A. WAITE

Taken on Behalf of the Defendants

Tuesday, October 17, 2006

    DEPOSITION OF THOMAS A. WAITE, taken on behalf of

the Defendants, at 1500 South Raymond Avenue, Fullerton,

California, commencing at 9:18 A.M. on Tuesday, October

17, 2006, before PATRICIA L. HUBBARD, CSR #3400, a

Certified Shorthand Reporter in and for the State of

California, pursuant to Notice.

Page 88

1    Q.  Okay.  So you arrived in Spokane and
2  did the orientation, then the Church in its van    10:49AM
3  or somehow got you up to -- or, in your case,
4  down to Troy, Idaho?
5    A.  Yeah.
6    Q.  Okay.  At some point in time upon
7  your arrival -- after the missionary training    10:49AM
8  center, arrival at the Spokane mission, were you
9  asked to fill out a form called a personal
10  driving record?
11    A.  I don't remember that I had to fill
12  out --                                            10:49AM
13    Q.  Let me hand you what's been marked as
14  Exhibit 2.
15    (Whereupon the document referred
16    to was marked Defendants'
17    Exhibit-2 by the Certified
18    Shorthand Reporter and is attached
19    hereto.)
20  BY MR. REKOFKE:
21    Q.  And -- and to move this along, across
22  the top it says "Personal Driving Record"; is    10:50AM
23  that right?
24    A.  Correct.
25    Q.  It has your name?

Page 89

1    A.  Yes.
2    Q.  And at the bottom that's your    10:50AM
3  signature?
4    A.  Yes.
5    Q.  And it's dated January 8, 2003, in
6  the bottom right?
7    A.  Yes.                            10:50AM
8    Q.  Okay.  In this personal driving
9  record document it asks on the -- in the top
10  right side type of vehicles you have driven.
11    Do you see where I'm referring to?
12    A.  Uh-huh, yes.                    10:50AM
13    Q.  And I think the first thing you put
14  was four-wheel drive truck?
15    A.  Yes.
16    Q.  And what experience did you have with
17  a four-wheel drive truck prior to January 8th of    10:50AM
18  2003?
19    A.  We owned a -- well, my dad owns a
20  Toyota Land Cruiser.  So I had the opportunity to
21  run a couple errands or -- it's a manual, and I
22  never really learned how to drive a manual    10:51AM
23  transmission.  So it was just that kind of --
24    Q.  Okay.  So it wasn't a pickup truck?
25    A.  No.  The Land Cruiser wasn't a pickup

Page 90

1  truck.
2    Q.  Okay.  Did you ever have any    10:51AM
3  experience with a pickup truck before your
4  mission?
5    A.  I have had an experience with a
6  pickup truck helping somebody move.  They asked
7  me if I could drive one of the vehicles, because    10:51AM
8  there wasn't a whole lot of people that were able
9  to.
10    Some of the young men weren't old
11  enough to have a license so I accepted -- I was
12  kind of nervous to drive someone else's newer    10:51AM
13  vehicle.  But, yeah.  And it was a stick shift,
14  also.
15    Q.  So you drove a fairly new manual
16  transmission pickup truck?
17    A.  Yes.                            10:51AM
18    Q.  And when was this?
19    A.  I can't say exactly when.  I just
20  know it was before I left on my mission.
21    Q.  You were obviously in high
22  school and had your license?              10:52AM
23    A.  Yes.
24    Q.  Okay.  Did you allow anybody to ride
25  in the back of the truck?

Page 91

1    A.  No.
2    Q.  Would you ever allow anybody to ride    10:52AM
3  in the back of the truck?
4    A.  No.
5    Q.  Why not?
6    A.  Like I said, it's -- growing up here,
7  it's illegal.  And there was a lot of stuff in    10:52AM
8  the back of the truck.
9    Q.  Okay.
10    A.  Just -- yeah.  I wouldn't invite
11  anybody to do that.
12    Q.  Why not?                      10:52AM
13    A.  A law-abiding citizen, I suppose.
14  It's just --
15    Q.  Okay.  Aside from -- from it being
16  against the law, do you have an understanding
17  what the reason for the law would be just as a    10:52AM
18  layperson?
19    A.  It's obviously not the safest place
20  to be.
21    Q.  The -- in your work where you go out
22  with your uncle to do survey, does that involve a    10:53AM
23  pickup truck at all?
24    A.  No.
25    Q.  Okay.  The -- let me ask you this.



**Exhibit B**

7

UNITED STATES DISTRICT COURT

FOR THE EASTERN DISTRICT OF WASHINGTON


THOMAS A. WAITE,

          Plaintiff,

vs.       No.  CV-05-399-EFS

THE CHURCH OF JESUS CHRIST OF LATTER DAY SAINTS d/b/a/

CORPORATION OF THE PRESIDING BISHOP OF THE CHURCE OF

JESUS CHRIST OF LATTER DAY SAINTS, a Utah corporation,

d/b/a/ CORPORATION OF THE PRESIDENT OF THE CHURCH OF

JESUS CHRIST OF LATTER DAY SAINTS, a Utah corporation,

et al.,

          Defendants.

_____


DEPOSITION OF THOMAS A. WAITE

Taken on Behalf of the Defendants

Tuesday, October 17, 2006

     DEPOSITION OF THOMAS A. WAITE, taken on behalf of

the Defendants, at 1500 South Raymond Avenue, Fullerton,

California, commencing at 9:18 A.M. on Tuesday, October

17, 2006, before PATRICIA L. HUBBARD, CSR #3400, a

Certified Shorthand Reporter in and for the State of

California, pursuant to Notice.



Thomas A. Waite                                    October 17, 2006

Page 100

1     A.  Well, I know we read it, but it was
2  just kind of a routine thing.            11:01AM
3     Q.  Okay.  And that's right.  If you
4  don't have any specific recollection of that,
5  then that's a fine -- that's a fine answer.
6         It says what it says.  So I'm not --
7  I'm just curious if you had any recollection.    11:01AM
8         Okay.  Let me hand you Exhibit 3.
9         (Whereupon the document referred
10        to was marked Defendants'
11        Exhibit-3 by the Certified
12        Shorthand Reporter and is attached
13        hereto.)
14  BY MR. REKOFKE:
15     Q.  And again to move this along, that
16  across the top it says "Driving Contract."
17     A.  Uh-huh, yes.              11:01AM
18     Q.  Okay.  And is that your name printed
19  in there after the first paragraph?
20     A.  Correct.
21     Q.  And is that your signature at the
22  bottom of that?                  11:02AM
23     A.  Affirmative.
24     Q.  And it's dated January 8th of 2003?
25     A.  Yes.

Page 101

1     Q.  Okay.  And what -- under that
2  contract, why don't you go ahead and read into    11:02AM
3  the record what -- what you agreed to do.
4     A.  Okay.
5     Q.  It says, "I Thomas Waite agreed to,"
6  and then go ahead and read those?
7     A.  "Obey all mission vehicle rules; wear    11:02AM
8  a seatbelt at all times while the vehicle is
9  moving; submit all reports on time; not tamper
10  with odometers; use defensive driving principles;
11  obey all local traffic laws; drive mission
12  vehicles only; not transport unauthorized people    11:02AM
13  in the vehicle; only use the vehicle for approved
14  mission business within my assigned area."
15     Q.  Okay.  So, do you have a recollection
16  of -- of reading this and signing this on
17  January 8th?                   11:02AM
18     A.  No.
19     Q.  Okay.  You understood the rules that
20  are -- that are set forth there, though?
21     A.  I understood the rules?
22     Q.  Yeah.  You under --        11:02AM
23     A.  I understand them.
24     Q.  Okay.  You understand them now,
25  obviously?

Page 102

1     A.  Right.
2     Q.  You understood them then?    11:03AM
3     A.  I'm sure I read them, but given my
4  current situation and then myself at that time,
5  obviously not to the same degree of appreciation
6  or --
7     Q.  Okay.  Do you think it's reasonable    11:03AM
8  to have you agree to wear a seat belt at all
9  times while the vehicle was moving?
10     A.  Yes.
11     Q.  And obviously if you're in the back
12  of a truck that's moving, in the bed of the truck    11:03AM
13  there's no seat belt?
14     A.  Correct.
15     Q.  Okay.  You -- in the first go-around
16  in the Spokane mission you were paired with Elder
17  Ross; is that right?              11:04AM
18     A.  Yes.
19     Q.  Okay.
20     A.  Or -- in the Spokane mission?
21     Q.  The Spokane mission, yes.
22     A.  Oh, in my first area with my trainer?    11:04AM
23     Q.  Yeah.  Let me walk through it?
24     A.  Okay.
25     Q.  Who -- let's do it this way.  I'll

Page 103

1  let you explain it.
2         Tell me sort of who your -- are they    11:04AM
3  called companions?
4     A.  Yes.
5     Q.  Why don't you tell me from the time
6  that you finished at mission training center, you
7  know, Troy, Bonners Ferry, Spokane who -- who    11:04AM
8  your companions were?
9     A.  My first companions Elder Eric
10  Maughn.
11     Q.  Do you know how to spell that last
12  name?                        11:04AM
13     A.  M-a -- I think there's a "G" in
14  there.  I can't remember specifically.
15     Q.  Maughn?  Is that how you pronounce --
16     A.  Yeah.  And also Elder Richard Bunton.
17  His Visa was delayed.  He was supposed to serve    11:05AM
18  in the Australian mission -- or a Australian
19  mission.  He was just kind of there.
20         And then after Elder Maughn left, I
21  was paired up with an Elder Craig.  And then he
22  left, and I was paired up with an Elder Mitchell.    11:05AM
23  And then I was transferred to Bonners Ferry.
24     Q.  Okay.  Everybody we've talked about
25  so far is Troy --

# DRIVING CONTRACT

In exchange for the privilege of being allowed to drive or ride in a
mission-owned car while serving in the Washington Spokane Mission,

I, _THOMAS_ _WAITE_
(PRINT NAME HERE)

agree to:

    a. Obey all mission vehicle rules.

    b. Wear a seat belt at all times while the vehicle is moving.

    c. Submit all reports on time.

    d. *Not* tamper with odometers.

    e. Use defensive driving principles.

    f. Obey all local traffic laws.

    g. Drive mission vehicles only.

    h. *Not* transport unauthorized people in the vehicle.

    i. Only use the vehicle for approved mission business
       within my assigned area.

Signed: _(signature)_

Date: _8 JAN 2003_

WASHINGTON SPOKANE MISSION                                1 JANUARY 2000



EXH. NO. 3 FOR ID
DATE: 10-19-06
WITNESS: T. WAITE
PATRICIA L. HUBBER
CSR NO 340

10

# Exhibit C

UNITED STATES JUDICIAL DISTRICT COURT

FOR THE EASTERN DISTRICT OF WASHINGTON

* * *

THOMAS A. WAITE,                    )
                                    )
          Plaintiff,                ) CIVIL NO. CV-05-399-EFS
                                    )
     vs.                            ) VIDEO DEPOSITION OF:
                                    )
THE CHURCH OF JESUS CHRIST ) KEVIN LUDLOW
OF LATTER DAY SAINTS, dba )
CORPORATION OF THE         )
PRESIDING BISHOP OF THE    )
CHURCH OF JESUS CHRIST OF  )
LATTER DAY SAINTS, a Utah  )
corporation, dba           )
CORPORATION OF THE         )
PRESIDENT OF THE CHURCH    )
OF JESUS CHRIST OF LATTER  )
DAY SAINTS, a Utah         )
corporation; DONALD C.     )
FOSSUM; and STEVEN D.      )
BRODHEAD,                  )
                           )
          Defendants.      )

* * *

November 10, 2006
1:55 p.m.

Offices of Kirton & McConkie
60 East South Temple, Suite 1800
Salt Lake City, Utah

* * *

RENEE L. STACY
Registered Professional Reporter

12

1    A    Yes.
2    Q    When was the first time you saw this
3  document or a similar document?
4    A    I think this might have been in the red
5  book that I referred to earlier.
6    Q    That book that you weren't sure the name
7  of? You said it was red and white?
8    A    Yeah. Washington Spokane Mission Welcome
9  Book. I don't know what it was called.
10    Q    I'm going to presume that you weren't the
11  one that sat down with the elders or sisters and had
12  them sign this. Or were you?
13    A    No, I did not.
14    Q    Okay. Do you know who did?
15    A    The vehicle coordinator would have -- Elder
16  Staggs or Elder Grimsrud, whoever the vehicle
17  coordinator -- they would have had them sign. They
18  had them sign this during orientation.
19    Q    All right. And do you know --
20    A    During the first day in the mission field.
21    Q    Is there a -- any type of set dialogue he's
22  to give them regarding this document? Do you know?
23    A    Just that they would read it. Also, they
24  would view a video put out by the Church.
25    Q    Specific --

1    A    Safety guidelines for missionaries, I
2  believe, was the name.
3    Q    Specific to this document?
4    A    Oh, no, not specific. I thought you
5  said -- what was his question? Maybe read it back.
6    Q    Are you sure you haven't had your
7  deposition taken before?
8    A    I've seen it on TV.
9    Q    Okay. That's fair.
10    A    I've never had mine -- I've witnessed a
11  deposition, but I've never had mine taken.
12    Q    You've seen this document. You're not
13  sure. You think it may be -- have been in the red
14  book?
15    A    It might have been in the red book. That
16  might have been the first time I had seen it, but I
17  did see it in the mission field, because I know that
18  they used this during the day that missionaries
19  arrived in the mission field. Their first day, they
20  would see this, they would sign this, and we would
21  put it in their file.
22    Q    Okay. So this was something they saw
23  during the very first day during orientation?
24    A    Yes.
25    Q    What's -- how long does the process for

1  orientation take?
2    A    We'd typically pick missionaries up -- we
3  would leave the airport around ten o'clock. We'd get
4  to a church about 10:30, 10:45, assuming the plane
5  was on time. They would be in orientation from about
6  eleven o'clock until three, 3:30, during which time
7  they would hear from myself, the vehicle coordinator,
8  the housing coordinator, the nurse, the secretary.
9  We'd feed them.
10    Q    So that --
11    A    If they were good.
12    Q    That included a meal, and then the other
13  individuals you've talked about. How much of that
14  time was -- strike that.
15        Did you ever sit through that whole process
16  so you could see what everybody said to the elders or
17  the sisters?
18    A    I couldn't sit through it.
19    Q    All right. Even from the very -- ever at
20  any point in time did you ever sit through the full
21  orientation?
22    A    No, because I had to interview each
23  individual missionary one on one.
24    Q    Okay. So --
25    A    During that time.

1    Q    Do you know how long the --
2    A    So I was in and out of the room.
3    Q    All right. Do you know how long the
4  vehicle coordinator spent with the --
5    A    He took quite a bit of time. He took --
6    Q    You have to wait till I finish the
7  question.
8    A    Oh.
9    Q    -- how long he took with each of the
10  missionaries?
11    A    With the group, you mean?
12    Q    Do they meet as a group in orientation?
13    A    Yes, it's a group. It's the whole group.
14    Q    All right. It can be a different group
15  size each time that comes in?
16    A    Sure.
17    Q    All right. Any idea how much time he
18  spends with the group?
19    A    I would say 40 -- well, I would say 45
20  minutes to an hour.
21    Q    Do you know what he discussed with them
22  during that 45 minutes to an hour?
23    A    They -- they -- they watched the video from
24  the Church.
25    Q    Any idea how long that video is?

13

1    A   I've sat through it and watched it. You'd
2  think I would know. No, but I'm sure it says right
3  on the cover.
4    Q   Okay. So more than 20 minutes?
5    A   Probably -- I'm guessing 20 minutes.
6    Q   Okay. So that leaves about 20 additional
7  minutes for the other portion of the orientation?
8    A   Right.
9    Q   Okay. And during that portion what takes
10 place?
11   A   They would talk about the report, the
12 monthly mileage report. They'd talk about the need
13 to keep track of mileage. Each car is allowed so
14 many miles.
15   Q   How many miles?
16   A   It varied.
17   Q   Let's say it's not the assistants. Is it
18 for area -- from area to area?
19   A   Right.
20   Q   Because I noticed someplace in the -- I
21 thought it was the president's handbook -- it
22 mentioned 1,250 miles. Is that total?
23   A   That's an average. If you took an average
24 of all the vehicles, it would be 1,250 miles, but --
25   Q   For each -- for each vehicle?

1    A   That's the -- well, average per vehicle.
2    Q   Okay.
3    A   But you can assign more miles to this area
4  and fewer miles to this area.
5    Q   So Elder Skaggs, did he -- did you or he
6  assign the miles?
7        MR. REKOFKE: You mean Staggs?
8        MR. NORDSTROM: Staggs. Sorry.
9        THE WITNESS: Myself, the assistants, and
10 the vehicle coordinator would work on that and change
11 that from time to time.
12   Q   (BY MR. NORDSTROM) Okay. Do you know the
13 number of miles that Elder Fossum was allotted?
14   A   No.
15   Q   Was that information kept someplace once
16 they were said -- once they were told, "These are
17 your allotted miles," was that written down
18 someplace?
19   A   In the mission office.
20   Q   And was that material or documentation kept
21 over a -- well, let me rephrase that.
22       What format was that kept?
23   A   At that time I believe we had a little
24 spreadsheet.
25   Q   When you got on your mission on July 1st,

1  these vehicles were already out?
2    A   Right.
3    Q   And I presume the miles had already been
4  allotted.
5    A   That's true, yes.
6    Q   And that information, is that -- do you
7  know whether -- when you left the mission field
8  almost a half a year ago, was that information still
9  available?
10   A   I doubt it.
11   Q   Okay. It wasn't transferred to any
12 electronic type of data source?
13   A   Not that I know of.
14   Q   Okay. What's the purpose of having a
15 mileage limitation? I know some of this sounds
16 obvious, but --
17   A   Well, the Church -- as I stated, the
18 average was 1,250 miles per vehicle, so if you had,
19 for example, ten vehicles, those ten vehicles could
20 drive 12,500 miles. You might have an area --
21 like -- let's take Elder Fossum, for example. He
22 was -- he and his companion were Spanish-speaking
23 missionaries. They were covering a large area of
24 Spokane, therefore, they needed more miles than
25 somebody -- another set of missionaries that were

1  serving in Othello --
2    Q   Okay.
3    A   -- or on the south hill of Spokane, and so
4  you would assign based on the need, keeping in mind
5  that you had a total number of miles that you needed
6  to try and stay under.
7    Q   If you didn't stay under it, any
8  ramifications?
9    A   Yes.
10   Q   Could you elaborate?
11   A   Just, you know, probably -- you'd hear
12 about it from Church headquarters. You got to --
13   Q   You would?
14   A   Yes.
15   Q   I'm talking about the missionaries that
16 went over.
17   A   Oh, yes.
18   Q   What happened there?
19   A   I would rant and rave. No. Strike that.
20   Q   No. Leave that on, please. It's --
21   A   No. I would tell the missionaries that
22 this can't happen or they won't be driving.
23   Q   Okay.
24   A   Or we'll find them a bike area.
25   Q   Okay. All right. Let's go back to

Page 54

1    Q   So you believe that they intended to break
2  a mission rule when they got in the bed of the
3  pickup?
4        MR. REFOFKE: Objection.
5        THE WITNESS: No, I don't believe they were
6  intending to break a rule. I'm saying I believe that
7  they knew that they were breaking a rule. They were
8  great missionaries. They're good guys, intelligent
9  guys. They knew what the rules were.
10   Q   (BY MR. NORDSTROM)  But they didn't intend
11 to break one when they got in the back?
12       MR. REKOFKE: Same objection.
13       THE WITNESS: Well, intending or knowing --
14 I mean, they knew -- I'm sure they knew they were
15 breaking a rule, and I guess if you get in the -- I
16 mean, I look at "intent" and "knowing," I guess, is
17 the -- in the same sense.
18   Q   Okay. So --
19   A   I think --
20   Q   -- if one of those missionaries indicated
21 that they didn't intend to break a mission rule when
22 they got in the back, would you believe -- would you,
23 knowing these missionaries, believe that?
24   A   No. I believe that they knew they were
25 breaking a rule.

Page 55

1    Q   Okay. And that would -- and all the
2  missionaries knew that, so they would be breaking the
3  mission rules?
4    A   Because they knew they had to wear a seat
5  belt, therefore, they knew they were breaking a rule.
6    Q   And that would go for the assistants, if
7  they knew, as well?
8        MR. REKOFKE: Objection to the form. I'm
9  not sure what --
10       THE WITNESS: If the assistants knew that
11 they were --
12   Q   (BY MR. NORDSTROM)  Riding in the back.
13   A   -- riding in the back without a seat
14 belt --
15   Q   Prior to the motor vehicle collision, they
16 would be breaking mission rules as well?
17   A   If the assistant was riding in the back?
18   Q   No. If they knew. Do they have a
19 responsibility to tell you if somebody is violating a
20 mission rule?
21   A   Well, their job was to -- yeah. Their job
22 is to consult with me and let me know what's going on
23 in the mission. You know, we would talk about
24 missionaries that were happy, missionaries that were
25 struggling. We'd talk about, you know, serious --

Page 56

1  well --
2    Q   I understand. Do you know what the
3  Washington law is -- strike that.
4        Were missionaries instructed as to the law
5  in Washington during orientation?
6    A   I don't know.
7    Q   Were they instructed at any other time on
8  traffic laws in the state of Washington?
9    A   Yes, because there was a discussion both in
10 the Church video that we talked about earlier, and
11 talk about not speeding.
12   Q   I understand. Do you understand what the
13 law is as -- when you were a mission president
14 regarding seat belts in the state of Washington?
15   A   No. I can't say that I know exactly what
16 the law is. I'm assuming that you -- my best guess
17 and assumption would be that you had to wear a seat
18 belt.
19   Q   Do you know whether your -- the information
20 that you have on the Washington law was any better
21 than the information that the missionaries received
22 on traffic laws in the state of Washington?
23   A   Theirs was probably better, because they
24 sat in the orientation where some of those laws would
25 have been discussed.

Page 57

1    Q   Okay. So, other than the orientation -- is
2  that the only place that those laws were discussed,
3  as far as you know, and these videos you've
4  mentioned?
5    A   No.
6    Q   The videos, were they specific to
7  Washington law?
8    A   No, because they're put out here --
9    Q   By the Church?
10   A   -- and distributed to all missions, so they
11 wouldn't be specific to Washington law, but you -- to
12 answer your question prior to that -- you asked if
13 orientation was the only place, and it wasn't,
14 because we would always, at every zone conference,
15 have a little safety session involving one of the
16 videotapes.
17   Q   When was the first zone conference you had
18 after you arrived in the mission field?
19   A   Let's see. July 1st was a Tuesday, so it
20 would have been, I believe, July the 8th.
21   Q   Oh. So you had a zone conference right
22 away?
23   A   Yes.
24   Q   Was traffic safety any type of input given
25 at that zone conference?

*15*

1    A    Yes.
2    Q    Do you remember what that was?
3    A    We would have at every zone conference.
4  And that one in particular, what I recall is we had a
5  video, because Elder Staggs was pretty adamant about
6  making sure that we had one of those -- he had
7  informed me, when I got there, the importance -- we
8  discussed the importance -- let me go back.
9        I don't know if I learned it in the MTC in
10  Provo or if I just realized it when I got there, but
11  I realized the need to make sure that the
12  missionaries, from time to time, saw the vehicles
13  put -- safety vehicles -- safety videos put out by
14  the Church, so I decided to have it at the beginning
15  of zone conference after we had our song and our
16  prayer and introductions and announcements. We would
17  do that first and have the video, and then we would
18  have another -- then we would have another -- right
19  after lunch, Elder Staggs had been out inspecting all
20  the vehicles and so he would talk to the missionaries
21  again and generally talk about safety, because he had
22  been in the industry and he used to talk about a
23  pyramid, and I won't go into that.
24    Q    Let me just ask you a little bit about the
25  makeup of the district itself. There's a district

1  leader; is that correct?
2    A    Yes.
3    Q    And is he in charge of that district?
4    A    Well, what do you mean by "in charge"?
5    Q    What's his responsibility?
6    A    He's -- he's the -- the -- he's a district
7  leader. He's in charge of district meetings. He's
8  in charge of helping the missionaries to perform at
9  their best and to help them be happy. The zone
10  leaders are also responsible for the district, the
11  assistants are, and the mission president, you know,
12  in a sense, is responsible.
13    Q    Elder Ross was --
14    A    District leader reports to the zone leader.
15    Q    Elder Ross was a zone leader; is that
16  correct?
17    A    Elder Ross was a zone leader, and I think
18  Elder Waite was a district leader.
19    Q    Well, at the time of the motor vehicle --
20  and I think we'll get to that in a minute, but at the
21  time of the motor vehicle collision, Elder Ross was
22  a --
23    A    A zone leader.
24    Q    And Elder Ryan was a district leader?
25    A    I thought it might have been Elder Waite,

1  but maybe it was Elder Ryan. I can't recall for
2  sure.
3    Q    Let's assume the testimony by Elder Ryan
4  was that he was a district leader at the time.
5    A    Okay.
6    Q    Elder Ross was a zone leader. They were in
7  the pickup. So we had a district leader and a zone
8  leader in the pickup, with two elders riding in the
9  bed of the pickup at the time during this collision,
10  correct?
11    A    Yes.
12    Q    Elder Waite, after the collision, was gone
13  for what period of time? Do you remember?
14    A    After the collision? My best recollection,
15  he was in -- he was in the hospital for about a
16  month. It was pretty close to right around a month
17  where he was stable enough to be air ambulanced back
18  to California where he was going into rehab.
19    Q    Okay. And do you recall the date of the
20  collision?
21    A    The date?
22    Q    Yes.
23    A    I believe it was August 21st. It was a
24  Thursday.
25    Q    All right. And have you reviewed any

1  documents regarding the collision, say, in the last
2  30 days?
3    A    No.
4    Q    Okay. And do you recall when he got back
5  to the mission field?
6    A    I believe he got back at the end of
7  February of '04.
8    Q    All right. And --
9    A    End of February, 1st of March, somewhere in
10  there.
11    Q    And he was released when?
12    A    He was released in -- I want to say April
13  of '05.
14    Q    Did he serve a complete two years in the
15  mission field, physically being in the Washington
16  mission?
17    A    I believe he did, yes.
18    Q    Is that your recollection?
19    A    He fulfilled -- well, let me -- let me
20  just --
21    Q    Well, if you recall as we sit here today.
22    A    I -- as far as -- he fulfilled an honorable
23  mission, including the amount of time -- considered a
24  two-year mission. Whether it was two weeks short of
25  two years, you know, but it was -- it was -- it fit

16

# Exhibit D

17

UNITED STATES DISTRICT COURT FOR THE

EASTERN DISTRICT OF WASHINGTON

THOMAS A. WAITE,

          Plaintiff,

   vs.                No.  CV-05-399-EFS

THE CHURCH OF JESUS CHRIST OF
LATTER DAY SAINTS d/b/a
CORPORATION OF THE PRESIDING
BISHOP OF THE CHURCH OF JESUS
CHRIST OF LATTER DAY SAINTS, a
Utah corporation, d/b/a CORPORATION
OF THE PRESIDENT OF THE CHURCH OF
JESUS CHRIST OF LATTER DAY SAINTS,
a Utah corporation; DONALD C. FOSSUM;
and STEVEN D. BRODHEAD,

          Defendants.

DEPOSITION OF STEVEN D. BRODHEAD

          BE IT REMEMBERED that on the 11th day of

December 2006, at the hour of 5:08 p.m., the deposition

of STEVEN D. BRODHEAD was taken at the request of the

Plaintiff, before Caryn E. Winters, RPR, a notary public and

court reporter, Washington CCR No. 2496, Idaho CSR No. 237,

at 717 West Sprague Avenue, Suite 1200, Spokane, Washington,

pursuant to the Washington Rules of Civil Procedure.

18

Page 38

1   A  USAA.
2   Q  The insurance company that you had insurance on this
3   vehicle?
4   A  Yes.
5   Q  With about either one of the other occupants, those
6   three girls, were any of them injured?
7   A  I believe there was a settlement for Rochelle and
8   Rebecca.
9   Q  Okay.  For both of them?
10  A  But -- I believe so.  I didn't hear much about that.
11  But I know that they had to go to the doctor a couple of
12  times at least.
13  Q  Okay.  But you don't -- as you sit here today, you don't
14  know whether there was a settlement or not?
15  A  I don't know exactly what, you know, what happened with
16  that.
17  Q  Okay.  And just finally, you mentioned the public
18  defender.  Were you represented by a public defender in this
19  case?
20  A  Yes.
21  Q  And I shouldn't say finally.  I've got a couple
22  follow-up questions.  Who was that?
23  A  Now I can't remember.
24  Q  All right.
25  A  I know it's written down somewhere or in some of the

Page 39

1   records.  But I can't remember his name.
2   Q  How was that resolved?
3   A  So do you mean --
4   Q  Did you make a plea?
5   A  Yes.
6   Q  And what was the plea?
7   A  To attempted assault and reckless driving.
8   Q  Okay.  Was there anything called vehicular assault?
9   A  No.
10  Q  Okay.  So it was called reckless driving?
11  A  And attempted assault.
12  Q  And attempted assault?
13  A  Yes.
14  Q  And what was the -- any type of punishment associated
15  with that?
16  A  It was three days in jail with 362 days that I would
17  have had to serve if I broke probation violation.  You know.
18  Q  Okay.  So you had 365 days, three days served, 362
19  suspended?
20  A  Two years -- I had 30 days license suspension, two years
21  probation.  And so if I did anything against my probation I
22  would have had to serve the other 362 days.
23  Q  Okay.  Any specific terms with your suspension or with
24  your probation?  Community service, anything like that?
25  A  I had a 760 dollar fine.  That was -- that was it.  I

Page 40

1   didn't have any community service.
2   Q  Was that fine paid?
3   A  Yes.
4   Q  All right.  Let me just make sure, after the collision
5   you said -- just at the scene itself, did you talk with --
6   well, let me start all over again.
7         Do you remember the impact itself?
8   A  Yes.
9   Q  Okay.  What do you recall about the impact?
10  A  Just slamming into the back of the truck.  And I saw --
11  I can't remember if I saw both individuals, but I know I saw
12  at least one fly out of the back of the truck.
13  Q  What about the canopy on the pickup?
14  A  That flew off as well.
15  Q  All right.
16  A  I saw that fly off as well.
17  Q  Okay.  And did you go over to see anyone that was -- any
18  of the individuals that had been in the pickup?
19  A  I'd gotten out of my car right after it happened.  I was
20  really dizzy.  Just about fell over.  And I -- I just kind
21  of -- I looked around and just broke down.  I didn't know
22  what to do.
23  Q  Sure.
24  A  I called 911 and someone was already --
25  Q  Had called it?

Page 41

1   A  Called it in.
2   Q  All right.
3   A  So but besides that, I didn't know what to do.  I was
4   scared.
5   Q  Do you remember having a conversation with anyone there
6   at the scene?
7   A  Well, there was a guy that came up and started yelling
8   at me, you know, asking what -- you know, what I was
9   thinking and stuff.  And I started yelling at him.  I can't
10  remember all that I said, but something to the effect of,
11  you know, "You don't know what -- you know, how I'm feeling
12  right now" or something.  And he apologized later because he
13  realized, you know, that I was -- you know, I wasn't just
14  some punk kid just, you know, --
15  Q  When you say "apologized later," that same afternoon?
16  A  Like ten minutes later.
17  Q  Okay.  Do you recall a conversation with anyone else?
18  A  Well, Rochelle and Rebecca's mom drove over.  And she
19  was just comforting me.  I didn't -- yeah, I was just
20  crying.  I didn't have any conversations.
21  Q  All right.  Do you know who called her?
22  A  I believe -- well, it was either Rochelle or Rebecca.  I
23  think it might have been Rebecca.  I don't know.
24  Q  Did you realize there were seven Mormon missionaries in
25  that truck?

**19**

b00248aa-bc5c-4384-a384-6b19c7899e70

**Exhibit E**

20

UNITED STATES DISTRICT COURT FOR THE

EASTERN DISTRICT OF WASHINGTON

---

THOMAS A. WAITE,

         Plaintiff,

   vs.                 No.  CV-05-399-EFS

THE CHURCH OF JESUS CHRIST OF
LATTER DAY SAINTS d/b/a
CORPORATION OF THE PRESIDING
BISHOP OF THE CHURCH OF JESUS
CHRIST OF LATTER DAY SAINTS, a
Utah corporation, d/b/a CORPORATION
OF THE PRESIDENT OF THE CHURCH OF
JESUS CHRIST OF LATTER DAY SAINTS,
a Utah corporation; DONALD C. FOSSUM;
and STEVEN D. BRODHEAD,

         Defendants.

---

DEPOSITION OF STEVEN D. BRODHEAD

---

       BE IT REMEMBERED that on the 11th day of

December 2006, at the hour of 5:08 p.m., the deposition

of STEVEN D. BRODHEAD was taken at the request of the

Plaintiff, before Caryn E. Winters, RPR, a notary public and

court reporter, Washington CCR No. 2496, Idaho CSR No. 237,

at 717 West Sprague Avenue, Suite 1200, Spokane, Washington,

pursuant to the Washington Rules of Civil Procedure.

**21**

b00248aa-bc5c-4384-a384-6b19c7899e70

Page 42

1  A  Later I did.  I didn't know at the time.
2  Q  But, I mean, at the scene were you able to tell that
3  they were Mormon missionaries?
4  A  Yes, I -- once they, you know, they flew out of the
5  truck and stuff, and there was pass along cards everywhere
6  and stuff.
7  Q  Were you familiar with pass along cards?
8  A  Yes.
9  Q  All right.  Did they have their name tags on?
10  A  Yes.
11  Q  Did you see Elder Waite at any point in time after the
12  collision but still that afternoon?
13  A  After they took him to the hospital?
14  Q  No, before while he was still at the scene did you see
15  him?
16  A  I didn't see a face.  I didn't know who it was until
17  later.  But I did see missionaries, you know, that were
18  hurt.
19  Q  Okay.  You saw a body that you later knew was Elder
20  Waite laying there?
21  A  Yes.
22  Q  All right.  Can you describe for me what you saw?
23  A  From what I can remember, just two individuals, one on
24  the sidewalk and one on the grass.
25  Q  Were they both conscious?

Page 43

1  A  No, I don't think so.
2  Q  Both unconscious?
3  A  I don't know.
4  Q  All right.  And, again, just what you remember is all I
5  want.
6  A  Yeah, I didn't go over and -- you know, I -- I didn't
7  know what to do, so I just kind of --
8  Q  Do you remember talking to any of the missionaries at
9  the scene?
10  A  They -- the ones that were in the truck, they, you know,
11  were just comforting me and trying to, you know, let me know
12  that it's going to be okay.  But we didn't -- you know, no
13  conversation of the accident.
14  Q  Okay.
15  A  You know, facts or what happened.
16  Q  All right.  Any other conversations that we've missed
17  before you get into the police officer's car?
18  A  Not that I can think of.  They took me pretty quick, you
19  know, and put me in there.
20  Q  And let me just follow up with what you said, that you
21  saw Thomas Waite or Elder Waite after the collision itself
22  at some point in time.  How long after that did you see him?
23  A  I'm trying to remember when that was.  I think maybe the
24  next time that I saw him was when he returned on his
25  mission.

Page 44

1  Q  Okay.  So you didn't see him at the hospital?
2  A  No, they kind of discouraged, you know, for me to go see
3  him.
4  Q  Okay.  Who is "they"?
5  A  Brother Lasley and the mission brethren kind of -- I saw
6  Elder Ryan, Tyler Ryan, and talked to him, you know, to see
7  how he was doing and stuff and told him how sorry I was.
8  But I didn't see Thomas Waite till when he returned on his
9  mission.
10  Q  Where was it when you saw Elder Ryan?
11  A  At the hospital.
12  Q  Okay.  Was he in the hospital?
13  A  Yes.
14  Q  All right.  And so was that just within a day or so?
15  A  It was that same day.
16  Q  Same day?
17  A  (Nods head).
18  Q  All right.  Did they take you to the hospital at the
19  same -- I mean, is that why you were at the hospital
20  initially, was for treatment?
21  A  No, I denied needing treatment.
22  Q  Okay.
23  A  I was more worried about others than myself.
24  Q  All right.  That's fair.  Okay.  So where were you when
25  you saw Elder Waite when he came home or came back from

Page 45

1  California back to the mission?
2  A  Well, when I moved from Everett to Spokane I lived -- I
3  was living with my friend Randy Ross.  And --
4  Q  Okay.  Well, let's find out when that was.  When did you
5  move from Everett to Spokane?
6  A  I moved July 4th of 2004.
7  Q  2004?
8  A  Yeah.
9  Q  And you moved in with Randy Ross?
10  A  Yes.
11  Q  Was that in a home or apartment or --
12  A  A home.  I had known their family since I was two.  And
13  they had just moved to Spokane almost a year prior to me
14  moving over there.
15  Q  Okay.  What's his parents' names?
16  A  Robin and Rhonda.
17  Q  All right.  And were they members of the church?
18  A  Yes.
19  Q  And do you know what ward they were in?
20  A  I don't.
21  Q  How long did you live with them?
22  A  Four or five months.
23  Q  Okay.  That brings us to Spokane.  Then so at what point
24  in time did you meet with Thomas Waite.
25  A  He was actually assigned to their ward as a missionary.

**22**

Spokane Reporting Service    509-624-6255   office@spokanereporting.com

b00248aa-bc5c-4384-a384-6b19c7899e70