1   RICHARD C. EYMANN
    Eymann Allison Hunter Jones, P.S.
2   2208 West Second Avenue
    Spokane, WA 99201-5417
3   (509) 747-0101

4   STEPHEN L. NORDSTROM
    Nordstrom & Nees, P.S.
5   323 S. Pines Road
    Spokane, WA 99206
6   (509) 924-9800

7   Attorneys for Plaintiff

8          UNITED STATES DISTRICT COURT FOR THE

9            EASTERN DISTRICT OF WASHINGTON

| | |
|---|---|
| 10   THOMAS A. WAITE, | No. CV-05-399-EFS |
| 11              Plaintiff, | **PLAINTIFF'S IDENTIFICATION** |
| 12     vs. | **OF REBUTTAL EXPERT WITNESSES AND DISCLOSURE** |
| 13   THE CHURCH OF JESUS CHRIST OF LATTER DAY SAINTS d/b/a | **OF EXPERTS' PRELIMINARY REPORTS** |
| 14   CORPORATION OF THE PRESIDING BISHOP OF THE CHURCH OF JESUS | |
| 15   CHRIST OF LATTER DAY SAINTS, a Utah corporation, d/b/a | |
| 16   CORPORATION OF THE PRESIDENT OF THE CHURCH OF JESUS CHRIST | |
| 17   OF LATTER DAY SAINTS, a Utah corporation; DONALD C. FOSSUM; | |
| 18   and STEVEN D. BRODHEAD, | |
| 19              Defendants. | |

20       Plaintiff, by and through his undersigned attorneys, hereby submits the

21   following identification of rebuttal expert witnesses and disclosure of experts'

22   preliminary reports:

23

24

25

26                   **EYMANN ALLISON HUNTER JONES P.S.**

27   PLAINTIFF'S IDENTIFICATION OF REBUTTAL     2208 WEST SECOND AVENUE• SPOKANE, WA 99201-5417
    EXPERT WITNESSES...-1           TELEPHONE: (509) 747-0101 • FAX: (509) 458-5977
28   (Plaintiff's Identification of Rebuttal Expert Witnesses.wpd)

1.   Richard T. Gill, Ph.D., CHFP, CXLT
     President and Chief Scientist
     Applied Cognitive Sciences
     2104 W. Riverside Avenue
     Spokane, WA 99201

     Dr. Gill is an expert in human factors, accident reconstruction, mechanical engineering, safety engineering and risk management. He is expected to testify in rebuttal to Matthew D. Mecham, M.S., Scott Kimbrough, Ph.D., Donald Fossum and LDS Church authorities including Kevin Ludlow and Ronald Funk. Dr. Gill is available for his deposition within 30 days after the depositions of defense experts Matthew D. Mecham, M.S., P.E. and Scott Kimbrough, Ph.D., P.E., and prior to the discovery cut-off of May 11, 2007. Dr. Gill's preliminary expert report, CV and case listings are attached as Exhibit "A."

     Plaintiff reserves the right to supplement these disclosures listed above as discovery is ongoing.

     DATED this 14th day of March, 2007.

                              EYMANN ALLISON HUNTER JONES, P.S.


                              BY   s/ Richard C. Eymann
                                   RICHARD C. EYMANN, WSBA #7470
                                   Co-counsel for Plaintiff

                              NORDSTROM & NEES, P.S.


                              BY   Telephonically approved 3/14/07
                                   STEPHEN L. NORDSTROM, WSBA #11267
                                   Co-counsel for Plaintiff

PLAINTIFF'S IDENTIFICATION OF REBUTTAL
EXPERT WITNESSES...-2
(Plaintiff's Identification of Rebuttal Expert Witnesses.wpd)

**EYMANN ALLISON HUNTER JONES P.S.**

2208 WEST SECOND AVENUE• SPOKANE, WA 99201-5417
TELEPHONE: (509) 747-0101 • FAX: (509) 458-5977

## CERTIFICATE OF SERVICE

I, RICHARD C. EYMANN, hereby certify that on the 14th day of March, 2007, I electronically filed the foregoing with the Clerk of the Court using the CM/ECF System which will send notification of such filing to the following participants:

Brian T. Rekofke
Witherspoon Kelley Davenport & Toole
1100 U.S. Bank Building
422 W. Riverside Avenue
Spokane, WA 99201

Andrew C. Smythe
Paine Hamblen Coffin Brooke & Miller
717 W. Sprague Avenue, Suite 1200
Spokane, WA 99201

_s/Richard C. Eymann_
**RICHARD C. EYMANN**

PLAINTIFF'S IDENTIFICATION OF REBUTTAL
EXPERT WITNESSES...-3
(Plaintiff's Identification of Rebuttal Expert Witnesses.wpd)

**EYMANN ALLISON HUNTER JONES P.S.**

2208 WEST SECOND AVENUE• SPOKANE, WA 99201-5417
TELEPHONE: (509) 747-0101 • FAX: (509) 458-5977

# Exhibit "A"

4



March 13, 2007

Steve Nordstrom
c/o Nordstrom and Nees
323 South Pines
Spokane, Washington  99206

**Re: Waite vs. Brodhead, LDS, et al**

Dear Mr. Nordstrom:

I have reviewed the initial file material your office provided me in the above referenced matter.  In addition, I also inspected the site of the incident wherein I took a variety of measurements and photographs that were relevant to understanding the underlying causes of this collision.  It is my understanding that the scope of my analysis is to provide rebuttal testimony to the analysis and opinions expressed in the two MRA Forensic Sciences' reports written by Mr. Mechum and Dr. Kimbrough.  The purpose of this letter is to summarize my findings and opinions to date.

## BACKGROUND

The subject collision occurred at the intersection of 8th Avenue and South Adams Road in Spokane Valley on August 21, 2003 at approximately 2:10 PM.  Mr. Brodhead was driving a 1988 Honda Accord eastbound on 8th Avenue, which is a two-lane asphalt road with a 35 MPH speed limit.  At approximately the same time Mr. Fossum was driving a 2003 Dakota pick-up, with two passengers riding in the bed of the pick-up, northbound on South Adams Road, which is a lesser two-lane asphalt road with a 25 MPH speed limit.  The intersection is a 4-way stop controlled by stop signs in each direction of travel.

Mr. Brodhead was approaching the intersection at a high rate of speed (i.e. approximately 65-70 MPH vis-à-vis eyewitness testimony and various accident reconstructionists) when his passengers alerted him to the upcoming stop sign at the intersection with South Adams Road.  Mr. Brodhead reacted by locking up the brakes and skidding approximately 260 feet before the ultimate point of impact (POI).  During this same general time frame in which Mr. Brodhead had initiated his perception/reaction and started skidding, Mr. Fossum had pulled up to the stop sign on northbound South Adams Road.  Mr. Fossum testified that he looked left (i.e. to the west or in the direction of Mr. Brodhead's vehicle), saw no vehicles, then looked right and proceeded to cross the intersection.

Given Mr. Brodhead's excessive speed he was unable to stop his vehicle short of the intersection; consequently, he collided with the driver's side rear quarter panel of the Dakota pick-up driven by Mr. Fossum as it proceeded through the intersection.  As a

5

result of the collision, the Dakota spun around approximately 180 degrees counter clockwise ejecting both occupants riding in the bed of the pick-up. Mr. Waite, one of these occupants, was seriously injured.

## ACCIDENT RECONSTRUCTION

Based on the reconstruction work of the police who investigated the collision, the work of Mr. Hunter, and Mr. Mechum I have assumed the following data from which all of my reconstruction calculations are based:
1. Length of skids from Mr. Brodhead's vehicle was 260 feet;
2. Initial speed of Mr. Brodhead's vehicle at beginning of skid was 68 MPH;
3. Effective coefficient of friction was 0.48 (i.e. due to reduced braking efficiency).

In addition, I assumed that Mr. Fossum came to a complete stop at the intersection and then accelerated forward at a uniform rate between 0.2 g and 0.25 g (i.e. typical acceleration rate for a passenger vehicle that is not in a hurry). I also assumed Mr. Fossum pulled his vehicle up close to the prolongation line of 8th Avenue so as to afford himself a minimally obstructed and/or reasonable view of eastbound traffic on 8th Avenue (i.e. as any reasonable and prudent driver would do). As such, Mr. Fossum's vehicle would have traveled approximately 20 to 25 feet from where it was stopped to the POI.

It is noted that there was no stop bar nor crosswalk markings painted on the roadway at the time of this collision. Also, as noted in the police report and photos there was a large evergreen tree along the south side of eastbound 8th Avenue just over 60 feet to the west of the intersection. As a driver **approached** the intersection on northbound South Adams Road (i.e. such as Mr. Fossum) this tree would partially obstruct the vision of eastbound traffic on 8th Avenue (i.e. the direction that Mr. Brodhead was traveling). However it is emphasized that a northbound driver on South Adams Road could have and should have pulled up far enough to obtain a proper view looking westward on 8th Avenue, in which case the evergreen would not obstruct the view of eastbound traffic on 8th Avenue.

Based on the foregoing numbers I then computed the possible range of values for the location of Mr. Brodhead's Honda Accord at the time Mr. Fossum initiated his movement into the intersection. In addition, I also computed the length of time Mr. Brodhead's Honda Accord had been sliding before Mr. Fossum initiated his movement into the intersection. In summary, Mr. Brodhead's Honda Accord would have been between 126 feet and 178 feet west of the POI, and would have been sliding for 0.85 to 1.43 seconds at the point in time that Mr. Fossum initiated his motion into the intersection.

## MR. BRODHEAD'S CUES AND BEHAVIOR

As noted above, Mr. Brodhead was traveling at approximately 65 to 70 MPH in a 35 MPH speed limit zone. For several blocks preceding the POI Mr. Brodhead would have been traveling through a residential area, one with relatively small lots and houses on both sides. In addition, the roadway was relatively narrow (i.e. 10 foot lanes), with no fog lines or shoulder lines, and no paved shoulder. In short, there was a plethora of cues that should have alerted Mr. Brodhead or any other reasonably prudent driver that the



proper speed for the roadway would have been approximately 35 MPH; it would have been self evident that a speed of 65 to 70 MPH would have been far in excess of the speed limit. In short, Mr. Brodhead's excessive speed was an underlying root cause of this collision.

As noted above, Mr. Brodhead skidded for 260 feet before the POI; he braked in response to a verbal warning from a passenger that he was approaching a stop sign. Assuming a standard 1.5 second perception reaction time for the passenger to perceive and begin to react to the stop sign (i.e. verbalize a warning), the duration of the verbal warning, and a 1.5 second perception reaction time for Mr. Brodhead, that would mean that Mr. Brodhead's passenger first began to detect the stop sign at least 3 seconds before Mr. Brodhead's skid marks. At a speed of 70 MPH (i.e. 103 feet/sec), that would mean Mr. Brodhead's vehicle would have been 309 feet from the beginning of his skid marks, or approximately 569 feet from the stop sign on South Adams Road when the passenger first observed the stop sign. Even if one assumes a very rapid perception reaction time of only 1 second for Mr. Brodhead and his passenger, that would mean that Mr. Brodhead was approximately 466 feet to the west of the stop sign on South Adams Road when his passenger first detected the stop sign.

These data are important in that they clearly demonstrate that the available line of sight between the stop sign at South Adams Road for east bound traffic on 8th Avenue is over 450 feet. To further illustrate this point, consider Figure 1, which is a photograph taken by the police shortly after the collision facing eastbound on 8th Avenue. Notice the large evergreen to the right of the stop sign for the South Adams Road intersection. This is the tree that partially occludes the view of eastbound 8th Avenue for a driver as a northbound driver on South Adams Road **approaches** the intersection; but it is of no consequence once the driver pulls all the way up to the intersection so as to obtain a proper view of traffic.



**Figure 1. Photograph Looking Eastbound on 8th Avenue Taken Approximately 225 Feet West of the POI.**

Several important to points should be noted in this photograph. Notice the bottom of the stop sign (i.e. approximately 82 ¾ inches high) is significantly higher than the top of the police car. This is important in that, if a vehicle northbound on South Adams Road stopped at the intersection, the driver's eye view looking westward down 8th Avenue would be lower than the bottom of the stop sign. Also notice that the stop sign is well off to the right side of 8th Avenue (approximately 86 inches to the right of the edge of the roadway), as evidenced by over ½ of the police car fitting between the shoulder of the roadway and the stop sign post; in other words a vehicle stopped on northbound South Adams Road could stop such that the driver's eye could be as far north as the stop sign without the vehicle penetrating the eastbound lane of 8th Avenue.

To further illustrate these points, consider Figures 2, 3, and 4, also taken by the police shortly after the accident. All photographs were taken facing eastbound on 8th Avenue; Figure 2 was taken approximately 458 feet from the POI, while Figures 3 and 4 were taken approximately 625 feet and 668 feet, respectively, from the POI. Figures 1 through 4, combined, clearly demonstrate that if a vehicle that is northbound on South Adams Road, and pulls up so as to obtain a proper view of eastbound traffic on 8th Avenue, both drivers will have an unimpeded view of each other's vehicles from well over 650 feet.



**Figure 2. Photograph Looking Eastbound on 8th Avenue Taken Approximately 458 Feet to the West of the POI.**



**Figure 3. Photograph Looking Eastbound on 8th Avenue Taken Approximately 625 Feet to the West of the POI.**



**Figure 4. Photograph Looking Eastbound on 8th Avenue Taken Approximately 668 Feet to the West of the POI.**

## MR. FOSSUM CUE'S AND BEHAVIOR

Mr. Fossum testified that when he pulled up to the intersection with 8th Avenue, he looked left and did not see any vehicle in sight; he then claims to have looked right and began his motion thru the intersection without ever looking back to the left. Such behavior violates the basic safe driving principle of look left, right, and then left before proceeding. More importantly, had Mr. Fossum been reasonably attentive to his driving task, had he pulled up to where he had a proper and safe view of the eastbound traffic on 8th Avenue, he would have seen Mr. Brodhead's vehicle skidding towards the intersection at a high rate of speed.

For example, Figure 5 is a photograph taken by the police shortly after the collision looking westward down 8th Avenue. Based on my photogrammetric analysis at the scene, I determined that the photographer that took this photograph was standing approximately 18 feet to the south of the southern edge of 8th Avenue. In other words, if Mr. Fossum had pulled the front of his vehicle up to the southernmost edge of 8th Avenue, this is the general view that would have been afforded to someone standing at the **rear** of his vehicle. Obviously, as the driver was seated over 10 feet forward or north of this perspective, he would have been able to see much further to the west down 8th Avenue.



**Figure 5. Photograph Looking to the West Taken 16 Feet from 8th Avenue.**

Notice the large shadow across the eastbound lane of 8th Avenue just before the view of the lane is occluded by the large evergreen. Figure 6 is a photograph taken showing the same general perspective as Figure 5, only in Figure 6 the photographer was standing approximately 6 ½ feet back or to the south of the southern most edge of 8th Avenue (i.e.

/ O

the northern most location for a driver such as Mr. Fossum who was traveling northbound on South Adams Road without entering 8th Avenue. There are two important features to notice in Figure 6; the unimpeded view looking westward down 8th Avenue and the same tree shadow seen in Figure 5. The importance of this shadow can be seen by reviewing Figure 7.



**Figure 6. Photograph Looking to the West Taken 6.5 Feet from 8th Avenue.**

Referring back to the photograph in Figure 1 which was taken by the police shortly after the collision, it shows a close-up of the same tree shadow discussed in Figures 5 and 6 above; this photograph was taken looking in an easterly direction along 8th Avenue. Upon careful examination of this photograph, notice the rectangular patch in the roadway. I was able to locate this same patch at the time of my site inspection; the centerline of the patch is 200 feet to the west of the POI.

In other words, this patch is within the field of view of the photograph shown in Figure 5; a photograph taken from approximately the location of the **rear** of Mr. Fossum's vehicle had he pulled up to the intersection so as to obtain a safe view of the eastbound traffic on 8th Avenue. The point to be made is that it is unequivocal that even if Mr. Fossum had pulled up and stopped well short of the intersection with 8th Avenue, he still could have easily seen well over 200 feet to the west along 8th Avenue. Yet as noted in the reconstruction section previously, when Mr. Fossum first began to pull out onto 8th Avenue, Mr. Brodhead was skidding only 126 feet to no more than 178 feet to the west of the POI. Despite Mr. Fossum's testimony, the physical evidence clearly demonstrates that Mr. Brodhead's vehicle was clearly in sight at the time Mr. Fossum began to pull out into Mr. Brodhead's path of travel.

## MR. WAITE'S BEHAVIOR

Although both of Mr. Waite's mission presidents, as well as Donald Fossum, indicate that Mr. Waite knew or was aware that he should not be riding in the bed of the pickup, such testimony is grossly inconsistent with the preponderance of the evidence in this matter.

Mr. Waite was new to the Spokane District; he had only been there 1 - 2 weeks prior to this collision. From the time of his arrival in the District, as well as before, it had been the practice of the missionaries within the District to ride in the bed of the pickup. It is noteworthy that these missionaries included his own companion, Mr. Ross who was a Zone Leader and ranking authority within the District. Equally compelling is the fact that Mr. Ryan, his District Leader, was in the bed of the pickup with Mr. Waite at the time of the collision. Neither of these leaders, nor any of the missionaries including the designated driver (i.e. Mr. Fossum), gave any indication that riding in the bed of the pickup was anything but appropriate. As such, any potential concerns Mr. Waite may have had regarding riding in the bed of the pickup would have been masked or overridden by a "transference of authority" to the senior members of his group.

## REBUTTAL OF MR. MECHUM

At the heart of Mr. Mechum's analysis and reconstruction is the underlying assumption that when Mr. Fossum pulled up and stopped at the intersection with 8th Avenue, his view was limited to no more than 120 feet to the west down 8th Avenue. However, Mr. Mechum offers no evidence to support this underlying assumption. In fact, as evidenced by the foregoing discussion and photographs, such an underlying assumption is patently false; hence, any subsequent calculations and analyses based on such an unfounded assumption are invalid.

It is noted that if Mr. Fossum had stopped well short of the intersection with 8th Avenue, his view may well have been only 120 feet. For example, consider the photograph in Figure 6 taken approximately 6.5 south of the intersection, which shows that if Mr. Fossum had stopped in approximately this location his view would have been over 650 feet to the west. Alternatively, as shown in Figure 5, if Mr. Fossum had needlessly and carelessly stopped that far back from the intersection, (i.e. 18 feet back) his view to the west down 8th Avenue would have been just over 200 feet. The point to be made is that one can "artificially" arrive at the 120 foot restricted view as postulated by Mr. Mechum, by having Mr. Fossum stop even further to the south of the intersection than 18 feet.

However, such driving behavior in and of itself is not reasonable and prudent and is unnecessarily dangerous. After all, no reasonable and prudent driver would pull up to a stop sign and then proceed without first verifying that it is safe to enter the intersection. It is precisely this reason that Mr. Fossum testified that he first stopped and then looked both left and right before proceeding. If one assumes for the sake of argument that Mr. Fossum stopped so far short of the intersection that his vision was

restricted to only 120 feet, then clearly, he should have pulled forward so as to afford himself a better view.

Mr. Mechum also opines that just because Mr. Brodhead could see the front of Mr. Fossum's truck at the stop sign that does not mean that Mr. Fossum could have seen Mr. Brodhead's vehicle. While in theory this **could** be true, Figures 1 thru 4 clearly demonstrate that had Mr. Fossum pulled up to the intersection so as to afford himself a safe and reasonable view of eastbound 8th Avenue, he could and should have easily seen Mr. Brodhead's vehicle.

Lastly, Mr. Mechum comments that Mr. Brodhead need only rotate his head approximately 10 degrees so as to bring Mr. Fossum's vehicle within his field of vision, while Mr. Fossum needed to rotate his head approximately 80 degrees to bring Mr. Brodhead's vehicle within his field of vision. Such commentary is not only irrelevant, it is misleading. When a vehicle pulls up to a stop sign at a right angle intersection, it is incumbent on the driver to "look both ways"; that is, look 90 degrees to the left, and 90 degrees to the right; and then 90 degrees back to the right before proceeding. The mere fact that Mr. Fossum had to rotate his head further than Mr. Brodhead for each to detect the presence of the other is totally irrelevant. The only issues that are important is whether or not Mr. Fossum should have done so and could have done so; clearly the answer is an unequivocal yes to both.

## REBUTTAL OF DR. KIMBROUGH

In his report Dr. Kimbrough appears to adopt Mr. Mechum's reconstruction; hence all of the criticisms of Mr. Mechum's analysis and subsequent opinions are applicable to Dr. Kimbrough. In addition, Dr. Kimbrough is critical of Mr. Hunter's opinion that Mr. Fossum should have been able to perceive the hazard created by Mr. Brodhead's vehicle before he pulled out onto 8th Avenue; more specifically, Dr. Kimbrough opines that there is no evidence that Mr. Fossum could have estimated Mr. Brodhead's speed.

Similar to Mr. Mechum, Dr. Kimbrough's opinion is irrelevant and misleading. There is no need or reason for Mr. Fossum to estimate Mr. Brodhead's speed; rather, all Mr. Fossum need do is make a determination if it is safe to pull out from the stop sign on South Adams Road. To do so, Mr. Fossum must first determine if there is an oncoming vehicle, which clearly, by his own testimony he failed to do when Mr. Brodhead was clearly within his field of vision. Once a vehicle such as Mr. Brodhead's is detected approaching the intersection, the next task a driver such as Mr. Fossum must perform is to determine if such a vehicle creates a potential hazard. This does not require a precise determination or estimation of the speed of the oncoming vehicle; rather all that is required is that Mr. Fossum perform a standard "gap acceptance" task.

That is, to view the oncoming vehicle long enough to estimate the closing time, which is a combination of the estimated speed and distance; if the combination of distance and speed is such that an impending collision is not likely, then it is considered safe to proceed. This is a task drivers are required to do many, many times almost every

time they drive (i.e., crossing a road, merging with traffic, and so forth). If Mr. Fossum had pulled up and stopped at a proper and safe location, if he had properly looked left, right, and left, he would have seen a vehicle approximately 126 to 178 feet to the west, bearing down on him in excess of 60 MPH; in fact, since Mr. Brodhead's car would have been skidding for approximately a second, likely more, Mr. Fossum most likely would have observed smoke emanating from the front tires (i.e. the only ones locked up).

Dr. Kimbrough also opines that unless Mr. Fossum knew that Mr. Brodhead was traveling at an extreme velocity, it would not appear to be a potential threat. Here again, I respectfully but strongly disagree with Dr. Kimbrough's assertion. It is a basic principle of safe driving that when pulling up to a stop sign any and all reasonable and prudent drivers should verify that it is safe to proceed before proceeding. As such, once an oncoming vehicle is perceived then the driver should observe the behavior of the vehicle long enough such that they can reasonably conclude (i.e. based on their gap acceptance experience) that it is safe to proceed. Given the facts of this case, had Mr. Fossum perceived the presence of Mr. Brodhead's vehicle, as he should have, then it would have been quite evident, as discussed above (i.e. distance, speed, smoke, etc) that Mr. Brodhead's vehicle was not likely to stop short of the intersection (i.e. the speed of impact was approximately 30 to 35 MPH).

Lastly, Dr. Kimbrough opines that to be inattentive, a driver must fail to react to a stimuli strong enough to be likely to attract attention. Yet again, I respectfully but strongly disagree with Dr. Kimbrough's assertion. I know of no scientific basis for such an assertion; in fact, it is contrary to basic human factors principles. For example, assume a driver pulls up to a stop sign where the opposing road is a 4 lane, 60 MPH highway. If the driver fails to look either left or right, there may well be no vehicle within his/her field of vision; as such, there would be no stimuli to attract the driver's attention (i.e. the 60 MPH cross traffic could be well outside their field of view). Yet, if such a driver stopped and then proceeded across the highway without **actively searching out more information, cues, or stimuli,** the consequences could be catastrophic. The point to be made is that an attentive driver must do more than simply respond to things that "attract" their attention, they must constantly "seek" out relevant driving information; clearly, Mr. Fossum failed to do so.

## CONCLUSIONS

In summary there were two underlying root causes to this collision. Mr. Brodhead created an unsafe condition by traveling at an excessive rate of speed and thereby being unable to stop at a properly posted stop sign. However, Mr. Fossum could have and should have avoided this collision. This did not require any extraordinary driving skills or vigilance on behalf of Mr. Fossum. Rather, to the contrary, it only required that Mr. Fossum have been a reasonable and prudent driver; had he been so, Mr. Fossum would have detected Mr. Brodhead's vehicle bearing down on the intersection, at a high rate of speed relative to its distance, most likely with smoking tires, and elected not to pull into its path. As such, Mr. Fossum's failure to drive in a

14

reasonable and attentive manner was another underlying root cause of this collision and Mr. Waite's subsequent injuries.

Please let me know if you have any questions or if I can be of any further assistance. I look forward to continuing to work with you on this matter.

Sincerely,

Richard Gill, Ph.D., CHFP, CXLT
President and Chief Scientist

15

Richard Thomas Gill
2104 West Riverside
Spokane, WA 99201
Phone/Fax: (509) 624-3714
Email: RickGill.ACS@Verizon.Net

**LICENSE:**

Board of Certification in Professional Ergonomics
Certified Human Factors Professional, 1994-present
License Number 0526, 1994

International Safety Academy
Certified XL Tribometrist
License Number A2002-0272

**EDUCATION:**

University of Illinois
Ph.D. in Mechanical Engineering, 1982
Area of Specialization: Human Factors

Wright State University, 1978
M.S. in Systems Engineering
Area of Specialization: Human Factors

Massachusetts Institute of Technology
1 year Graduate Study in Electrical Engineering, 1973

Wright State University
B.S. in Systems Engineering, 1972

**ACADEMIC EXPERIENCE:**

*Professor of Mechanical Engineering at the University of Idaho (1995-2002):* Teaching responsibilities include human factors, math modeling, mechanics, and statistics. Additional responsibilities include appointment as an adjunct professor in the Department of Psychology and Director of Idaho Space Grant Consortium.

*Associate Professor of Mechanical Engineering at the University of Idaho (1990-1995):* Teaching responsibilities include human factors, math modeling, mechanics, and statistics. Additional responsibilities include appointment as an adjunct professor in the Department of Psychology and Director of Idaho Space Grant Consortium.

/16

**ACADEMIC EXPERIENCE: (Continued)**

*Assistant Dean for the College of Engineering at the University of Idaho (1989-1990):* Administrative responsibilities included the overall administration of the Engineering Science curriculum, coordinating statewide off-campus programs, managing engineering cooperative education programs, and recruiting new students. Position also included teaching and research responsibilities.

*Assistant Professor of Mechanical Engineering at the University of Idaho (1987-1988):* This tenure track appointment was 65% Mechanical Engineering and 35% Engineering Sciences. Teaching responsibilities included math modeling, mechanics, statistics, and course development in human factors. Additional responsibilities included a position as an adjunct professor in the Department of Psychology to assist in the development of an interdisciplinary research laboratory and graduate program in human factors.

*Assistant Professor of Engineering Science at the University of Idaho (1984-1987):* This tenure track appointment was 50% in the Engineering Science Department and 50% in the Mathematics and Applied Statistics Department. Teaching responsibilities included courses in engineering mechanics, applied probability and statistics, and developing a course in human factors in engineering design. Additional responsibilities included helping staff the Statistical Consulting Center.

*Assistant Professor of Engineering at Wright State University (1980-1984):* Served as Program Director for the Human Factors Engineering Program. Teaching responsibilities included engineering statics, engineering dynamics, human factors engineering, senior seminar, and systems approach to human factors. Also held a joint appointment with the WSU School of Professional Psychology where the primary responsibility was to assist in the development of a Doctor of Psychology degree in Human Factors.

*Tutor for the State of Ohio (1978):* Worked as a personal tutor for individual college students being rehabilitated from mental illnesses.

*Student Tutor (1969-1972):* Worked as a tutor for Wright University, Dean of Students Office. Tutored courses in Mathematics and Physics.

**PROFESSIONAL EXPERIENCE:**

*Engineering Consultant for Applied Cognitive Sciences (1983-Present):* I have worked as an expert witness, for both the plaintiff and defense, on over 1000 legal cases nationwide. I have been qualified as an expert in human factors, accident reconstruction, mechanical engineering, safety engineering, and risk management. Work has also included contracts from U.S. government agencies (USAF Aeromedical Research Laboratory and Idaho National Engineering Laboratory) as well as private industry (Arvin Industries, The Vendo Corporation, Key Tronic Corporation, Port Townsend Paper, and Hewlett Packard).

**PROFESSIONAL EXPERIENCE: (Continued)**

*Research Scientist for the USAF Office of Scientific Research (1983):* This was an appointment at the USAF Aeromedical Research Laboratory. The work focused on assessing the relationship between acceleration-stress and pilot workload. In addition, I also worked on a project concerning the effects of high-onset rates of acceleration on pilot performance.

*Graduate Research Assistant at the University of Illinois (1978-1981):* Responsibilities included the conception and formulation of various research projects in the fields of Engineering Psychology and Mechanical Engineering.

*Human Factors Engineer for the United States Air Force Human Resources Laboratory (1976-1978):* Worked concurrently in two major fields: (1) visual simulation and (2) motion and force simulation. This included conducting in-house research as well as serving as program manager for externally conducted research.

*Electronics Engineer for the United States Air Force Foreign Technology Division (1974-1976):* Position required a Top Secret security clearance. The work involved the selection and analysis of intelligence data to predict foreign military trends and capabilities.

*Process Control Engineer for Industrial Nucleonics Corporation (1973-1974):* Worked on the development of an infra-red moisture gauge to allow real-time computer control for tobacco dryers. Responsibilities included the development of a calibration technique and system installation at an operational site.

*Computer Operator for Synergy, Inc. (1970-1972):* Operated a CDC 6600 Computer at Wright Patterson Air Force Base while attending undergraduate school.

**HONORS AND AWARDS:**

University of Idaho College of Engineering Outstanding Academic Advisor, 1998.

University of Idaho College of Engineering Outstanding Senior Faculty, 1996.

University of Idaho Alumni Award for Excellence, 1994.

American Society for Engineering Education Centennial Certificate Awardee, 1993.

Best Paper Award from American Society for Engineering Education Regional Conference, 1991.

ASUI Outstanding Faculty Award, 1991.

University of Idaho Alumni Award for Excellence, 1988.

**HONORS AND AWARDS: (Continued)**

Recipient of the New Engineering Educator Excellence Award from American Society for Engineering Education, 1987.

Recipient of the Dow Outstanding Young Faculty Award from the American Society for Engineering Education, 1986.

Selected as an S.C.E.E.E. fellow for the Air Force Office of Scientific Research Summer Faculty Research Program, 1983.

Graduated first in class at the University of Illinois (GPA 5.0 out of 5.0), 1981.

Member of Tau Beta Pi National Engineering Honor Society, 1979.

Recipient of the "Science and Engineering Career Motivation Award" which is given annually by the Dayton Board of Education, 1978.

Graduated first in class at Wright State University (GPA 4.0 out of 4.0), 1978.

Awarded National Science Foundation Traineeship to Massachusetts Institute of Technology, 1972.

Graduated first in class at Wright State University, summa cum laude (GPA 3.9 out of 4.0), 1972.

W.S.U. Foundation Scholarship, 1972.

W.S.U. Foundation Scholarship, 1971.

Golding Award (Outstanding Junior Engineer) at Wright State University, 1971.

**PUBLICATIONS:**

Gill, R., and Gordon, S. Cognitive Task Analysis. In C. Zsambok and G. Kline (Eds.), Naturalistic Decision Making, pp. 131-140, Lawrence Erlbaum Associates, 1997.

Gill, R. Towards Protection from Cumulative Trauma Disorder Litigation. Advances in Industrial Ergonomics and Safety VII, Taylor and Francis, Ltd., 1996.

Gill, R., Gordon, S., McGehee, D., and Dean, S. Integrating Cursor Control into the computer Keyboard. In Human Factors Perspectives on Human-Computer Interaction: Selections from Human Factors and Ergonomics Society Annual Meeting Proceedings, 1983-1994, Human Factors Society, 1995.

Gill, R., Gordon, S., and Babbitt, B. Embedding Intelligent Tutoring into Real Time Simulation. Proceedings of the Eighth Symposium on Aviation Psychology, 1995.

**PUBLICATIONS: (Continued)**

Babbitt, B., Bell, H., Crane, P., Sorensen, H., Gordon, S., and Gill, R. Intelligent Tutoring System: F-16 Flight Simulation. <u>Proceedings of the 1994 American Institute of Aeronautics and Astronautics (AIAA) Computing in Aerospace Conference</u>, 1994.

Gill, R.  A Comprehensive Evaluation of Warning Label Design.  In K. Laughery, M. Wogalter, and S. Young (Eds.), <u>Human Factors Perspectives on Warnings</u>, pp. 50-52, Human Factors and Ergonomics Society, 1994.

Gill, R., and Gordon, S. Conceptual Graph Analysis: A Tool for Curriculum Development, Instructional Design, and Trainee Evaluation. <u>Proceedings of the 1993 Interservice/Industry Training Systems and Education Conference</u>, pp. 861-870.

Gordon, S. E., Schmierer, K. A., and Gill, R. T. Conceptual Graph Analysis: Knowledge Acquisition for Instructional System Design. <u>Human Factors</u>, 35, pp. 459-482, 1993.

Gordon, S. E., and Gill, R.T. Knowledge Acquisition with Question Probes and Conceptual Graph Structures. In T. Lauer, E. Peacock, and A. Graesser (Eds.), <u>Questions and Information Systems</u>, pp. 29-46. Hillsdale, N J: Lawrence Erlbaum Associates, 1992.

Gill, R, Gordon, S., McGehee, D., and Dean, S. Integrating Cursor Control into the Computer Keyboard. <u>Proceedings of the Human Factors Society's 35th Annual Meeting</u>, Vol. 1, pp. 256-260, 1991.

Gill, R., Dingus, T. Human Factors and Engineering Design High School Summer Workshop. <u>Proceedings of the Human Factors Society's 34 Annual Meeting</u>, Vol. 1, pp. 522-524, 1990.

Dingus, T., Gordon, S., and Gill, R. A New Program for the Remote Training of Human Factors Professionals. <u>Proceedings of the Human Factors Society's 34 Annual Meeting</u>, Vol. 1, pp. 534-536, 1990.

Gill, R., and Stauffer, L. Developing Appropriate Evaluation Criteria for Assessing the Value Added by Mechanical Engineering Education Programs. <u>Proceedings of the 1989 American Society for Engineering Education Annual Conference</u>, Vol. 3, pp. 1263-1265, 1989.

Gordon, S., and Gill, R. Question Probes: A Structured Method for Eliciting Declarative Knowledge. <u>AI Applications in Natural Resource Management</u>, Vol. 3, pp. 13-20, 1989.

Gill, R. Mail-order Errors: The Role of Human Factors. <u>Dickinson's PSAO</u>, Vol. 3, No. 12, pp. 6-7, Dec. 1988.

Christensen, J., Topmiller, D. and Gill, R. Human Factors Definitions Revisited. <u>Human Factors Bulletin</u>, pp. 7-8, Oct. 1988.



**PUBLICATIONS: (Continued)**

Dingus, T., Hyde, R., Hyde, T., Frame, M. and Gill, R. The Speed and Accuracy of a Spatial Communication Task as a Function of Operator Location. Proceedings of the 21 st Annual Meeting of the Human Factors Association of Canada.

Gill, R., Gordon, S., Moore, J. and Barbera, C. The Role of Knowledge Structures in Problem Solving. Proceedings of the 1988 American Society for Engineering Education Annual Conference, Vol. 2, pp. 583-90, 1988.

Junker, A., Levison, B. and Gill, R. A Systems Engineering Based Methodology for Analyzing Human Electrocortical Responses. AFAMRL Technical Report AAMRL-TR-87-030, May 1987.

Gill, R., Barbera, C. and Precht, T. A Comparative Evaluation of Warning Label Designs. Proceedings of the Human Factors Society's 31 st Annual Meeting, Vol. 1, pp. 476-78, 1987.

Gordon, S., Gill, R., and Dingus, T. Designing for the User: The Role of Human Factors in Expert System Development. Artificial Intelligence Applications in Natural Resource Management, Vol. 1, No. 1, pp. 35-46, 1987.

Gill, R. The Need for Human Factors in the Design of Expert Systems. Proceedings of the 1987 Frontiers in Education Conference, 1987.

Gill, R., and Dingus, T. A Structural Approach to Teaching Relative Motion. Proceedings of the 1987 American Society for Engineering Education Annual Conference, Vol. 4, pp. 1806-08, 1987.

Barbera, C. and Gill, R. Human Factors in Warning Label Design. Proceedings of Interface 1987.

Gill, R., Kenner, K. and Junker, A. Steady State EEG as A Measure of Peripheral Light Loss. Proceedings of the Human Factors Society's 30th Annual Meeting, Vol. 2, pp. 1249-52, 1986.

Kenner, K, Junker, A. and Gill, R. Visual Evoked Response in the Periphery, The Beginnings of an Objective Measure of G-Induced PLL. Proceedings of the National Aerospace and Electronics Conference, Vol. 3, pp. 909-12, May 1986.

Gill, R., and Albery, W. The Effects of Acceleration Stress on Human Workload and Manual Control. Proceedings of the 21st Annual NASA Conference on Manual Control, 1985.

Albery, W., Ward, S. and Gill, R. Effects of Acceleration Stress on Human Workload. AFAMRL Technical Report AAMRL-TR-85-039, 1985.

21

**PUBLICATIONS: (Continued)**

Gill, R., and Gordon, S. The Effectiveness of Group Projects in Teaching Engineering Mechanics. Proceedings of the 1984 American Society for Engineering Education, 5(5), pp. 27-33, 1984.

Gill, R., Obleski, M. Gordon, S. and Albery, W. The Effects of Acceleration on Cognitive Processing. Proceedings of Mid-Central Ergonomics/Human Factors Conference, April 1984.

Gill, R. Pilot Workload and G-Stress: A Potential Interaction? USAF Summer Faculty Research Program - Final Reports. Published by Southeastern Center for Electrical Engineering Education, December 1983.

Pierce, B., Obleski, M. and Gill, R. Human Factors in Aerospace: A Student Chapter Project. Human Factors Bulletin, April 1983.

Gill, R., and Wickens, C. Operator Workload as a Function of the System State. Proceedings of the 18th Annual NASA Conference on Manual Control, 1982.

Gill, R., Wickens, C., Reid, R. and Donchin, E. Pseudo-Quickening: A New Display Technique for Manual Control of Higher Order Systems. Proceedings of the Human Factors Society's 26th Annual Meeting, 1982.

Gill, R., Wickens, C., Donchin, E. and Reid, R. The Internal Model as a Means of Analyzing Human Performance. Proceedings of the 1982 I.EE.E. International Conference on Systems, Man and Cybernetics, 1982.

Hull, J., Gill, R. and Roscoe, S. Locus of Stimulus to Visual Accommodation: Where in the World, or Where in the Eye? Human Factors, 24, pp. 311-19, 1982.

Wickens, D., Gill, R., Kramer, A., Ross, W. and Donchin, E. The Cognitive Demands of Second Order Manual Control: Applications of the Event-Related Brain Potential. Proceedings of the 17th Annual NASA Conference on Manual Control, NASA TM, 1981.

Ritchie, M., Gill, R. and Jankowski, R. The Education and Placement of Human Factors Engineers. Proceedings of the North Central Section, American Society for Engineering Education, Dayton, OH, pp. 82-87, April 1981.

Albery, W., and Gill, R. Development and Validation of Drive Concepts for an Advanced G-Cueing System. Proceedings of the 1978 American Institute of Aeronautics and Astronautics, 1978.

**PRESENTATIONS:**

Gill, R. Electronic Billboards: Safety and Social Issues. Invited presentation to the Snohomish City Council Meeting, May 2005.

Gill, R. Human Factors in Accident Reconstruction. Invited address to the 20th Annual Special Problems in Traffic Crash Reconstruction at IPTM, Jacksonville, Florida, April, 2002.

Gill, R. Human Factors Expert Witness. American Board of Trial Advocates Meeting, Waikiki, Hawaii, November 2000.

Gill, R. Industrial Funding Support for K-12 Programs. Panel discussant for the Annual Meeting of Space Grant Directors, April 1997.

Gill, R. Human Factors in Forensic Investigations. Invited address at Society of Forensic Engineers and Scientists Meeting, August 1996.

Barnes, T., Hodge, J., and Gill, R. Design and Fabrication of an Integrated Cystic Fibrosis Treatment System. Presented at the 1996 Idaho Academy of Science Meeting.

Gill, R. Technology and Its Impact on Society. Invited address at the Fourteenth Annual International Exchange Conference, Lewis-Clark State College, October 1994.

Gill, R., and Lewis, V. Towards Improved College Teaching: A Preliminary Report. Presented at the American Society for Engineering Education Pacific Northwest Section Annual Regional Meeting, April 1992.

Elger, D., and Gill, Modeling the Problem Solving Process Used by an Expert. Presented at the American Society for Engineering Education Pacific Northwest Section Annual Regional Meeting, April 1992.

Gill, R. High School Summer Workshops: An Effective Recruitment Technique. Presented at the American Society for Engineering Education Pacific Northwest Section Annual Regional Meeting, April 1991.

Elger, D., and Gill, R. A Goal for Engineering Education: The Ideal Engineer. Presented at the American Society for Engineering Education Pacific Northwest Section Annual Regional Meeting, April 1991.

Carson, B., and Gill, R. The Human Factors Element in Engineering Design. Presented at the 1989 Idaho Academy of Science.

Simon, A., Imthurn, J., Polillo, S. and Gill, R. The Role of Human Factors in Engineering Design: A Case Study of an Industrial Paper Winder. Presented at the 1987 Idaho Academy of Science.

23

## PRESENTATIONS: (Continued)

Gill, R. The Role of Human Factors in Operator Workstation Design. Invited Presentation at the 1986 PCAPPA.

Gill, R., and Mau, C. The Feasibility of Using EEG to Measure Peripheral Light Loss. Presented at the Annual Western Psychological Association Meeting, 1986.

Gill, R., Ward, S. and Albery, W. The Comparison of Subjective and Objective Workload Measures for Humans Under Acceleration Stress. Presented at the 1984 National Aerospace and Electronics Conference, May 1984.

Gordon, S., & Gill, R. A New Technique for Assessing Cognitive Processing Capabilities. Presented at the Annual Meeting of the Ohio Academy of Science, April 1984.

Richard, M., Rice, S. and Gill, R. The Improvement of a Ballistics Test Range Control Panel Via Human Factors Engineering. Presented at the Annual Meeting of the Ohio Academy of Science, April 1984.

Peters, R., Gill, D., Pasquini, L. and Gill, R. Human Factors Critique and Redesign of a Jet Engine Control Panel. Presented at the Annual Meeting of the Ohio Academy of Science, April 1984.

Gill, R. Improved Quickened Displays. Presented at the Annual Meeting of the Ohio Academy of Science, April 1983.

Julien, J., Click, A., Sanders, S., Scandura, L. and Gill, R. Human Factors Critique and Design of a Hydraulic Systems Test Stand. Presented at the Annual Meeting of the Ohio Academy of Science, April 1983.

Ingle, D., Dabney, G., Scherty, K. Beckett, T. and Gill, R. A Human Factors Critique of an Industrial Sewer Cleaner. Presented at the Annual Meeting of the Ohio Academy of Science, April 1983.

Gill, R. The Role of Human Factors at Three Mile Island. Invited presentation by the Southern Ohio Chapter of the Human Factors Society, October 1982.

Gill, R. Human Factors in Education. Invited presentation by the Dayton Chapter of the I.E.E.E., October 1980.

Gill, R., Ross, T. and Albery, W. An Advanced Acceleration Simulation Device for the Flight Simulators. Presented at the Dayton-Cincinnati AIAA  Mini-Symposium, 1978.

## PROFESSIONAL ACTIVITIES:

Member of Human Factors and Ergonomics Society
Member of American Society for Testing and Materials
Member of American Academy of Forensic Sciences
Member of Illuminating Engineering Society of North America



**GRANTS AND CONTRACTS:**

Safety Analysis of Electronic Billboards, City of Snohomish, 2005

Evaluation of Warning Label Designs, American Fun Kart Association, 2002.

Idaho Space Grant Consortium, NASA, $260,000, Assistant Director, 2001.

Idaho Space Grant Consortium, NASA, $260,000, Assistant Director, 2000.

Transforming Engineering Consulting into Engineering Case Studies, University of Idaho, $35,000, Sabbatical, 1999-2000.

Idaho Space Grant Consortium, NASA, $256,500, Director, 1999.

NASA Experimental Program to Stimulate Competitive Research, $225,000, State-wide Director, 1999.

Idaho Space Grant Consortium, NASA, $256,000, Director, 1998.

Idaho Space Grant Consortium, NASA, $255,000, Director, 1998.

Idaho Total Engineering Challenge, Lockheed Martin Aerospace Corporation, $5,000, Principal investigator, 1997.

Idaho Space Grant Consortium, NASA, $255,000, Director, 1997.

Idaho Space Grant Consortium, NASA, $230,000, Director, 1996.

Summer Institute for Engineering Educators on Curriculum Design and Implementation for Interactive Teaching/Learning, University of Idaho Office of Teaching Enhancement, $2,500, Co-principal investigator, 1995.

Idaho Space Grant Consortium, NASA, $230,000, Director, 1995.

Evaluation of an F-16 Intelligent Tutoring System, Northrop Corporation, $37,600, Co-principal investigator, 1994.

JETS Workshop, US Department of Energy, $1,400, Co-principal investigator, 1993.

Workstation and Hand Tool Design for Disk Drive Assembly, Hewlett Packard, $5,000, Co-principal investigator, 1993.

Analysis of a Disk Drive Arm Assembly Line Process, Hewlett Packard, $2,000, Co-principal investigator, 1992.

Multimedia for Enhanced Undergraduate Education, University of Idaho Office of Academic Affairs and IBM, $81,000, Co-principal investigator, 1991.



**GRANTS AND CONTRACTS: (Continued)**

JETS Summer Workshop, US Department of Energy, $9,000, Co-investigator, 1991.

Analysis of a Paper Winder Safety Gate, Port Townsend Paper, $2,500, Co-principal investigator, 1991.

Keymouse Configuration and Design, Key Tronic Corporation, $6,700, Co-principal investigator, 1990.

Keymouse Usability, Key Tronic Corporation, $18,900, Co-principal investigator, 1990.

JETS Summer Workshop, US Department of Energy, $9,000, Principal investigator, 1990.

Mapping Knowledge in Declarative and Procedural Structures, Idaho State Board of Education, $35,000, Co-principal investigator, 1990.

JETS Summer Workshop, US Department of Energy, $22,000, Principal investigator, 1990.

A Program to Test and Evaluate Equipment for the Disabled, University of Idaho Research Office, $7,000, Co-principal investigator, 1989.

Research Experience for Undergraduates, National Science Foundation, $4,000, Co-principal investigator, 1989.

Stressor Interaction Assessment, Boeing Military Aircraft Corporation, $21,600, Co-principal investigator, 1989.

Design and Evaluation of a Vending Machine Retrofit System, The Vendo Company, $20,400, Principal investigator, 1988.

A Structural Technique for Evaluating Design Tools, National Science Foundation, $60,000, Co-author and consultant, 1988.

Formations and Use of Conceptual Structures in Problem Solving Domains, Air Force Office of Scientific Research, $79,200, Co-principal investigator, 1988.

Software Interface Design for Asynchronous Computer Conferencing, EG&G of Idaho, $12,800, Co-principal investigator, 1987.

Techniques for Augmenting the Communication of Spatial Information, Boeing Military Aircraft Company, $15,000, Co-principal investigator, 1987.

Evaluation of Warning Label Effectiveness, Arvin Industries, $1,400, principal investigator, 1986.

**GRANTS AND CONTRACTS: (Continued)**

A Structured Approach for Developing an Effective Teaching Methodology for Problem Solving: A Case Study, American Society for Engineering Education, $1,500, principal investigator, 1986.

The Development of an Innovative Technique for Using Personal Computers to Aid in Teaching Deaf People to Speak, University of Idaho Seed Grant, $3,300, principal investigator, 1986.

The Development of a Steady State EEG Measure of Acceleration Induced Peripheral Light Loss, United States Air Force Aerospace Medical Research Laboratory, Human Engineering Division, $7,100, principal investigator, 1985.

The Feasibility of Using Electroencephalograms to Measure Acceleration Stress, United States Air Force Aerospace Medical Research Laboratory, Human Engineering Division, $14,000, principal investigator, 1984.

The Effects of Acceleration Stress on Cognitive Workload, United States Air Force Aerospace Medical Research Laboratory, Biomechanics Division, $35,000, principal investigator, 1984.



**Applied Cognitive Sciences**

Human Factors
Engineering

A CONSULTING GROUP

### Sworn Testimony for Richard Gill, Ph.D., CHFP, CXLT
### As of March 3, 2007

**2007:**
Trials:

1. Demello vs. State of Hawaii; Honolulu, Hawaii (State)
   Via Preservation Deposition
2. Herbert vs. State of Hawaii; Honolulu, Hawaii (State)
   Via Preservation Deposition
3. Findlay vs. Anderson Cattle Company Restaurant; Vancouver, Washington (State)
   Via Preservation Deposition
4. Jones vs. State of Hawaii; Honolulu, Hawaii (State)
5. Dickman vs. Budget Rental, et al.; Spokane, Washington (State)
6. Clark vs. Sharley-Hubbard; Spokane, Washington (State)
7. Stamey et al, vs. Big Mountain Resort, et al.; Kalispell, Montana (Federal)
   Via Preservation Deposition

Depositions/Arbitrations:
1. Pearl vs. Fred Meyer Stores; Seattle, Washington
2. LeMaster et al. vs. Arrow Metal, et al.; Seattle, Washington
3. Sanders vs. Fairmont Orchid; Kona, Hawaii
4. Holler vs. Hilton; Honolulu, Hawaii
5. Tani vs. Healy Tibbits, et al.; Honolulu, Hawaii (Arbitration)
6. Perez vs. Sack N' Save; Honolulu, Hawaii
7. Sampio vs. State of Hawaii; Honolulu, Hawaii (Arbitration)
8. Peters vs. Smith Construction; Helena, Montana
9. Powell, et al. vs. City and County of Honolulu; Honolulu, Hawaii

**2006:**
Trials:
1. Hokland vs. City and County of Honolulu; Honolulu, Hawaii,
   Via Preservation Deposition (State)
2. Papadopoulos vs. Fred Meyer Stores; Seattle, Washington,
   Via Preservation Deposition (Federal)
3. Thornton vs. Spooner Farms; Seattle, Washington,
   Via Preservation Deposition (State)

---

28

4. Camanse vs. Padre; Honolulu Hawaii
   Via Preservation Deposition (State)
5. State vs. Elder; Honolulu, Hawaii (State)
6. Steigman vs. Outrigger Properties; Honolulu, Hawaii
   Via Preservation Deposition (State)
7. Kelly vs. Foodland; Honolulu, Hawaii (State)
   Via Preservation Deposition (State)
8. Birdwell, et al. vs. AMTRAC, et al.; Philadelphia, Pennsylvania (Federal)
9. Robins vs. PACCAR, et al.; Lexington, Kentucky
10. Nelson vs. Stellar Sea, et al.; Seattle, Washington
    Via Preservation Deposition (Federal)
11. Harouff vs. Life Church; Dallas, Oregon (State)
12. Clark vs. Harding; Spokane, Washington (State)

Depositions/Arbitrations:
1. Romero vs. Lowe, et al; Kailua, Hawaii
2. Sanchez vs. Tsunami's; Waianae, Hawaii
3. Sisneros vs. UPRR; Hana, Wyoming
4. Pelzel vs. Pacific County et al.; Gray's Harbor, Washington
5. Bocatija vs. Cabras Marine; Hagåtña, Guam
6. Boos et al. vs. Chicago Pneumatic; Seattle, Washington
7. Lee vs. Royal Orchid et al.; Hagåtña, Guam
8. Lindall vs. Hawaiian Waters Adventure Park; Honolulu, Hawaii
9. Stankewich vs. City and County of Honolulu; Honolulu, Hawaii (Arbitration)
10. Remmick vs. Daisy; Billings, Montana
11. Brooks vs. City of Washougal, et al.; Washougal, Washington
12. Boltron vs. St. Francis Medical Center; Honolulu, Hawaii
13. Scrimshaw vs. Stewart; Kona, Hawaii (Arbitration)
14. Nolan vs. Kaanapali Beach Hotel; Kaanapali, Maui (Arbitration)
15. Bright vs. Brown; Spokane, Washington
16. Caldetera vs. Accu-Cut, et al.; Honolulu, Hawaii
17. Teranishi vs. New Casino; Honolulu, Hawaii
18. Heydon vs. City and County of Honolulu; Honolulu, Hawaii
19. Lonczak vs. County of Maui; Wailuku, Maui (Records Deposition)
20. Keehu vs. Players, et al.; Honolulu, Hawaii (Records Deposition)
21. Paglinawan vs. Schuler Homes, et al.; Honolulu, Hawaii
22. Le vs. Kealani, et al.; Wailea, Maui
23. Robins vs. Wayne Engineering, et al.; Lexington, Kentucky
24. Espinoza vs. Risenmay Farms, et al.; Rexburg, Idaho
25. Dickman vs. Budget Rent A Car; Spokane, Washington
26. Sewell vs. Viper Motors; Spokane, Washington
27. Yogi vs. Stearns Airport Equipment, et al.; Honolulu, Hawaii
28. Lewis vs. Mossholders Furniture; Casper, Wyoming
29. Baccus vs. Ameripride; Idaho Falls, Idaho
30. Kelley vs. Foodland; Honolulu, Hawaii
31. Bishop vs. Marriott; Wailuku, Hawaii (Records Deposition)
32. Babayan vs. Wal-Mart; Wailuku, Hawaii (Records Deposition)

33. Bright vs. Brown; Spokane, Washington
34. Maxwell vs. Jerome County; Jerome, Idaho
35. Megison vs. GM, et al.; San Jose, California
36. Carlton vs. BG Consultants, et al.; Hutchinson, Kansas
37. Andrade vs. Flores, et al.; Hilo, Hawaii
38. Warren vs. Kleenco; Honolulu, Hawaii
39. Ringer vs. County of Hawaii; Kona, Hawaii
40. Shimose vs. Apolo, et al.; Honolulu, Hawaii
41. Malott vs. Marriott, Honolulu, Hawaii
42. Pang vs. Yamaha, et al.; Kona, Hawaii
43. Salvini vs. Ski Lifts, Inc.; Seattle, Washington
44. Demello vs. State; Honolulu, Hawaii (Arbitration)
45. Seitz vs. New Holland Equipment, et al.; San Francisco, California
46. Herbert vs. State of Hawaii; Honolulu, Hawaii (Arbitration)
47. Porter vs. Stark; Seattle, Washington

**2005:**
Trials:
1. Juarez vs. Frias; San Francisco, California via Preservation Deposition (State)
2. State of Idaho vs. Marek; Sandpoint, Idaho (State)
3. Dubac-Tyler vs. Hyatt Corp; Kaanapali, Maui (State)
4. Rukavina, et al. vs. Crane Plumbing, et al.; Challis, Idaho (State)
5. Rabissa vs. Costco; Kona, Hawaii (State)
6. Haggard vs. Parma Furniture; Nampa, Idaho (State)

Depositions/Arbitrations:
1. Kim vs. Savard, et al.; St. Johnsbury, Vermont (Volume 1)
2. Cormier vs. Gold's Gym, et al., Boise, Idaho
3. Cross vs. Takenaka Landscaping, et al.; Makakilo, Oahu
4. Li and Wang vs. Sea Life Park; Honolulu, Hawaii
5. Rabissa vs. Costco; Kona, Hawaii (Volume II)
6. Erickson vs. Badger Building Center; Bonners Ferry, Idaho
7. Kim vs. Savard, et al.; St. Johnsbury, Vermont (Volume II)
8. Harris vs. Union Pacific Railroad; Seattle, Washington
9. Juarez vs. Frias; San Francisco, California
10. Horsley vs. Hilton Hotel Corp; Seattle, Washington
11. Dubac-Tyler vs. Hyatt Corp; Kaanapali, Maui
12. Bacani vs. State of Hawaii, et al.; Honolulu, Hawaii
13. Kanei vs. Daiei; Honolulu, Hawaii
14. Stevens vs. Robert Bosch Tool Corporation; Twin Falls, Idaho
15. Young vs. Holiday Inn; Hagåtña, Guam
16. Anthony vs. Alexander & Baldwin, Inc., et al.; Kahalui, Maui (Records)
17. Anthony vs. Alexander & Baldwin, Inc., et al.; Kahalui, Maui
18. Baker vs. Flying J; Casper, Wyoming
19. Abiley vs. State of Hawaii; (Arbitration); Honolulu, Hawaii
20. Sales vs. Self-Help Housing; Honolulu, Hawaii
21. Rukavina, et al. vs. Crane Plumbing, et al.; Challis, Idaho

30

22. Hart vs. Hoist, et al.; Bonners Ferry, Idaho
23. LeMaster vs. BNSF; Billings, Montana
24. Dunivent vs. UPRR; Cheyenne, Wyoming
25. Glaberson vs. A & B Properties; Kahului, Hawaii (Records Depo)
26. Newman vs. Milacron, et al.; Bozeman, Montana (Volumes 1 and 2)
27. Glaberson vs. A & B Properties; Kahului, Hawaii
28. McKay vs. Smith; Spokane, Washington; (Arbitration)
29. Schultz vs. Ellensburg Cement Products, et al.; Seattle, Washington
30. Scholz vs. Zip Truck Lines, et al.; Spokane, Washington
31. Nyquist vs. Farmers, et al.; Great Falls, Montana (Arbitration)
32. Hernadez vs. Lematic; Honolulu, Hawaii
33. Abiley vs. State of Hawaii; Honolulu, Hawaii
34. Dison vs. Vaagen Brothers Lumber; Colville, Washington
35. Harvey vs. Payne Properties; Spokane, Washington
36. Mallot vs. Marriott; Ko'Olina, Oahu (Records Deposition)
37. Stewart vs. Violich, et al.; Kailua, Hawaii
38. Hytrek vs. Albertsons; Casper, Wyoming
39. Hedge vs. Redmond Heavy Hauling; Tacoma, Washington

**2004:**
Trials:
1.  Twenge vs. Fred Meyers, et al.; Portland, Oregon (State)
2.  Tyler vs. Petsmart, et al.; Spokane, Washington (State)
3.  Lewis vs. Tribune Publishing Company, et al.; Colfax Washington (State)
4.  Fowler vs. Fred Meyers; Portland, Oregon (State)
5.  Richardson vs. State of Montana; Butte, Montana (State)
6.  Wendt vs. USA; Honolulu, Hawaii (Federal)
7.  Parris vs. State of Washington, et al.; Spokane, Washington (State)
8.  Miller vs. Ostler; Moses Lake, Washington (State)
9.  Kelley vs. County of Maui, et al.; Wailuku, Maui (State)

Depositions/Arbitrations:
1.  Robinson vs. State of Montana; Butte, Montana
2.  Lewis vs. Colfax Masonic Corp.; Colfax, Washington
3.  Rabisa vs. Costco; Kona, Hawaii
4.  Kitchens vs. Outrigger, et al.; Waikiki, Hawaii
5.  Ishii vs. Island Colony Condominiums; Waikiki, Hawaii
6.  Cadman vs. City and County of Honolulu; Honolulu, Hawaii
7.  Castillo vs. A & A Electric; Honolulu, Hawaii
8.  Lyons vs. Smith's Food and Drug; Casper, Wyoming
9.  Johnson vs. Manco, et al.; Modesto, California
10. Benoy vs. Jacobson; Coeur d'Alene, Idaho
11. Rabisa vs. Costco; Kona, Hawaii (Arbitration)
12. Lawlor vs. Naeole, et al.; Honolulu, Hawaii
13. Carter vs. City of Spokane; Spokane, Washington
14. Kahikina vs. Hilo Terrace Apartments AOAO, et al.; Hilo, Hawaii
15. Moniz vs. Barland, et al.; Honolulu, Hawaii

16. Zelinski vs. BNSF; Portland, Oregon
17. Hopkin vs. BNSF; Greybull, Wyoming
18. Schroder vs. Arby's; Spokane, Washington
19. Vuittonet vs. Hayes Lemmerz International, et al.; Boise, Idaho
20. Gapero vs. Pacific Shores AOAO, et al.; Kihe, Maui
21. Ibara vs. Aloha Tower Management Company, et al.; Honolulu, Hawaii
22. Baker vs. Totally Titanium Inc.; Waikiki, Hawaii
23. Jenner vs. Bargain Giant; Spokane, Washington
24. Milward vs. Vandervert; Spokane, Washington
25. Baker vs. Totally Titanium Inc.; Waikiki, Hawaii (Arbitration)
26. Frahm vs. Alamo Rental Car; Las Vegas, Nevada
27. Mathews vs. Harrington; Spokane, Washington
28. Cuthbert vs. JB's Family Restaurant; Coeur d'Alene, Idaho
29. Kelley vs. County of Maui, et al.; Wailuku, Maui
30. Kappel vs. Kea Lani, et al.; Wailea, Maui
31. Cross vs. Takanaka Landscaping, et al.; Makakilo, Hawaii (Arbitration)
32. Sharp vs. Best; Cheney, Washington
33. Meador vs. Chipman & Taylor, et al.; Pullman, Washington
34. Miyamoto vs. Hawaiian Electric Company, et al.; Honolulu, Hawaii (Vol 1 & 2)
35. Hayes vs. Union Pacific Railroad, et al.; Rupert, Idaho
36. Reaves vs. Rowe; Kennewick, Washington

**2003:**
Trials:
1. George vs. Diamond Parking, Inc., et al.; Honolulu Hawaii (State)
2. Slack vs. Kelleher; Caldwell, Idaho (State)
3. Sinclair vs. BNSF; Great Falls, Montana (State)
4. Barnedo vs. Dominguez; Honolulu, Hawaii (State)
5. Lewis vs. State of Hawaii; Honolulu, Hawaii (State)
6. Gouveia vs. 24 Hour Fitness; Honolulu, Hawaii (State)
7. Fenwick vs. Watabe, et al.; Hagåtña, Guam
8. Gipson vs. Yoke's Pac & Save; Spokane, Washington (State)
9. England vs. Swinerton; San Francisco, California (State)

Depositions/Arbitrations:
1. Vuillemot vs. Wailuna Recreation Association; Honolulu, Hawaii (Arbitration)
2. King vs. Cottrell; Spokane, Washington
3. Lewis vs. State of Hawaii; Honolulu, Hawaii
4. Easterday vs. Leeward Auto Recycling; Honolulu, Hawaii
5. Weathers vs. 24 Hour Fitness; Boise, Idaho
6. Prior vs. Columbus McKinnon Corporation; Lewiston, Idaho
7. Pettit, et al. vs. Friendly Ford, et al.; Las Vegas, Nevada
8. Sinclair vs. BNSF; Billings, Montana
9. Burkey vs. Premier Chemicals, et al; Pocatello, Idaho
10. Figaroa vs. State of Hawaii; Lihue, Hawaii
11. Sherwood, et al. vs. Williams & Associates, et al.; Honolulu, Hawaii (Vol 1-2)

12. Borges vs. County of Hawaii; Hilo, Hawaii (Arbitration)
13. Johnson vs. K.C. Charles, et al.; Spokane, Washington (Volume 1-2)
14. Bishop vs. Union Pacific Railroad; Cheyenne, Wyoming (Volume 1-2)
15. Van Dinter vs. Nason; Spokane, Washington
16. Olson vs. Johnson; Post Falls, Idaho
17. Schmit vs. Vandouris; Spokane, Washington
18. Martin vs. State of Hawaii, et al.; Waimanalo, Hawaii
19. Himmelmann vs. Taroc; Honolulu, Hawaii
20. Olson vs. BNSF; Cheyenne, Wyoming
21. Gomez, et al. vs. IBM, et al.; San Jose, California (Volumes 1-6)
22. Kubinski vs. UPRR; Salt Lake City, Utah (Volume 1-2)
23. Broadfoot vs. Watco; Colfax, Washington
24. Berry vs. Hotel of Marianas; Hagåtña, Guam  96910
25. Ganley vs. Harbor Square; Honolulu, Hawaii (Deposition)
26. Ganley vs. Harbor Square; Honolulu, Hawaii (Arbitration)
27. Ferger vs. Spokane Valley Four Square Church; Spokane, Washington
28. Tyler vs. Petsmart, et al.; Spokane, Washington
29. Paulson vs. Ru-mar Club; Twin Falls, Idaho
30. O'Donnell vs. Taylor Construction; Bozeman, Montana
31. England vs. Swinerton , et al.; San Francisco, California
32. Fenwick vs. Watabe, et al.; Hagåtña, Guam
33. Pinkley vs. BNSF; Spokane, Washington
34. Harrison vs. Hilton Hawaii Village; Waikiki, Hawaii
35. Clark vs. BNSF; Gillette, Wyoming
36. Zygutis vs. Beech; Waipio Valley, Hawaii
37. Retford vs. Snow King, et al.; Jackson Hole, Wyoming
38. Westlake vs. Ryobi, et al.; Pocatello, Idaho
39. Mecurio vs. Brownlee, et al.; Missoula, Montana
40. Nordstrom vs. Bodkin Enterprises; Hayden Lake, Idaho
41. Houser vs. Resort Quest, et al.; Lahaina, Maui
42. Benson vs. Magic Valley Partners, et al.; Twin Falls, Idaho

**2002:**
Trials:
1. Wright vs. Chanel; Honolulu, Hawaii (State)
2. Dexheimer vs. Guthrie; Spokane, Washington (State)
3. Becker vs. Oliver Family Limited Partnership; Coeur d'Alene, Idaho (State)
4. Weissinger vs. Lewis & Clark College; Portland, Oregon (State)

Depositions/Arbitrations:
1. Hotel Corporation of the Pacific vs. Group 70; Kauai, Hawaii
2. Eades vs. Lisandra, Inc.; Kihei, Hawaii (Volume 2)
3. Requelman vs. Pacific Transportation Services; Hilo, Hawaii
4. Eades vs. Lisandra, Inc.; Kihei, Hawaii (Arbitration)
5. Parlin vs. Miller; Spokane, Washington
6. Gaspero vs. Pacific Shores; Kihei, Hawaii (Records Deposition)
7. Bowkett vs. Texton; Boise, Idaho

33

8.  Guerrero vs. Cabjaun, et al.; Honolulu, Hawaii
9.  Fenzke vs. Naniloa Hotel; Hilo, Hawaii (Arbitration)
10. Harshmans vs. Jackson Hole Mountain Resort, et al.; Jackson, Wyoming
11. Gibson vs. BNSF; Albuquerque, New Mexico
12. Colburn vs. Amtrack; Salt Lake City, Utah
13. Wells vs. Wolf Lodge; Coeur d'Alene, Idaho
14. Ley vs. Stockman Financial Corporation; Billings, Montana
15. Becker vs. Oliver Family Limited Partnership; Coeur d'Alene, Idaho
16. Britton vs. Shearer; Spokane, Washington
17. Keller, et al. vs. Jones, et al.; New Orleans, Louisiana
18. Kinery vs. Mathieu; Jackson Hole, Wyoming
19. Zalopany vs. Keller; Honolulu, Hawaii
20. Williams vs. LRG Real Estate LP, et al.; Kona, Hawaii
21. Rehkopf vs. Kahana Falls, et al.; Lahaina, Maui
22. Evans vs. England; Springdale, Washington
23. Idaho Department of Labor vs. Sunset Marts, et al.; Orofino, Idaho
24. Karlsson, et al. vs. Savage, et al.; Los Angeles, California
25. O'Neil vs. Ho; Honolulu, Hawaii (Records Deposition)
26. Ng vs. Hwa, et al.; San Francisco, California
27. Tracy vs. Bock, et al.; Spokane, Washington
28. Hart Machine vs. Clapp; Minneapolis, Minnesota
29. Parrish et al. vs. Minidoka County Highway Department; Pocatello, Idaho
30. Radke vs. Pacific Hawaiian Holidays, et al.; Honolulu, Hawaii (Arbitration)
31. Oie vs. Himuro; Waikiki, Hawaii
32. Kailieha vs. PRN 'Ekolu dba Scoozies'; Waikiki, Hawaii
33. Keating vs. Fox and Hound; Waikiki, Hawaii
34. Hirukawa vs. Structures International; Honolulu, Hawaii
35. Firestone vs. Milford; Spokane, Washington
36. Oschner vs. BNSF; Laramie, Wyoming
37. Hippler vs. Dittman; Elk, Washington
38. Collins vs. Union Pacific Railroad; Laramie, Wyoming
39. Milford vs. Firestone; Spokane, Washington (Mediation)
40. Zygutis vs. Beech; Waipio Valley, Hawaii (Arbitration)
41. Nazar vs. Amsbury; Spokane, Washington (Mediation)
42. Ejercito vs. Baywatch Production, et al.; Honolulu, Hawaii (Arbitration)
43. Jackson vs. Larson; Moscow, Idaho
44. Bumgraber vs. Safeway; Spokane, Washington
45. George vs. Diamond Parking; Waikiki, Hawaii
46. Koenig vs. Riemer, et al.; Kihei, Maui
47. Piggee vs. Chrysler, et al.; San Francisco, California