1   RICHARD C. EYMANN
2   Eymann Allison Hunter Jones, P.S.
    2208 West Second Avenue
3   Spokane, WA  99201-5417
    (509) 747-0101
4

5   STEPHEN L. NORDSTROM
    Nordstrom & Nees, P.S.
6   323 S. Pines Rd.
7   Spokane, WA  99206
    (509) 924-9800
8

9   Attorneys for the Plaintiff

10              UNITED STATES DISTRICT COURT
           FOR THE EASTERN DISTRICT OF WASHINGTON
11

12  THOMAS A. WAITE,                    )
13               Plaintiff,             )   **Case No.: CV-05-399-EFS**
                                        )
14  vs.                                 )   **PLAINTIFF'S MEMORANDUM**
                                        )   **OF AUTHORITIES IN**
15                                      )   **OPPOSITION TO**
    THE CHURCH OF JESUS CHRIST OF       )   **DEFENDANT'S MOTION TO**
16  LATTER DAY SAINTS d/b/a             )   **COMPEL**
    CORPORATION OF THE PRESIDING        )
17  BISHOP OF THE CHURCH OF JESUS       )
    CHRIST OF LATTER DAY SAINTS, a      )
18  Utah corporation, d/b/a CORPORAITON )
    OF THE PRESIDENT OF THE CHURCH      )
19  OF JESUS CHRIST OF LATTER DAY       )
20  SAINTS,  a Utah corporation; DONALD C. )
    FOSSUM; and STEVEN D. BRODHEAD,     )
21                                      )
22               Defendants.            )
23

24

25

26

27
PLAINTIFF'S MEMORANDUM OF AUTHORITIES IN
OPPOSITION TO DEFENDANT'S MOTION TO COMPEL - 1

                    NORDSTROM & NEES, P.S.
                      ATTORNEYS AT LAW
                      323 South Pines Road
                    Spokane, Washington 99206
                        (509) 924-9800

                                          Dockets.Justia.com

Plaintiffs, by and through their attorneys, STEPHEN L. NORDSTROM and RICHARD C. EYMANN, submit the following Memorandum in opposition to the church defendant's motion to compel discovery responses.

## I.     INTRODUCTION

The church defendant's motion for an order compelling discovery should be denied because it requests attorney work product. Moreover, although protected as attorney work product, the information was previously provided to them.

## II.     FACTS

1.     In 2005, after Mark Ryan and Dillon Hanson (missionary passengers involved in the motor vehicle collision), had completed their church mission and returned to their respective homes, they were contacted by J.R. Reese, a representative of Mr. Nordstrom's office.  (Declaration of Stephen Nordstrom, page 2, lines 10-12; Ryan Deposition, p. 18, lines 1-5).

2.     With the assistance of Mr. Nordstrom, Mr. Reese prepared questions, which he telephonically posed separately to Mr. Ryan and Mr. Dillon.  Mr. Reese recorded their answers in pencil.  No electronic recordings of the interviews were performed.  (Declaration of Stephen Nordstrom, page 2, lines 13-16).

3.     On November 9, 2006, in the Salt Lake City law offices of the Defendant Church, Plaintiff's co-counsel Stephen Nordstrom took the deposition of Donald

PLAINTIFF'S MEMORANDUM OF AUTHORITIES IN
OPPOSITION TO DEFENDANT'S MOTION TO COMPEL - 2

NORDSTROM & NEES, P.S.
ATTORNEYS AT LAW
323 South Pines Road
Spokane, Washington 99206
(509) 924-9800

Fossum, the missionary driver of the pickup involved in the motor vehicle collision at issue herein. Plaintiff's co-counsel Richard Eymann was present, along with the Church's defense counsel, Brian Rekofke, Church attorney Tom Walk, and Church representative Richard Black. (Counsel for non-Church defendant appeared telephonically). (Fossum Deposition, p. 4, lines 11-20).

4.     During the deposition an exchange occurred as to whether Mr. Nordstrom could inquire into a conversation Mr. Fossum had with Tom Walk:

> Q:     (By Mr. Nordstrom)   Okay. Let me kind of go back to the beginning again, when I talked to you about who you may have spoken with regarding this accident. You had a conversation sometime ago with Mr. Walk. Is that correct?
> A:     Yeah.
> Q:     Was that down in Provo?
> A:     Yeah. That was at my house.
> Q:     Do you remember the nature of that conversation?
> A:     He just asked me questions about it, and I don't recall everything. I have talked about it with so many people and so many times that it's kind of hard to distinguish.
> Q:     Sure. Just tell me what you do remember of that conversation involving him.
> MR. REKOFKE:   Excuse me. That would be attorney-client privilege.
> MR. NORDSTROM: I didn't realize that Mr. Walk was an attorney for Mr. Fossum. I thought he was – in fact, I don't – did I ever get a notice of appearance from anybody but you, I think and Andy. Am I missing something here?
> MR. REKOFKE: You are missing that he is a lawyer for various church entities. He investigated that accident. It's the same thing under Heidebrink versus Moriwaki in the state of the Washington.
>
> It's privileged, so I am instructing Mr. Fossum not to answer any questions about – other than he's already answered

NORDSTROM & NEES, P.S.
ATTORNEYS AT LAW
323 South Pines Road
Spokane, Washington 99206
(509) 924-9800

the general tenor of the conversation and when it occurred. He's not going to answer any questions about his discussions with Mr. Walk.
(Fossum deposition, p. 17, lines 3-25 through p. 18, lines 1-6.)

5.    During the break, Mr. Eymann challenged Mr. Rekofke on the issue of whether he represented any missionaries other than Mr. Fossum, and Mr. Rekofke conveyed that he viewed all missionary witnesses as being represented by himself and Mr. Walk. Mr. Eymann countered that unless they were "speaking agents," there could not be a valid attorney/client privilege objection.    (Eymann declaration, p. 3, lines 16-22.)

6.    Mr. Eymann and Mr. Rekofke continued to discuss the issue during subsequent breaks, outside the presence of Mr. Nordstrom.    Regarding the issue of direct contact between plaintiff's lawyers and former missionaries, Mr. Eymann cited the case of _Wright v. Group Health Hospital_, 103 Wn.2d 192, 691 P.2d 564 (1984), and Mr. Rekofke acknowledged that he had forgotten about that case, indicating that it might apply.    But rather than asking Mr. Nordstrom, Mr. Rekofke asked Mr. Eymann what contacts Mr. Nordstrom had made with missionaries.    Mr. Eymann indicated that it was his position that plaintiff's counsel had every right to contact former missionaries who were witnesses unless they were speaking agents.    Mr. Rekofke responded that he wanted to return to his office and look at the _Wright_ case, and that if he felt he was on

solid ground, he wanted to get a court ruling. Mr. Eymann agreed that that would be fine. (Declaration of Richard Eymann, p. 3, lines 16-26, and p. 4, lines 1-14)

7.   Mr. Nordstrom was not present, nor did Mr. Eymann discuss these conversations with Mr. Nordstrom (until recently). (Declaration of Richard Eymann, p. 4, lines 14-16; Declaration of Stephen Nordstrom, p. 2, lines 18-23).

8.   The following day, (November 10, 2006), Plaintiff's co-counsel, Richard Eymann, took the deposition of Mr. Ryan. The same attorneys and representatives who had been present for Mr. Fossum's deposition were again present for Mr. Ryan's deposition. (Deposition of Mark Ryan, p. 4, lines 14-23). During questioning, Mr. Eymann made direct reference to the prior telephone interview conducted by Mr. Reese:

> Q:   (Mr. Eymann). I'll represent to you that one of the people that called you who is not an attorney but simply an investigator was JR Reese, . . . but JR Reese was just doing an investigation, and it was done back in 2005, . . . he had a set of questions he wanted to ask you, and he went through and he put down your answers, and I just want to see today if those answers are the same today as you gave to him then.

(Deposition of Mark Ryan, p. 18, lines 1-11).

9.   Mr. Eymann then recited each of the questions and Mr. Ryan's answers from the beginning through the end of the interview with Mr. Reese. (Deposition of Mark Ryan, p. 18, lines 18-25, through page 32, lines 1-4). Mr. Eymann also offered to show Mr. Rekofke the actual interview document but Mr. Rekofke declined:

NORDSTROM & NEES, P.S.
ATTORNEYS AT LAW
323 South Pines Road
Spokane, Washington 99206
(509) 924-9800

Mr. Rekofke:  Dick, just - - before you go on to the next one, you've done a great job of comparing - - of saying what the answer was and then asking if he agrees, and I didn't - - is that what he said in response to the Reese interview?

Mr. Eymann:   He didn't answer that question in the Reese - - that specific question in the Reese interview, because what he did was he answered - - I think he tried to answer two questions at once, and there's no answer here.  I can show you.

Mr. Rekofke:  No, that's fine.  I trust you.

(Deposition of Mark Ryan, p. 27, lines 15-25, and page 26, line 1).

10.    When Mr. Eymann returned to his office in Spokane, he reviewed the *Wright* case and confirmed that he was correct in his assessment. Mr. Eymann assumed that Mr. Rekofke had done the same, as he never saw a motion for clarification by the court. (Declaration of Richard Eymann, p. 4, lines 17-21).

11.    Approximately two weeks later, Mr. Nordstrom interviewed James T. Ross by telephone. Mr. Ross was also one of the passenger missionaries involved in the motor vehicle collision. He had been released from his mission in May of 2004, and was now residing in Arizona.  Mr. Nordstrom took notes of the telephone interview, which he put into declaration form.  (Declaration of Stephen Nordstrom p. 3, lines 1-6 and Declaration of James Ross, p. 4, lines 13-14).   A copy of the declaration was provided to defendants.  (Declaration of Stephen Nordstrom p. 3, line 7).

12.    On February 26, 2007, Defendants served Interrogatories and Requests for Production concerning Mr. Nordstrom's contacts with missionaries.  On March 27,

NORDSTROM & NEES, P.S.
ATTORNEYS AT LAW
323 South Pines Road
Spokane, Washington 99206
(509) 924-9800

2007, Plaintiffs responded by objecting to the request as "attorney work product." However, Plaintiff did indicate that "Mr. Nordstrom's office has been in direct contact with Mark T. Ryan, James T. Ross, and Dillon Hanson. Information, statements, or declarations from each have previously been provided."

13.    On April 2, 2007, Mr. Rekofke responded by letter to Mr. Nordstrom, indicating he was seeking ". . . specific information concerning the individuals you have contacted ex parte." (i.e. Ryan, Ross, and Hanson). (Declaration of Stephen Nordstrom, p. 3, lines 9-13).

14.    Mr. Nordstrom responded by letter dated April 5, 2007, stating:

> Regarding Mark Ryan or Dillon Hanson, we do not have signed declarations or statements from these individuals. We have only the Ross declaration which was previously provided to you. Regarding interviews of Mr. Hanson, Mr. Ryan or Mr. Ross, the memoranda of these witnesses' oral statements to representatives of this office are clearly work product. They are not discoverable. See *Soter v. Cowles Pub. Co.*, 131 Wn.App. 882, 130 P. 3d 840 (2006, Div. III).

Defendants responded by filing the motion to compel.

## III.    ARGUMENT

The information requested by defense counsel is plaintiff's work product, and defendants have made no showing of substantial need for this information. *FRCP 26(b)(3)*.

PLAINTIFF'S MEMORANDUM OF AUTHORITIES IN
OPPOSITION TO DEFENDANT'S MOTION TO COMPEL - 7

NORDSTROM & NEES, P.S.
ATTORNEYS AT LAW
323 South Pines Road
Spokane, Washington 99206
(509) 924-9800

In referring to decisions by the Washington Supreme Court as well as the United States Supreme Court, the court in _Soter v. Cowles Pub. Co.,_ 131 Wn.App. 882, 893-4, 130 P. 3d 840 (2006), stated:

> Work product refers to documents prepared by counsel in anticipation of litigation. _Heidebrink v. Moriwaki_, 104 Wn.2d 392, 396, 706 P.2d 212 (1985). There are two categories: (1) Factual Information; and (2) Attorney's mental impressions, research, legal theories, opinions, and conclusions. _Linstrom v. Ladenburg_, 136 Wn.2d 595, 605-06, 963 P.2d 869 (1998). Disclosure of counsel's memoranda of witnesses' oral statements is 'particularly disfavored because it tends to reveal the attorney's mental processes.' _Upjohn Co. v. United States_, 449 U.S. 383, 399, 101 Sup. Ct. 677, 66, L. Ed. 2d 584 (1981). Notes of oral statements gathered during preparation for litigation are included with mental impressions in the 'opinion' work product category. _In Re Firestorm 1991_, 129 Wn.2d 130, 159, 916 P.2d 411 (1996).
>
> The court may allow an adverse party to discover factual information gathered by an attorney upon a showing of substantial need for the information in preparing the party's case and an ability to obtain the substantial equivalent without undue hardship. _Heidebrink_, 104 Wn.2d at 395.

In the present case, the information requested by the defendant church is counsel's memorandum of the witnesses' oral statements. However, unlike counsel for the church, who refused to allow any inquiry into a discussion which took place between an employee of the church and a missionary (Mr. Walk and Mr. Fossum), plaintiffs not only provided defendants with Mr. Ross' declaration, but also a verbatim recitation of the documents Mr. Reese used to interview both Mr. Ryan and Mr. Hanson. (Deposition of Mark Ryan, p. 18, lines 18-25, through page 32, lines 1-4).

PLAINTIFF'S MEMORANDUM OF AUTHORITIES IN
OPPOSITION TO DEFENDANT'S MOTION TO COMPEL - 8

NORDSTROM & NEES, P.S.
ATTORNEYS AT LAW
323 South Pines Road
Spokane, Washington 99206
(509) 924-9800

Moreover, defendant neither alleged nor made a showing of substantial need for the requested information. In addition, such a showing would appear impossible since Defendants have already received most of the requested information, as well as having had the opportunity to interview the same witnesses.

Further, it is specifically disputed that there was an agreement between counsel that there would be no contact by plaintiff's counsel *ex parte* with individuals affiliated with the LDS church. (Declaration of Richard Eymann, p. 3, lines 16-26, p. 4, lines 1-16). It is also interesting to note that as of this date defendants have taken no action to establish that while on their missions, the missionaries were speaking agents for the church, let alone following their release, as in the present case when all plaintiff's interviews were conducted. The purpose behind allowing interviews of non speaking agents is to advance the policy of keeping witnesses freely accessible to both parties. *Wright v. Group Health Hospital*, 103 Wn.2d 192, 200, 691 P.2d 564 (1984). Since Mr. Ross, Mr. Ryan, and Mr. Hanson were not speaking agents of the defendant church, they were freely accessible to both parties and defendant's motion to compel is improper.

## IV.     CONCLUSION

Plaintiff's interviews were performed in anticipation of litigation and their memoranda of those witnesses' oral statements is work product. Moreover, there was no stipulation between the parties that plaintiffs would not conduct interviews of

**PLAINTIFF'S MEMORANDUM OF AUTHORITIES IN OPPOSITION TO DEFENDANT'S MOTION TO COMPEL - 9**

NORDSTROM & NEES, P.S.
ATTORNEYS AT LAW
323 South Pines Road
Spokane, Washington 99206
(509) 924-9800

missionary witnesses.    Further, plaintiff has previously provided most information concerning those interviews to the defendant church, and the church has made no showing of substantial need that anything else is required.


DATED this 23rd day of April, 2007.

NORDSTROM & NEES, P.S.

By:   s/Stephen L. Nordstrom
      STEPHEN L. NORDSTROM, WSBA #11267
      Co-Counsel for Plaintiff


EYMANN ALLISON HUNTER JONES, P.S.

By:   *Telephonically Approved 4/20/07*
      RICHARD C. EYMANN, WSBA #7470
      Co-Counsel for Plaintiff

**PLAINTIFF'S MEMORANDUM OF AUTHORITIES IN
OPPOSITION TO DEFENDANT'S MOTION TO COMPEL - 10**

NORDSTROM & NEES, P.S.
ATTORNEYS AT LAW
323 South Pines Road
Spokane, Washington 99206
(509) 924-9800

## CERTIFICATE OF SERVICE

I, Stephen L. Nordstrom, hereby certify that on the 23rd day of April, 2007, I electronically filed the foregoing with the Clerk of the Court using the CM/ECF System which will send notification of such filing to the following participants:

Brian T. Rekofke
Witherspoon Kelley Davenport & Toole
422 W. Riverside Avenue, Suite 1100
Spokane, WA  99201-0302

Andrew C. Smythe
Paine Hamblen Coffin Brooke & Miller
717 W. Sprague Avenue, Suite 1200
Spokane, WA  99201-3503


_____s/Stephen L. Nordstrom_____
STEPHEN L. NORDSTROM

NORDSTROM & NEES, P.S.
ATTORNEYS AT LAW
323 South Pines Road
Spokane, Washington 99206
(509) 924-9800

# VIDEOTAPED DEPOSITION OF
# DONALD C. FOSSUM

# EXHIBIT 1

12

# CONDENSED TRANSCRIPT

## UNITED STATES DISTRICT COURT FOR THE
## EASTERN DISTRICT OF WASHINGTON

THOMAS A. WAITE,                    :    No. CF-05-399-EFS

            Plaintiff,              :    Videotaped Deposition of:

vs.                                 :    DONALD C. FOSSUM

THE CHURCH OF JESUS CHRIST          :
OF LATTER-DAY SAINTS dba
CORPORATION OF THE PRESIDING        :
BISHOP OF THE CHURCH OF
JESUS CHRIST OF LATTER-DAY          :
SAINTS, a Utah corporation,
dba CORPORATION OF THE              :
PRESIDENT OF THE CHURCH OF
JESUS CHRIST OF LATTER-DAY          :
SAINTS, a Utah corporation;
DONALD C. FOSSUM; and STEVEN        :
D. BRODHEAD,

            Defendants.            :



November 9, 2006 - 1:08 p.m.

Location:  Kirton & McConkie
1800 Eagle Gate Tower
60 East South Temple
Salt Lake City, Utah 84111

Reporter:  Teri Hansen Cronenwett
Certified Realtime Reporter, Registered Merit Reporter
Notary Public in and for the State of Utah



## GARCIA & LOVE
COURT REPORTING AND VIDEOGRAPHY

36 South State Street • Suite 1220 • Salt Lake City, UT 84111 • 801.538.2333 • Fax 801.538.2334

*13*

UNITED STATES DISTRICT COURT FOR THE
EASTERN DISTRICT OF WASHINGTON

THOMAS A. WAITE,                        :  No. CV-05-399-EFS

        Plaintiff,                      :  Videotaped deposition of:

vs.                                     :  DONALD C. FOSSUM

THE CHURCH OF JESUS CHRIST              :
OF LATTER-DAY SAINTS dba
CORPORATION OF THE PRESIDING            :
BISHOP OF THE CHURCH OF
JESUS CHRIST OF LATTER-DAY              :
SAINTS, a Utah corporation,
dba CORPORATION OF THE                  :
PRESIDENT OF THE CHURCH OF
JESUS CHRIST OF LATTER-DAY              :
SAINTS, a Utah corporation;
DONALD C. FOSSUM; and STEVEN            :
D. BRODHEAD,
                                        :
        Defendants.

November 9, 2006 - 1:08 p.m.

Location:  Kirton & McConkie
           1800 Eagle Gate Tower
           60 East South Temple
           Salt Lake City, Utah  84111

Reporter:  Teri Hansen Cronenwett
Certified Realtime Reporter, Registered Merit Reporter
Notary Public in and for the State of Utah

                                        1

A P P E A R A N C E S

For the Plaintiff:    Stephen L. Nordstrom
                      NORDSTROM & NUSS, P.S.
                      233 E. Riley Road
                      Spokane, WA  99206
                      (509) 624-8900

                      Richard D. Eymann
                      EYMANN ALLISON HENNESSY CLEARY
                      HOWE, P.S.
                      2208 W. Second Avenue
                      Spokane, WA  99204
                      (509) 747-0101
                      (509) 455-3111  Fax

For the Defendants:   Brian T. Rekofke
                      WITHERSPOON KELLEY DAVENPORT & TOOLE
                      1100 U.S. Bank Building
                      422 W. Riverside Avenue
                      Spokane, WA  99201
                      (509)  624-5265
                      btr@wkdtlaw.com

                      Thomas L. Walk
                      KIRTON & McCONKIE
                      1800 Eagle Gate Tower
                      60 East South Temple
                      Salt Lake City, UT  84111
                      (801) 328-3600

For the Defendant     Andrew C. Smythe
Brodhead:             PAINE HAMBLEN COFFIN BROOKE & MILLER
-Via Speakerphone:    717 W. Sprague Avenue, Suite 1200
                      Spokane, WA  99201
                      (509) 455-6045
                      andy.smythe@painehamblen.com

Also Present:         Gavin Bohne, Legal Videographer
                      Richard Black

                                        2

                    I N D E X

Witness                                      Page

DONALD C. FOSSUM
    Examination by Mr. Nordstrom               4

                   E X H I B I T S

Number        Description                   Page Marked

1         Driving Contract                       44

2         Overview of Responsibilities           44

3         Safe Intersection Driving              44

 1   November 11, 2006            1:08 p.m.
 2        P R O C E E D I N G S
 3        VIDEOGRAPHER:  This is the videotaped deposition of
 4   Donald C. Fossum being held in the law offices of Kirton and
 5   McConkie in Salt Lake City, Utah on November 9th, 2006.  The
 6   time is 1:08 p.m.  My name is Gavin Bohne, legal videographer
 7   for Garcia & Love Reporting.  The court reporter is Teri
 8   Cronenwett, also with Garcia & Love Reporting.  Will counsel
 9   please state their appearances for the record and the witness
10   be sworn.
11        MR. EYMANN:  Richard Eymann for the plaintiff.
12        MR. NORDSTROM:  Stephen Nordstrom for the
13   plaintiff.
14        MR. REKOFKE:  Brian Rekofke, defendants.
15        MR. WALK:  Thom Walk with church defendants.
16   Sorry, Andy.
17        MR. SMYTHE:  Andy Smythe for defendant Steve
18   Brodhead.
19        MR. BLACK:  Richard Black, church representative.
20        DONALD C. FOSSUM,
21   called as a witness at the instance of the plaintiff, having
22   been first duly sworn, was examined and testified as follows:
23        EXAMINATION
24   BY MR. NORDSTROM:
25        Q.  Could you please state your name and your address,

14

**Column 1 (Page 17)**

1  it. I don't recall the specific month or anything that I
2  visited with him but --
3      Q. Okay. Let me kind of go back to the beginning
4  again, when I talked to you about who you may have spoken
5  with regarding this accident. You had a conversation
6  sometime ago with Mr. Walk. Is that correct?
7      A. Yeah.
8      Q. Was that down in Provo?
9      A. Yeah. That was at my house.
10     Q. Do you remember the nature of that conversation?
11     A. He just asked me questions about it, and I don't
12 recall everything. I have talked about it with so many
13 people and so many times that it's kind of hard to
14 distinguish.
15     Q. Sure. Just tell me what you do remember of that
16 conversation involving him.
17     MR. REKOFKE: Excuse me. That would be
18 attorney-client privilege.
19     MR. NORDSTROM: I didn't realize that Mr. Walk was
20 an attorney for Mr. Fossum. I thought he was -- in fact, I
21 don't -- did I ever get a notice of appearance from anybody
22 but you, I think and Andy. Am I missing something here?
23     MR. REKOFKE: You are missing that he is a lawyer
24 for various church entities. He investigated this accident.
25 It's the same thing under Heidebrink versus Moriwaki in the

17

**Column 2 (Page 19)**

1      Q. Or Walk, excuse me. Mr. Walk. I represent
2  Mr. Waite. Mr. Walk.
3      A. I have been told that he was investigating it. As
4  far as specifics of what they told me his position was in the
5  case, I don't recall.
6      Q. And who is they, when you say they?
7      A. Whoever contacted me, his assistants or secretary
8  or whoever it was.
9      Q. Okay. Let's go back to the orientation when you
10 got to Spokane. So you remember the vehicle safety, housing.
11 Did you discuss any issues regarding safety involved with
12 housing?
13     A. I believe so. It would make sense to me that we
14 did. I don't recall any specific examples, but --
15     Q. Okay. At the time of the collision in August of
16 2003, did you remember the specifics of that commitment
17 letter that you had signed?
18     A. Basically that we were responsible for our actions
19 and that we had to wear seatbelts.
20     Q. I understand that --
21     A. That's --
22     Q. -- but at the time of the collision did you
23 remember that commitment letter, how it read?
24     A. No.
25     Q. Okay. It's -- you have obviously read it since

19

**Column 3 (Page 18)**

1  state of the Washington.
2      It's privileged, so I am instructing Mr. Fossum not
3  to answer any questions about -- other than he's already
4  answered the general tenor of the conversation and when it
5  occurred. He's not going to answer any questions about his
6  discussions with Mr. Walk.
7      Q. (By Mr. Nordstrom) All right. So you had a -- so
8  you met with Mr. Walk?
9      A. Yes, sir.
10     Q. Okay. I just want to make sure. Who else, other
11 than when we talked about Mr. Rekofke, anyone else that you
12 met with specifically other than, say, ward members and
13 missionaries, that may concern the litigation of this case?
14     A. I don't recall. I -- yeah. I want to say that I
15 might have spoken to a lawyer from Spokane, but I don't know
16 if it was -- I know you're not from Spokane, but I don't
17 recall specifics.
18     Q. Okay. As we sit here today, do you know who your
19 attorney is in this case?
20     A. It's Mr. Rekofke.
21     Q. Okay.
22     A. I believe that's how you say it.
23     Q. Were you ever advised that you were represented in
24 any capacity by Mr. Waite?
25     A. By Mr. Waite, no.

18

**Column 4 (Page 20)**

1  that time, and has that kind of refreshed your memory?
2      A. Uh-huh.
3      Q. All right. Okay. And that's yes to those
4  questions?
5      A. Yes.
6      Q. Okay. Let's talk a little about after the
7  orientation, anything else besides those about, you know,
8  bills, housing, vehicle safety, anything else that you
9  recall?
10     A. Also talked about bike safety, I think, wearing
11 your helmet. The rest I don't recall.
12     Q. Did you receive anything in writing regarding
13 wearing a helmet or bicycles?
14     A. I am not sure. I wasn't too worried about it. As
15 a Spanish-speaking missionary, we didn't very often ride
16 bicycles.
17     Q. You usually had a car?
18     A. We usually had vehicles, yes.
19     Q. Okay. So from the time -- was there a time you
20 spent on your mission where you didn't have a car or a
21 pickup?
22     A. Yes, after the accident.
23     Q. Okay. And how long did you not have a car or a
24 pickup after the accident?
25     A. From the time I was -- from the -- probably a week

20

15

# VIDEO DEPOSITION OF MARK TYLER RYAN

# EXHIBIT 2

16

UNITED STATES JUDICIAL DISTRICT COURT

FOR THE EASTERN DISTRICT OF WASHINGTON

\* \* \*

THOMAS A. WAITE,                    )
                                    )
          Plaintiff,                )   CIVIL NO. CV-05-399-EFS
                                    )
     vs.                            )   VIDEO DEPOSITION OF:
                                    )
THE CHURCH OF JESUS CHRIST          )   MARK TYLER RYAN
OF LATTER DAY SAINTS, dba           )
CORPORATION OF THE                  )
PRESIDING BISHOP OF THE             )
CHURCH OF JESUS CHRIST OF           )
LATTER DAY SAINTS, a Utah           )
corporation, dba                    )
CORPORATION OF THE                  )
PRESIDENT OF THE CHURCH             )
OF JESUS CHRIST OF LATTER           )
DAY SAINTS, a Utah                  )
corporation; DONALD C.              )
FOSSUM; and STEVEN D.               )
BRODHEAD,                           )
                                    )
          Defendants.               )


\* \* \*

November 10, 2006
10:11 a.m.


Offices of Kirton & McConkie
60 East South Temple, Suite 1800
Salt Lake City, Utah

\* \* \*

RENEE L. STACY
Registered Professional Reporter

17

**Page 2**

A P P E A R A N C E S

FOR THE PLAINTIFF:   RICHARD C. EYMANN
   Attorney at Law
   EYMANN ALLISON FENNESSY HUNTER
   & JONES, P.S.
   2208 W. Second Avenue
   Spokane, WA 99204
   (509) 747-0101

   STEPHEN L. NORDSTROM
   Attorney at Law
   NORDSTROM & NEES, P.S.
   323 S. Pines Road
   Spokane, WA 99206
   (509) 924-9800

FOR THE DEFENDANT,
BRODHEAD:  RYAN BEST
(By phone)  Attorney at Law
   PAINE HAMBLEN COFFIN BROOKE
   & MILLER
   717 W. Sprague Avenue
   Suite 1200
   Spokane, WA 99201
   (509) 455-6000

FOR ALL OTHER
DEFENDANTS:  BRIAN T. REKOFKE
   Attorney at Law
   WITHERSPOON KELLEY DAVENPORT
   & TOOLE
   1100 U.S. Bank Building
   422 W. Riverside Avenue
   Spokane, WA 99201
   (509) 645-5265

ALSO PRESENT:  GAVIN BOHNE, Videographer

**Page 3**

I N D E X

EXAMINATION
BY MR. EYMANN. . . . . . . . . . . . . . .   5

E X H I B I T S

(None)

**Page 4**

1     November 10, 2006
2     10:11 a.m.
3
4    P R O C E E D I N G S
5  VIDEOGRAPHER:  This is the videotaped
6  deposition of Tyler Ryan, being held in the law
7  offices of Kirton McConkie in Salt Lake City, Utah,
8  on November 10th, 2006.  The time is 10:11 a.m.
9  My name is Gavin Bohne, legal videographer
10  for Garcia & Love Reporting.  The court reporter is
11  Renee Stacy.
12  Will counsel please state their appearances
13  for the record, and the witness will be sworn.
14  MR. EYMANN:  Richard Eymann for the
15  plaintiff.
16  MR. NORDSTROM:  Stephen Nordstrom for the
17  plaintiff.
18  MR. REKOFKE:  Brian Rekofke for the Church
19  defendants.
20  MR. BLACK:  Richard Black, Church
21  representative.
22  MR. WALK:  Tom Walk with the Church
23  defendants.
24  MR. BEST:  Ryan Best with the other
25  defendant.

**Page 5**

1    MARK TYLER RYAN
2  called as a witness at the instance and request of
3  the plaintiff, having been first duly sworn, was
4  examined and testified as follows:
5    EXAMINATION
6  BY MR. EYMANN:
7  Q   Good morning.  Could you state your name
8  for the record?
9  A   Mark Tyler Ryan.
10  Q   And your address?
11  A   Home address, 981 North 1200 West, Pleasant
12  Grove, Utah 84062.
13  Q   And would you tell us what your current
14  profession is?
15  A   Real estate agent and real estate
16  developer.
17  Q   How long have you been doing that?
18  A   I've been a real estate agent for a little
19  over two years now, and I've been doing development
20  as of this year.
21  Q   Where did you grow up?
22  A   I grew up in Kennewick, Washington, until I
23  was 12 years old, and then I moved to American Fork,
24  and I've been living in the Utah County area now for
25  the past 12 years, except for my mission, the two

18

Page 18

1    Q   I'll represent to you that one of the
2    people that called you who is not an attorney but
3    simply an investigator was JR Reese, who was the son
4    of Dale Reese, but JR Reese was just doing an
5    investigation, and it was done back in 2005, and I'd
6    like to ask you some questions and just see if you
7    agree or disagree with the answers that -- he had a
8    set of questions he wanted to ask you, and he went
9    through and he put down your answers, and I just want
10   to see today if those answers are the same today as
11   you gave to him then.
12   A   Okay.
13   Q   I'll represent to you --
14       And if you want a continuing objection to a
15   leading question here, or form, it's accepted.
16       MR. REKOFKE:  Okay.
17       MR. EYMANN:  All right?
18   Q   The first question was, "Had you been
19   riding in cars during the mission?"  And your answer
20   was, "Yes, throughout the mission."  Is that correct?
21   A   Uh-huh, yes.
22   Q   The second question was, "If so, what kinds
23   of vehicles?"  And you indicated, "Passenger
24   vehicles, vans and a truck."  Is that correct?
25   A   Yes.

Page 19

1    Q   The third question was, "How were the
2    vehicles assigned?"  And your answer was, "The truck
3    on this day was assigned to the Spanish elders."
4    A   Which was Elder Fossum and Elder Porras.
5    Q   Okay.  And they're both -- they were both
6    Spanish elders?
7    A   Spanish-speaking missionaries, yes.
8    Q   Okay.  The next one was, "How many elders
9    were generally allowed to ride in a vehicle?"  And
10   your answer was, "There was no policy."
11   A   At the time -- like -- as far as we know,
12   like -- like, looking back at it now, like, is -- for
13   as many as there were seat belts.  Like, I remember
14   that.  But -- and as far as I knew at the time, I
15   think -- I don't think, no.  Like, for the actual
16   truck, I don't -- I don't really know.  I don't
17   remember.  I don't recall.  But as of -- now, looking
18   back at it, yeah, like, we were very well trained
19   about the seat belts in a vehicle and to stay
20   belted.
21   Q   Okay.  Well, I'll get to some questions
22   later about that.  I'm trying to square your answer
23   given back then of how many elders were generally
24   allowed to ride in a vehicle.  Your answer then was,
25   "No policy," and are you saying that the seat belt

Page 20

1    was a policy that was in effect at that time?
2    A   It's always -- the entire mission, the seat
3    belt -- I've had so many people ask me questions
4    about all this stuff, it really, like -- I'm just --
5    it's just been -- because everybody asks me whether,
6    you know, I was on my mission, or people ask me all
7    the time, "Oh, how are you doing?" after the car --
8    it's just -- it -- it's just menial all the time.  It
9    -- you know what I mean?  This and -- I don't know.
10       But, like, at the time, I can see how I
11   wouldn't -- like, I don't -- I don't remember saying,
12   you know, "Only 17 people are allowed to be in a
13   car," or whatever.  But I do remember now -- like
14   now -- not that I didn't remember then, but, like,
15   the whole seat belt thing, but -- at the time.
16   Q   Okay.  You were asked the next question,
17   "How many were riding in the pickup truck on the day
18   of the accident?"  And your answer then was, "Six.
19   There were four in the cab and there were two back in
20   the bed."
21   A   Uh-huh.
22   Q   And is that correct?
23   A   That is correct.
24   Q   You were asked what type of vehicle it was,
25   and your answer was, "Dodge Dakota."

Page 21

1    A   Yes.
2    Q   And is that correct?
3    A   Yes.
4    Q   You were asked, "Why were you all riding in
5    the truck?"  And in that regard -- part of that
6    question was, "Were there no other cars or other
7    passenger-oriented vehicles available?"  And your
8    answer was, "There were, but they were filled with
9    the other elders."  Is that correct?
10   A   That is correct.
11   Q   As I understand it from testimony that was
12   given by Elder Fossum yesterday, there was a sedan --
13   four-door sedan, and there was this Dodge Dakota
14   truck.  Is that correct?
15   A   Yes.
16   Q   Okay.  And that question wasn't in here.  I
17   just added that just now.  I just wanted to clarify.
18       You were asked, "Where were you traveling
19   to and from?"  And your answer then was, "Meetings at
20   the stake center next to the temple, and at this
21   time, to lunch at a Subway restaurant."
22   A   Yes.
23   Q   Is that correct?
24   A   That is correct.  Well, when we were --
25   when we were actually in the accident, it was from

19

Page 22

1  Subway to Elder Ross's apartment, which I -- I can't
2  remember the name of the street that we got in the
3  car accident on, but that's -- he lives on that
   street, right off of that.
5      Q    The next question was, "Had elders been
6  riding in the back of the pickup all day?"  Your
7  answer was, "Yes."
8      A    Yes.
9      Q    Is that still correct?
10     A    Yes.
11     Q  . And then the next question, "If so, how
12  many, and where were they situated?"  Your answer
13  then was, "Four in the cab, two in the back."  Is
14  that correct?
15     A    Yes.
16     Q    Okay.  The next question was, "How did you
17  choose who sat where?"  Your answer was, "He just sat
18  in the back because he didn't mind."  And I'm
19  wondering from that answer if you know who you're
20  referring to.
21     A    I would assume Elder Waite.
22     Q    Did you also sit in the back because you
23  didn't mind sitting in the back?
24     A    Yeah.  Well, because we were the last ones
25  out of the restaurant, so...

Page 23

1      Q    Okay.  So is it first come, first served?
2      A    Yeah.
3      Q    All right.  We had -- I'll come back to
4  this in a moment.
5           The next question was, "Had you ridden in
6  the back of any other pickup truck at any time before
7  this?"  And your answer was, "Yes, many times."
8      A    Uh-huh.
9      Q    Is that correct?
10     A    Yes.
11     Q    Now, to clarify on that, are we speaking
12  about the pickup truck when you were a missionary, or
13  are you speaking --
14     A    Ask the question again.
15     Q    Had you ridden in the back of any other
16  pickup truck at any time before this?
17     A    Yes.  Both --
18     Q    Okay.
19     A    Both -- both on the mission and before the
20  mission.
21     Q    The next question, "Were you aware of any
22  policy regarding riding in the back of pickup
23  trucks?"  And your answer then was, "No, I never
   heard of anything."
25     A    That's true.

Page 24

1      Q    Going to the second page, next question,
2  "Was there any other means of transportation
3  available at that time?"  Your answer was, "Yes, but
4  they were not practical because everything was so far
5  away."
6      A    We could have rode our bikes or walked.
7      Q    Did you have your bikes with you at the
8  Subway?
9      A    No.
10     Q    So your alternative would have been to
11  walk?
12     A    Yeah.
13     Q    Are you allowed to take a taxi?
14     A    Yes, but we don't have enough money to take
15  a taxi.
16     Q    I take it you're precluded from hitchhiking
17  and precluded from otherwise bumming a ride from
18  someone else, correct?
19     A    Well, we're allowed to.  It's just finding
20  somebody that will give us a ride.  That's the
21  difficulty.
22     Q    All right.
23     A    But, I mean, if we wanted -- if somebody
24  offered us a ride -- I've taken many rides on my
25  mission, yeah.

Page 25

1      Q    Okay.  You were asked questions about what
2  happened during the accident, and the first question
3  was, "Did the vehicle you were riding in stop at the
4  stop sign?"  And your answer was, "Yes."
5      A    Yes.
6      Q    I take it you couldn't -- is it true --
7  well, let me ask this question:  The next question
8  was, "Did you or could you see the other vehicle
9  before getting to the stop sign?"  And part of that
10  question was, "Was there anything which might impede
11  or block you from being able to see the other vehicle
12  coming?"  Your answer to both those questions was,
13  quote, "Could not have seen anything because there
14  was a big bush blocking the view.  Did not see
15  anything."
16     A    Yeah.
17     Q    And I think that you were inside the
18  canopy, correct?
19     A    Yes, I was inside.
20     Q    Could you see anything out of the canopy?
21     A    Yes, but I was not facing the accident.  I
22  was not facing the car.  I was facing the other
23  direction.  But I knew the area well.
24     Q    Now --
25     A    Even if I could look, I couldn't have seen

20

Page 26

1  anything.  There is a -- if you've been to the
2  intersection, there's a huge tree covering the stop
3  sign, and it's just -- it looks like it goes straight
4  until you get about 50 -- I would assume 50 feet
5  before it, and then -- I mean, if you were going as
6  fast as Brodhead was going, it wouldn't -- like --
7  it's just the fact that -- if he would have been
8  going the speed limit, it would have been fine, but
9  he was going way over the speed -- there's no way of
10  telling.
11     Q   We really started out here with whether you
12  could see anything or not.
13     A   Oh.  Sorry.  No, I couldn't see anything.
14     Q   So I move to strike the portion of your
15  answer, which is just a legal thing here, just so you
16  know.  I just want to verify that --
17     MR. REKOFKE:  So we're clear, you asked
18  him, on the day of the accident, could he --
19     MR. EYMANN:  Right.
20     THE WITNESS:  On the day of the accident,
21  no.  Absolutely no.
22     Q   (BY MR. EYMANN)  Could you -- do you know,
23  on the day of the accident -- because you were asked
24  two questions here.  I take it you did not see the
25  other vehicle at any time.

Page 27

1     A   No.
2     Q   You only heard screeching of the tires?
3     A   That's it.
4     MR. REKOFKE:  Are we reading now?  Just so
5  we're clear, can you -- was the last question, Dick,
6  one that's off script?
7     MR. EYMANN:  Two questions are combined
8  here, and this one didn't have an answer.
9     MR. REKOFKE:  Oh, okay.
10     Q   (BY MR. EYMANN)  So the first question was,
11  "Did you see the other vehicle before getting to the
12  stop sign?"  And your answer to that is?
13     A   My official answer is no.
14     Q   Okay.
15     MR. REKOFKE:  Dick, just -- before you go
16  on to the next one, you've done a great job of
17  comparing -- of saying what the answer was and then
18  asking if he agrees, and I didn't -- is that what he
19  said in response to the Reese interview?
20     MR. EYMANN:  He didn't answer that question
21  in the Reese -- that specific question in the Reese
22  interview, because what he did was he answered -- I
23  think he tried to answer two questions at once, and
24  there's no answer here.  I can show you.
25     MR. REKOFKE:  No, that's fine.  I trust

Page 28

1  you.
2     Q   (BY MR. EYMANN)  The next question was,
3  "Was there anything that might impede or block you
4  from being able to see the other vehicle coming?"
5  And your answer to that, as I said before, was,
6  quote, "Could not have seen anything because there
7  was a big bush blocking his view."  And I want to
8  clarify.  His view --
9     A   Brodbent --
10     Q   -- would have been --
11     THE REPORTER:  Just a second.  We just need
12  to go one at a time, please.
13     THE WITNESS:  Oh.  Sorry.
14     THE REPORTER:  So I'll need you to finish
15  the end of your question.
16     Q   (BY MR. EYMANN)  I'll start over.  Quote,
17  "Could not have seen anything because there was a big
18  bush blocking his view," unquote.  Now, that was part
19  of your answer.  I'm just trying to know here who is
20  "his view"?
21     A   It would be both Fossum and Brodhead.
22     Q   Do I understand from that answer, just to
23  clarify here, that you and the rest of the elders
24  knew that there was this -- at this intersection
25  there was this tree that you just spoke of that

Page 29

1  blocked views?
2     A   It's not -- that I remember, like, it's not
3  like we're, "Oh, we're" -- you know, "We're at the
4  corner of Eighth.  Look out for the big bush."  You
5  know, like, we don't -- it's not like it consciously
6  went through our heads, but I -- I don't know how to
7  answer that question.  Really, I don't.
8     Q   The other part of your answer to that one,
9  "I did not see anything."
10     A   Yeah.
11     Q   Is that correct?
12     A   Yeah.
13     Q   When you say, "I did not see anything," to
14  clarify, is that referring to the other vehicle
15  coming?
16     A   Yes.  Yeah.
17     Q   The next question was, "Did you say
18  anything before the collision?"  And your answer to
19  that was, "No.  All that I can recall is screeching
20  of tires and a crashing sound."
21     A   Yeah.
22     Q   Is that correct?
23     A   Yeah.  Like, I got hit, and the next thing
24  I know is -- like, I woke up on the side of the road.
25     Q   Okay.  You were asked, then, some questions

21

Page 30

1   about after the accident, and the first one was,
2   "What happened immediately following the collision?"
3   And your answer was, "I was knocked unconscious. I
4   would not be able to remember."
5       A   After the accident?
6       Q   Yeah. And the question was, quote, "What
7   happened immediately following the collision?" Your
8   answer was, "I was knocked unconscious. I would not
9   be able to remember." Is that correct?
10      A   That is correct.
11      Q   Okay. Next question, "Were you injured in
12  the collision?" And the answer was -- that you gave
13  at that time was, "I was knocked unconscious,
14  suffered other bruises and abrasions."
15      A   Yes.
16      Q   And that's correct?
17      A   That is correct. One thing that's not on
18  there is I did have a concussion, but --
19      Q   Sure. And I think you testified to that
20  earlier.
21      A   Yes.
22      Q   The next question was, "What was your
23  response?" And to that question, "All I can
24  remember was getting up and everything being in slow
25  motion, and then I could recall hearing the ambulance

Page 31

1   workers working on Elder Waite."
2       A   Yes.
3       Q   Do you remember anything else at the scene
4   of the accident, to clarify?
5       A   The slow motion part is true. I remember
6   people holding me down. Like, I tried to get up, and
7   they held me down because they thought -- somebody
8   might have thought my neck was broken, that -- like,
9   you're not supposed to move somebody. And I remember
10  people holding me down.
11      Q   There was a last category of questioning
12  which was called "miscellaneous," and that question
13  was, "Who was Elder Waite's companion at the time of
14  the collision?" And your answer to that was, "Elder
15  Ross."
16      A   Uh-huh.
17      Q   Is that correct?
18      A   That is correct.
19      Q   The next question in that category was,
20  "How long had you been on the mission before the
21  accident?" And your answer was, "Thirteen months,
22  from July 2002, and then it went through July 2004."
23  Is that correct?
24      A   Yes.
25      Q   And the last question was, under

Page 32

1   "miscellaneous," "Where are you living now?" Your
2   answer was, "Pleasant Grove, Utah." "And what are
3   you doing for a living?" You were working in real
4   estate. And I take it those are both correct.
5       A   Yes. Right now I'm actually living in
6   Provo, but I still keep my home address.
7       Q   And I realize -- and I asked you some
8   clarification questions, but I want to go back over a
9   couple points here, just so that we're clear on a few
10  things.
11          It's my understanding that when everyone
12  came out of the Subway, more than six got into the
13  truck originally. Do you remember that?
14      A   Yes.
15      Q   And Elder Fossum described yesterday
16  essentially eight getting in, four in the cab portion
17  of the truck, pickup truck, and four in the back. Do
18  you remember who the two other gentlemen were that
19  got into the back with you and Elder Waite?
20      A   I think it was Elder Smith and Elder -- I
21  don't remember what Elder Smith's companion's name
22  was. I don't remember his name. I got his face, but
23  I don't remember the name. I really don't remember,
24  but I think it was Elder Smith and his companion.
25      Q   Okay. Would that have been Elder

Page 33

1   Pimmentel?
2       A   No.
3       Q   Okay.
4       A   No. Elder Pimmentel was the driver of the
5   other vehicle.
6       Q   Okay. Who was the person that asked the
7   two other gentlemen to go to the other vehicle?
8       A   It was me. I was the district leader at
9   the time.
10      Q   And as district leader, why did you tell
11  them to do that?
12      A   Because we were heading east and they
13  needed to go west, and so it would have been more
14  convenient for them to go in the car. And we weren't
15  used to having the car. It was only there for a few
16  weeks, so...
17      Q   How many elders were there in the district
18  during this time frame, let's say the two months in
19  the summer?
20      A   I don't remember. Maybe eight or six. Six
21  or eight. But I -- the specific number, I don't -- I
22  don't recall.
23      Q   At this time, there were essentially --
24  well, at this time, Elder Fossum said there were four
25  in the sedan when you left the Subway.

22