# EXHIBIT 2A

9


FORENSIC
SCIENCES

May 15, 2007

Brian Rekofke, Esq.
Witherspoon, Kelley, Davenport & Toole
1100 U.S. Bank Building
422 West Riverside Avenue
Spokane, WA 99201

RE: Waite vs. LDS Church, et al.

Dear Mr. Rekofke:

This report is an addendum to an earlier report that was sent to you regarding an automobile
accident involving your client.

**Background:**

On August 21, 2003, around 2:10 in the afternoon, an accident occurred at the intersection of
8th Avenue and Adams Road, in Spokane, Washington. Traffic at the intersection in question
was controlled by 4-way stop signs. The accident involved a 2003 Dodge pickup truck,
driven by Donald Fossum, and a 1988 Honda Accord, driven by Steve Brodhead. As events
unfolded, the pickup truck was headed north on Adams and had come to a lawful stop at the
intersection. After looking in both directions and seeing that there were no vehicles in the
vicinity of the intersection, the driver of the pickup truck proceeded to enter the intersection.
At the same, and unbeknownst to the driver of the pickup, the Honda was heading east on 8th
and approaching the intersection at an extremely high rate of speed. Not only was the driver
of the Honda driving in a reckless manner, he was unfamiliar with the road and was unaware
there was a stop sign ahead at the subject intersection. When the driver of the Honda finally
realized there was a stop sign, he slammed on his brakes but was unable to stop before
entering the intersection and striking the side of the pickup truck.

lo

**Information:**

The findings and opinions expressed in this report are based upon review of the following information sources:

1. State of Washington Police Traffic Collision Report 1592500 and an "additional report" by the investigating officers.

2. A Preliminary Investigative Report authored by Matthew Mecham, of MRA Forensic Sciences.

3. An inspection of the subject intersection.

4. The depositions of :

   a) Donald Fossum – driver of pickup truck.
   b) Steven Brodhead – driver of Honda.
   c) Mark Ryan – passenger bed of pickup truck.
   d) Paul Hyde – C.P.B. employee.
   e) Dillon Hansen – passenger back seat of pickup truck.

5. Washington Driver Guide.

6. An accident investigation report by John Hunter of Investigative Training Service.

7. Various Traffic Law references, including:

   a) RCW 46.61.190(2)
   b) WPI 70.02.02
   c) Vehicle Traffic Law (ISBN 0-912642-00-9)
   d) U.V.C.

8. The deposition of John Hunter.

9. A report by Richard Gill. Ph.D..

10. A Policy on Geometric Design of Highways and Streets.

11. Various municipal statutes regarding sight distances at intersections.

12. Discussion with Donald Fossum.

13. Declaration of James Ross.

14. Supplemental Statement of John Hunter.

2

**Findings and Opinions:**

In addition to the findings and opinions expressed in the first report, the following findings and opinions hold.

1. The notion of expectancy runs throughout traffic laws and traffic engineering. It runs throughout human factors. In order to negotiate their way through traffic in an efficient manner, drivers must be able to expect (and rely) on other drivers to drive in a reasonable manner. Without this reliance, traffic flow would be severely hampered.

A vehicle traveling 35 mph can stop in about 70 feet, once hard braking begins on asphalt. It can stop in about 140 feet once typical moderate braking begins on asphalt. Therefore, if a driver at a 4-way stop sees a vehicle 140 feet away from him, in a 35 mph zone, based upon expectancy, that driver is highly disposed to assume the oncoming vehicle will be able to stop, unless there are strong cues that the oncoming vehicle is traveling at excessive speed.

In the subject case, the only time the oncoming Honda would have been close enough to the intersection to be of concern to the driver of the pickup truck was about when the driver began to pull out. This is a time when many drivers reflexively glance back to the left for one last check. But this is typically just a quick glance and serves to determine if a vehicle is close enough to present an immediate hazard. The word glance is used because just as a driver begins to pull out, he needs to focus most of his attention on where he is going and on any other factors that present a higher risk. Keep in mind that the driver we are talking about has already searched in both directions for any vehicle close enough that one would expect them to be an immediate hazard. A glance is appropriate, because if the driver spent the time to study all aspects of any oncoming vehicles from the left for the second time, then enough time would have transpired to make it necessary to look back in the other direction, ad infinitum.

2. When someone glances to the left and detects a car about 150 feet away in his peripheral view, he will receive few cues as to the speed of that car. In the subject case, if the driver of the pickup truck glanced to his left and saw a vehicle approaching at about 150 feet away and expected it was traveling at a reasonable speed and would stop at the stop sign, there would be no reason for him to consider it a threat and to pay any further attention to it (or even to remember it).

3. Plaintiff's human factors expert has asserted that the driver of the pickup truck should have pulled forward far enough as he stopped to see the oncoming Honda during his first look to the left. At the time the driver of the pickup truck first looked to the left, the Honda would have been about 450 feet or more away and was not braking yet. Therefore, Plaintiff's human factors expert is requiring that a driver at a 4-way stop in a residential area with a 35 mph speed limit pull forward far enough to see about 450 feet down the roadway. This is an excessive requirement because it goes well beyond the intentions of roadway designers and it is excessive because under any reasonable circumstances it would be totally unnecessary.

\2

4. Plaintiff's human factors expert conjectures that had the driver of the pickup truck looked down the road such a great distance he would have recognized that the Honda "was skidding towards the intersection at a high rate of speed." The word conjecture is used because Plaintiff's human factors expert has provided no proof that the driver of the pickup truck would have been able to determine what the speed of the Honda was or that it had its brakes on, if it had its brakes on.

5. Plaintiff's human factors expert faults the driver of the pickup truck for not looking to his left a second time. Plaintiff's human factors expert erroneously states in his report that the driver of the pickup truck testified that he had not looked back to the left before proceeding. This is simply incorrect. Whereas the driver of the pickup truck had stressed that he looked to the right a second time, he did not rule out that he looked to the left a second time. Understandably, the driver of the pickup truck was more focused on a vehicle to his right that he felt was a greater risk because of it closer proximity.

6. Plaintiff's human factors expert asserts that had the driver of the pickup truck looked to the left a second time the accident would have been avoided. But once again, as discussed above, the second look to the left is typically a glance. There is no reason to expect such a glance would reveal to the driver of the pickup truck anything more than that the Honda was still at a safe distance away under any reasonable circumstances.

7. Plaintiff's human factors expert asserts that all the driver of the pickup truck had to do is perform a standard "gap acceptance task". Then he goes on to define a standard gap acceptance task as requiring the driver of the pickup truck to watch the Honda "long enough" to be able to determine the closing time of the vehicle, which is a combination of the estimated speed and distance. Besides not specifying how long "long enough" is, elsewhere in his report Plaintiff's human factors expert contradicts himself by saying it was not necessary for the driver of the pickup truck to estimate the speed of the Honda. Granted, the driver would not need to determine a numerical value for the speed of the Honda, but he would need to develop a sense of its speed (e.g., low, average, high), which can fairly be termed as estimating its speed.

8. Plaintiff's human factors expert asserts that the smoke and noise coming from the tires of the Honda would have made it clear it was braking, yet he provides no evidence about the amount of smoke or noise or how it would compare to human thresholds for detection, given the distance away it was and the angle at which it was at when the pickup truck started to move forward. According to testimony, after the pickup truck had pulled out and was on its way, the sound of the Honda became heard, but it was too late. This testimony in itself implies that the sound of the tires was too faint to be heard until after the pickup truck had started to pull out.

Simply put, Plaintiff's human factors expert has not demonstrated that if the driver of the pickup truck glanced to his left before pulling out that he would have been presented with cues strong enough to alert him to the danger.

13

4

9. Despite the declaration of the investigating officer, Ron Miya, to the contrary, this engineer can see the faded remnants of a stop line and a crosswalk in the photographs taken at the accident scene. If the driver of a vehicle approaching the intersection saw the faded remnants he would be justified in stopping at the remnant of the stop line or the remnant of the crosswalk.

**Closure:**

According to the evidence, the sole cause of the subject accident was the reckless and extreme unlawful driving behavior of the driver of the Honda. According to the evidence, the driver of the pickup truck acted in a lawful and reasonable manner and took all due care when stopping and then proceeding at the subject intersection.

Plaintiff's human factors expert tries to place a duty on all drivers to expect extreme unlawful driving behavior from other drivers. Such a duty goes well beyond the bounds established by traffic engineers and ignores the realities of driving, which require drivers to optimally allocate their attention to the risks present, which often entails expecting (and relying upon) other drivers to act in a reasonable manner.

Best Regards,

Scott Kimbrough

Scott Kimbrough, Ph.D., P.E.

\14