# EXHIBIT A



UNITED STATES DISTRICT COURT FOR THE

EASTERN DISTRICT OF WASHINGTON

THOMAS A. WAITE,

        Plaintiff,

vs.                        No. CV-05-399-EFS

THE CHURCH OF JESUS CHRIST OF
LATTER DAY SAINTS d/b/a
CORPORATION OF THE PRESIDING
BISHOP OF THE CHURCH OF JESUS
CHRIST OF LATTER DAY SAINTS, a
Utah corporation, d/b/a CORPORATION
OF THE PRESIDENT OF THE CHURCH OF
JESUS CHRIST OF LATTER DAY SAINTS,
a Utah corporation; DONALD C. FOSSUM;
and STEVEN D. BRODHEAD,

        Defendants.

DEPOSITION OF STEVEN D. BRODHEAD

        BE IT REMEMBERED that on the 11th day of December 2006, at the hour of 5:08 p.m., the deposition of STEVEN D. BRODHEAD was taken at the request of the Plaintiff, before Caryn E. Winters, RPR, a notary public and court reporter, Washington CCR No. 2496, Idaho CSR No. 237, at 717 West Sprague Avenue, Suite 1200, Spokane, Washington, pursuant to the Washington Rules of Civil Procedure.

7

Page 38

1  A  USAA.
   Q  The insurance company that you had insurance on this
3  vehicle?
4  A  Yes.
5  Q  With about either one of the other occupants, those
6  three girls, were any of them injured?
7  A  I believe there was a settlement for Rochelle and
8  Rebecca.
9  Q  Okay. For both of them?
10 A  But -- I believe so. I didn't hear much about that.
11 But I know that they had to go to the doctor a couple of
12 times at least.
13 Q  Okay. But you don't -- as you sit here today, you don't
14 know whether there was a settlement or not?
15 A  I don't know exactly what, you know, what happened with
16 that.
17 Q  Okay. And just finally, you mentioned the public
18 defender. Were you represented by a public defender in this
19 case?
20 A  Yes.
21 Q  And I shouldn't say finally. I've got a couple
22 follow-up questions. Who was that?
23 A  Now I can't remember.
24 Q  All right.
25 A  I know it's written down somewhere or in some of the

Page 39

1  records. But I can't remember his name.
2  Q  How was that resolved?
3  A  Do you mean --
4  Q  Did you make a plea?
5  A  Yes.
6  Q  And what was the plea?
7  A  To attempted assault and reckless driving.
8  Q  Okay. Was there anything called vehicular assault?
9  A  No.
10 Q  Okay. So it was called reckless driving?
11 A  And attempted assault.
12 Q  And attempted assault?
13 A  Yes.
14 Q  And what was the -- any type of punishment associated
15 with that?
16 A  It was three days in jail with 362 days that I would
17 have had to serve if I broke probation violation. You know.
18 Q  Okay. So you had 365 days, three days served, 362
19 suspended?
20 A  Two years -- I had 30 days license suspension, two years
21 probation. And so if I did anything against my probation I
22 would have had to serve the other 362 days.
23 Q  Okay. Any specific terms with your suspension or with
24 your probation? Community service, anything like that?
25 A  I had a 760 dollar fine. That was -- that was it. I

Page 40

1  didn't have any community service.
2  Q  Was that fine paid?
3  A  Yes.
4  Q  All right. Let me just make sure, after the collision
5  you said -- just at the scene itself, did you talk with --
6  well, let me start all over again.
7      Do you remember the impact itself?
8  A  Yes.
9  Q  Okay. What do you recall about the impact?
10 A  Just slamming into the back of the truck. And I saw --
11 I can't remember if I saw both individuals, but I know I saw
12 at least one fly out of the back of the truck.
13 Q  What about the canopy on the pickup?
14 A  That flew off as well.
15 Q  All right.
16 A  I saw that fly off as well.
17 Q  Okay. And did you go over to see anyone that was -- any
18 of the individuals that had been in the pickup?
19 A  I'd gotten out of my car right after it happened. I was
20 really dizzy. Just about fell over. And I -- I just kind
21 of -- I looked around and just broke down. I didn't know
22 what to do.
23 Q  Sure.
24 A  I called 911 and someone was already --
25 Q  Had called it?

Page 41

1  A  Called it in.
2  Q  All right.
3  A  So but besides that, I didn't know what to do. I was
4  scared.
5  Q  Do you remember having a conversation with anyone there
6  at the scene?
7  A  Well, there was a guy that came up and started yelling
8  at me, you know, asking what -- you know, what I was
9  thinking and stuff. And I started yelling at him. I can't
10 remember all that I said, but something to the effect of,
11 you know, "You don't know what -- you know, how I'm feeling
12 right now" or something. And he apologized later because he
13 realized, you know, that I was -- you know, I wasn't just
14 some punk kid just, you know, --
15 Q  When you say "apologized later," that same afternoon?
16 A  Like ten minutes later.
17 Q  Okay. Do you recall a conversation with anyone else?
18 A  Well, Rochelle and Rebecca's mom drove over. And she
19 was just comforting me. I didn't -- yeah, I was just
20 crying. I didn't have any conversations.
21 Q  All right. Do you know who called her?
22 A  I believe -- well, it was either Rochelle or Rebecca. I
23 think it might have been Rebecca. I don't know.
24 Q  Did you realize there were seven Mormon missionaries in
25 that truck?

Page 42

1  A  Later I did. I didn't know at the time.
2  Q  But, I mean, at the scene were you able to tell that
3     they were Mormon missionaries?
4  A  Yes, I -- once they, you know, they flew out of the
5     truck and stuff, and there was pass along cards everywhere
6     and stuff.
7  Q  Were you familiar with pass along cards?
8  A  Yes.
9  Q  All right. Did they have their name tags on?
10 A  Yes.
11 Q  Did you see Elder Waite at any point in time after the
12    collision but still that afternoon?
13 A  After they took him to the hospital?
14 Q  No, before while he was still at the scene did you see
15    him?
16 A  I didn't see a face. I didn't know who it was until
17    later. But I did see missionaries, you know, that were
18    hurt.
19 Q  Okay. You saw a body that you later knew was Elder
20    Waite laying there?
21 A  Yes.
22 Q  All right. Can you describe for me what you saw?
23 A  From what I can remember, just two individuals, one on
24    the sidewalk and one on the grass.
25 Q  Were they both conscious?

Page 43

1  A  No, I don't think so.
2  Q  Both unconscious?
3  A  I don't know.
4  Q  All right. And, again, just what you remember is all I
5     want.
6  A  Yeah, I didn't go over and -- you know, I -- I didn't
7     know what to do, so I just kind of --
8  Q  Do you remember talking to any of the missionaries at
9     the scene?
10 A  They -- the ones that were in the truck, they, you know,
11    were just comforting me and trying to, you know, let me know
12    that it's going to be okay. But we didn't -- you know, no
13    conversation of the accident.
14 Q  Okay.
15 A  You know, facts or what happened.
16 Q  All right. Any other conversations that we've missed
17    before you get into the police officer's car?
18 A  Not that I can think of. They took me pretty quick, you
19    know, and put me in there.
20 Q  And let me just follow up with what you said, that you
21    saw Thomas Waite or Elder Waite after the collision itself
22    at some point in time. How long after that did you see him?
23 A  I'm trying to remember when that was. I think maybe the
24    next time that I saw him was when he returned on his
25    mission.

Page 44

1  Q  Okay. So you didn't see him at the hospital?
2  A  No, they kind of discouraged, you know, for me to go see
3     him.
4  Q  Okay. Who is "they"?
5  A  Brother Lasley and the mission brethren kind of -- I saw
6     Elder Ryan, Tyler Ryan, and talked to him, you know, to see
7     how he was doing and stuff and told him how sorry I was.
8     But I didn't see Thomas Waite till when he returned on his
9     mission.
10 Q  Where was it when you saw Elder Ryan?
11 A  At the hospital.
12 Q  Okay. Was he in the hospital?
13 A  Yes.
14 Q  All right. And so was that just within a day or so?
15 A  It was that same day.
16 Q  Same day?
17 A  (Nods head).
18 Q  All right. Did they take you to the hospital at the
19    same -- I mean, is that why you were at the hospital
20    initially, was for treatment?
21 A  No, I denied needing treatment.
22 Q  Okay.
23 A  I was more worried about others than myself.
24 Q  All right. That's fair. Okay. So where were you when
25    you saw Elder Waite when he came home or came back from

Page 45

1  California back to the mission?
2  A  Well, when I moved from Everett to Spokane I lived -- I
3     was living with my friend Randy Ross. And --
4  Q  Okay. Well, let's find out when that was. When did you
5     move from Everett to Spokane?
6  A  I moved July 4th of 2004.
7  Q  2004?
8  A  Yeah.
9  Q  And you moved in with Randy Ross?
10 A  Yes.
11 Q  Was that in a home or apartment or --
12 A  A home. I had known their family since I was two. And
13    they had just moved to Spokane almost a year prior to me
14    moving over there.
15 Q  Okay. What's his parents' names?
16 A  Robin and Rhonda.
17 Q  All right. And were they members of the church?
18 A  Yes.
19 Q  And do you know what ward they were in?
20 A  I don't.
21 Q  How long did you live with them?
22 A  Four or five months.
23 Q  Okay. That brings us to Spokane. Then so at what point
24    in time did you meet with Thomas Waite?
25 A  He was actually assigned to their ward as a missionary.

12 (Pages 42 to 45)
Spokane Reporting Service   509-624-6255   office@spokanereporting.com
b00248aa-bc5c-4384-a384-6b19c7899e70

# EXHIBIT B

10

Page 1

UNITED STATES DISTRICT COURT FOR THE

EASTERN DISTRICT OF WASHINGTON

THOMAS A. WAITE,

        Plaintiff,

  vs.                              No.  CV-05-399-EFS

THE CHURCH OF JESUS CHRIST OF
LATTER DAY SAINTS d/b/a
CORPORATION OF THE PRESIDING
BISHOP OF THE CHURCH OF JESUS
CHRIST OF LATTER DAY SAINTS, a
Utah corporation, d/b/a CORPORATION
OF THE PRESIDENT OF THE CHURCH OF
JESUS CHRIST OF LATTER DAY SAINTS,
a Utah corporation; DONALD C. FOSSUM;
and STEVEN D. BRODHEAD,

        Defendants.

DEPOSITION OF STEVEN D. BRODHEAD

        BE IT REMEMBERED that on the 11th day of

December 2006, at the hour of 5:08 p.m., the deposition

of STEVEN D. BRODHEAD was taken at the request of the

Plaintiff, before Caryn E. Winters, RPR, a notary public and

court reporter, Washington CCR No. 2496, Idaho CSR No. 237,

at 717 West Sprague Avenue, Suite 1200, Spokane, Washington,

pursuant to the Washington Rules of Civil Procedure.

Page 6

1  Q  But you had -- is that, yes, you had or --
2  A  Oh, yes, I didn't take it that day.
3  Q  That day? But you had been prescribed Zoloft prior to
4  the motor vehicle collision?
5  A  Yeah, just about two weeks prior.
6  Q  Okay. And had you ever been prescribed Zoloft before
7  that?
8  A  No.
9  Q  Since I'm asking that question, who was the doctor that
10 prescribed that?
11 A  Mark Carlson.
12 Q  And he's over in Seattle?
13 A  Yeah, in Everett.
14 Q  All right. And was there any particular diagnosis of
15 why you were prescribed Zoloft?
16 A  For -- well, just, they started me out on 50 milligrams.
17 That's the basic -- it's -- right now I take 250. So they
18 were -- it was for antidepressant and --
19 Q  Was there any particular diagnosis, though, of why it
20 was prescribed? Just if you remember?
21 A  I was just having problems with depression.
22 Q  All right. So there was a diagnosis of depression at
23 that point in time?
24 A  Yeah.
25 Q  And you were 17? Is that my understanding?

Page 7

1  A  Yeah.
2  Q  Well, let's see, your birthday's in July?
3  A  In October.
4  Q  So your birthday is in October 1985?
5  A  Uh-huh.
6  Q  Is that yes?
7  A  Yes. Sorry.
8  Q  All right. So in August of 2003 you would have been 17?
9  A  Yes.
10 Q  All right. Do you have a recollection of that -- of the
11 events leading up to the collision?
12 A  Yeah. Yes.
13 Q  Okay. You were driving a Honda?
14 A  Yes.
15 Q  Who owned that Honda?
16 A  It was -- I was paying off the rest of the amount to my
17 dad. So he purchased it and I was paying him the rest off.
18 I made a down payment and --
19 Q  Okay. So had he basically sold it to you?
20 A  Yeah. Yes, because I didn't have the money at the time,
21 so he --
22 Q  All right. My understanding is he hadn't transferred
23 the title to you or registration? It was still registered
24 in his name?
25 A  Yes.

Page 8

1  Q  But for all intents and purposes you owned the vehicle?
2  A  Yes.
3  Q  And making payments to him?
4  A  Yes.
5  Q  All right. And as far as your driving history, I
6  understand you haven't had any tickets before this date?
7  A  No.
8  Q  And I'm going to -- do you remember the specific date in
9  August of 2003?
10 A  Yes.
11 Q  And what was the date?
12 A  The 22nd. Or the 21st.
13 Q  Okay. So when we're talking -- so when we talk about
14 this collision, it's the collision that's referenced in this
15 particular Honda you were driving; is that correct?
16 A  Yes.
17 Q  All right. And the Honda, if I recall from the police
18 report, had about 214,000 miles on it?
19 A  Yes.
20 Q  Any idea how many of those miles you put on?
21 A  Probably maybe a thousand.
22 Q  Okay. Because you had your driver's license for about a
23 month?
24 A  Yeah, I had just gotten the car two weeks prior to the
25 accident.

Page 9

1  Q  Okay. And how long had that car been in the family
2  before it was actually -- before it became your car?
3  A  At the same time. We bought it from a friend. So we
4  got it two weeks prior to the accident, and that's when I
5  started driving it.
6  Q  Okay. So you didn't have any history of or knowledge of
7  driving that car before, say, two weeks before this
8  collision?
9  A  No, not of that car.
10 Q  Okay. And specifically with that vehicle then you said
11 it was a friend that you bought it from?
12 A  Yeah.
13 Q  You'd never driven it when it belonged to the friend; is
14 that correct?
15 A  I had boughten it, yeah. It belonged to them but I had,
16 you know, boughten it from then.
17 Q  I understand. But you'd never driven it prior to the
18 two-week period of time before this collision?
19 A  No.
20 Q  Okay. So the first time you ever drove it was after it
21 was purchased by your family?
22 A  Yes.
23 Q  All right. And it had approximately -- or, it had over
24 200,000 miles when it was purchased?
25 A  Yes.

12                                            3 (Pages 6 to 9)
Spokane Reporting Service    509-624-6255    office@spokanereporting.com
b00248aa-bc5c-4384-a384-6b19c7899e70

# EXHIBIT C

13

UNITED STATES DISTRICT COURT FOR THE

EASTERN DISTRICT OF WASHINGTON

THOMAS A. WAITE,

        Plaintiff,

vs.                        No. CV-05-399-EFS

THE CHURCH OF JESUS CHRIST OF
LATTER DAY SAINTS d/b/a
CORPORATION OF THE PRESIDING
BISHOP OF THE CHURCH OF JESUS
CHRIST OF LATTER DAY SAINTS, a
Utah corporation, d/b/a CORPORATION
OF THE PRESIDENT OF THE CHURCH OF
JESUS CHRIST OF LATTER DAY SAINTS,
a Utah corporation; DONALD C. FOSSUM;
and STEVEN D. BRODHEAD,

        Defendants.

DEPOSITION OF STEVEN D. BRODHEAD

        BE IT REMEMBERED that on the 11th day of December 2006, at the hour of 5:08 p.m., the deposition of STEVEN D. BRODHEAD was taken at the request of the Plaintiff, before Caryn E. Winters, RPR, a notary public and court reporter, Washington CCR No. 2496, Idaho CSR No. 237, at 717 West Sprague Avenue, Suite 1200, Spokane, Washington, pursuant to the Washington Rules of Civil Procedure.



Page 2

1 APPEARANCES:
  FOR THE PLAINTIFF:
  NORDSTROM & NEES, P.S.
  By: Stephen L. Nordstrom
4   Attorney at Law
  323 South Pines Road
5 Spokane, Washington 99206
6 FOR BRODHEAD:
7 PAINE, HAMBLEN, COFFIN, BROOKE & MILLER
  By: Andrew C. Smythe
8   Attorney at Law
  717 West Sprague Avenue, Suite 1200
9 Spokane, Washington 99201
10 FOR THE CHURCH OF JESUS CHRIST OF LATTER DAY SAINTS and
   FOSSUM:
11
   WITHERSPOON, KELLEY, DAVENPORT & TOOLE
12 By: Brian T. Rekofke
     Attorney at Law
13 422 West Riverside Avenue, Suite 1100
   Spokane, Washington 99201
14
   KIRTON & McCONKIE
15 By: Christian S. Collins
     Attorney at Law
16 1800 Eagle Gate Tower
   60 East South Temple
17 P.O. Box 45120
   Salt Lake City, Utah 84145-0120
18
19
20       *****
21
22
23
24
25

Page 3

1         INDEX
2
  WITNESS: STEVEN D. BRODHEAD
3
4 EXAMINATION:
5 By Mr. Nordstrom - Page No. 3-8
6 By Mr. Rekofke - Page No. 51-14
7
8 EXHIBITS MARKED:
9 None.

         *****

Page 4

1         STEVEN D. BRODHEAD,
2       called as a witness at the request
3       of the Plaintiff herein, having
4       been first duly sworn on oath,
5         did testify as follows:
6
7      THE WITNESS: Yes, I do.
8        EXAMINATION
9 BY MR. NORDSTROM:
10 Q State your name and your address, please.
11 A Steven Daniel Brodhead, 502 East Garden Avenue,
12 Apartment 3, Coeur D'Alene, Idaho, 83814.
13 Q Mr. Brodhead, I'm Stephen Nordstrom, and I represent a
14 Thomas Waite. I don't know if you're familiar with that
15 name.
16 A (Nods head).
17 Q But one of the individuals involved in the collision
18 with you in August of 2003.
19 A Uh-huh.
20 Q Did you ever meet him?
21 A Yeah, I had the opportunity to meet him.
22 Q Okay. Have you ever had your deposition taken before?
23 A No, this is the first time.
24 Q All right. You're represented by counsel. I presume
25 you've had a chance to talk with him?

Page 5

1 A Uh-huh.
2 Q You have to answer yes or no.
3 A Okay. Sorry, yes.
4 Q And have you done anything to prepare for your
5 deposition today? Specifically, have you read any
6 documents?
7 A No, I haven't.
8 Q Reviewed any police reports, anything like that?
9 A We reviewed the police report briefly but that's about
10 it.
11 Q Okay. How long ago did you do that?
12 A We just did that just right before I came in.
13 Q Just before you came in?
14 A Yeah.
15 Q Okay. And are you on any kind of medication that would
16 make it difficult for you to respond today in any way?
17 A I don't see how my medication would affect that.
18 Q Are you on some medication now?
19 A Yeah, I take Zoloft.
20 Q Zoloft? Okay. I notice I had you were on Zoloft at the
21 time of this collision, --
22 A Uh-huh.
23 Q -- except you hadn't taken it on the day of the
24 collision; is that correct?
25 A Yes.

2 (Pages 2 to 5)

Page 6

1  Q  But you had -- is that, yes, you had or --
   A  Oh, yes, I didn't take it that day.
3  Q  That day? But you had been prescribed Zoloft prior to
4  the motor vehicle collision?
5  A  Yeah, just about two weeks prior.
6  Q  Okay. And had you ever been prescribed Zoloft before
7  that?
8  A  No.
9  Q  Since I'm asking that question, who was the doctor that
10 prescribed that?
11 A  Mark Carlson.
12 Q  And he's over in Seattle?
13 A  Yeah, in Everett.
14 Q  All right. And was there any particular diagnosis of
15 why you were prescribed Zoloft?
16 A  For -- well, just, they started me out on 50 milligrams.
17 That's the basic -- it's -- right now I take 250. So they
18 were -- it was for antidepressant and --
19 Q  Was there any particular diagnosis, though, of why it
20 was prescribed? Just if you remember?
21 A  I was just having problems with depression.
22 Q  All right. So there was a diagnosis of depression at
23 that point in time?
24 A  Yeah.
25 Q  And you were 17? Is that my understanding?

Page 7

1  A  Yeah.
2  Q  Well, let's see, your birthday's in July?
3  A  In October.
4  Q  So your birthday is in October 1985?
5  A  Uh-huh.
6  Q  Is that yes?
7  A  Yes. Sorry.
8  Q  All right. So in August of 2003 you would have been 17?
9  A  Yes.
10 Q  All right. Do you have a recollection of that -- of the
11 events leading up to the collision?
12 A  Yeah. Yes.
13 Q  Okay. You were driving a Honda?
14 A  Yes.
15 Q  Who owned that Honda?
16 A  It was -- I was paying off the rest of the amount to my
17 dad. So he purchased it and I was paying him the rest off.
18 I made a down payment and --
19 Q  Okay. So had he basically sold it to you?
20 A  Yeah. Yes, because I didn't have the money at the time,
21 so he --
22 Q  All right. My understanding is he hadn't transferred
23 the title to you or registration? It was still registered
24 in his name?
25 A  Yes.

Page 8

1  Q  But for all intents and purposes you owned the vehicle?
2  A  Yes.
3  Q  And making payments to him?
4  A  Yes.
5  Q  All right. And as far as your driving history, I
6  understand you haven't had any tickets before this date?
7  A  No.
8  Q  And I'm going to -- do you remember the specific date in
9  August of 2003?
10 A  Yes.
11 Q  And what was the date?
12 A  The 22nd. Or the 21st.
13 Q  Okay. So when we're talking -- so when we talk about
14 this collision, it's the collision that's referenced in this
15 particular Honda you were driving; is that correct?
16 A  Yes.
17 Q  All right. And the Honda, if I recall from the police
18 report, had about 214,000 miles on it?
19 A  Yes.
20 Q  Any idea how many of those miles you put on?
21 A  Probably maybe a thousand.
22 Q  Okay. Because you had your driver's license for about a
23 month?
24 A  Yeah, I had just gotten the car two weeks prior to the
25 accident.

Page 9

1  Q  Okay. And how long had that car been in the family
2  before it was actually -- before it became your car?
3  A  At the same time. We bought it from a friend. So we
4  got it two weeks prior to the accident, and that's when I
5  started driving it.
6  Q  Okay. So you didn't have any history of or knowledge of
7  driving that car before, say, two weeks before this
8  collision?
9  A  No, not of that car.
10 Q  Okay. And specifically with that vehicle then you said
11 it was a friend that you bought it from?
12 A  Yeah.
13 Q  You'd never driven it when it belonged to the friend; is
14 that correct?
15 A  I had boughten it, yeah. It belonged to them but I had,
16 you know, boughten it from then.
17 Q  I understand. But you'd never driven it prior to the
18 two-week period of time before this collision?
19 A  No.
20 Q  Okay. So the first time you ever drove it was after it
21 was purchased by your family?
22 A  Yes.
23 Q  All right. And it had approximately -- or, it had over
24 200,000 miles when it was purchased?
25 A  Yes.

# EXHIBIT D

UNITED STATES DISTRICT COURT FOR THE

EASTERN DISTRICT OF WASHINGTON

---

THOMAS A. WAITE,

        Plaintiff,

vs.                         No. CV-05-399-EFS

THE CHURCH OF JESUS CHRIST OF
LATTER DAY SAINTS d/b/a
CORPORATION OF THE PRESIDING
BISHOP OF THE CHURCH OF JESUS
CHRIST OF LATTER DAY SAINTS, a
Utah corporation, d/b/a CORPORATION
OF THE PRESIDENT OF THE CHURCH OF
JESUS CHRIST OF LATTER DAY SAINTS,
a Utah corporation; DONALD C. FOSSUM;
and STEVEN D. BRODHEAD,

        Defendants.

---

DEPOSITION OF STEVEN D. BRODHEAD

---

        BE IT REMEMBERED that on the 11th day of

December 2006, at the hour of 5:08 p.m., the deposition

of STEVEN D. BRODHEAD was taken at the request of the

Plaintiff, before Caryn E. Winters, RPR, a notary public and

court reporter, Washington CCR No. 2496, Idaho CSR No. 237,

at 717 West Sprague Avenue, Suite 1200, Spokane, Washington,

pursuant to the Washington Rules of Civil Procedure.



Page 18

```
 1  Q  That's fair.
    A  -- told me how to go.
    Q  All right. And I understand that they wanted you to
 4  avoid Sprague Avenue because of traffic; is that correct?
 5  A  They said not to take 16th.
 6  Q  16th. And, well, explain to me why you ended up on 8th
 7  Avenue.
 8  A  We were driving back. We were going to go see one of
 9  Sheila's friends before Sheila left for Las Vegas. So I was
10  going to take them there. And so I -- since I didn't know
11  where this girl's house was, they were, you know, going to
12  tell me how to get there.
13      I was just going to take 16th because Dallas
14  lives off of 16th over by Evergreen, and so, you know, I was
15  more familiar with that road. And they said to take 8th, so
16  I took 8th.
17  Q  Okay. So if I understand you correctly, someplace up on
18  North Pines, North of Sprague, you picked up some school
19  books for them?
20  A  Dropped them off.
21  Q  Dropped them off? And you had all three of the girls in
22  the car at that time?
23  A  Yes.
24  Q  Sheila was in the shotgun passenger seat? Was that
25  right?
```

Page 19

```
 1  A  Yes.
 2  Q  And where was Rochelle and where was Rebecca?
 3  A  I can't remember if Rochelle or Rebecca was in the back
 4  right.
 5  Q  Okay. But they were in the back, the twins?
 6  A  Yes, they were in the back.
 7  Q  Okay. The twins? And you had bucket seats in the
 8  Honda?
 9  A  Yes. It had -- well, there was a bench in the back.
10  Q  Okay. Bench in the back, bucket seats in the front?
11  A  Yes.
12  Q  Stick or automatic?
13  A  Automatic.
14  Q  And then they told you to take 8th Avenue?
15  A  Yes.
16  Q  So you were on Pines Road and you turned east off onto
17  8th; is that correct?
18  A  Yes.
19  Q  My understanding, you'd never been on 8th Avenue before?
20  A  Yes, it was the first time.
21  Q  Okay. Not familiar with it at all?
22  A  No.
23  Q  All right. You drive over to Evergreen and --
    A  Yes.
    Q  And do you remember what the configuration of Evergreen
```

Page 20

```
 1  is as far as stop signs?
 2  A  Later I figured out what the configuration was. When I
 3  got to the stop sign I thought it was a four-way stop for
 4  some reason. And that's why then I proceeded through the
 5  intersection.
 6  Q  You were upset at somebody?
 7  A  Yeah. Well, I -- a car came, you know, towards me,
 8  almost T-boned me. And so I got mad and yelled and floored
 9  it.
10  Q  So that's why I was a little confused. So as you sit
11  here today you remember, though, it was stop signs stopping
12  you on 8th Avenue, correct?
13  A  Yes.
14  Q  But so the right-of-way without a stop sign was on
15  Evergreen, correct?
16  A  Yes.
17  Q  And so you started after you -- did you stop at the stop
18  sign at Evergreen?
19  A  Yes.
20  Q  All right. And you entered into the intersection, and
21  you were almost hit by a car that was traveling north or
22  south on Evergreen?
23  A  North.
24  Q  North? And almost got hit. And you thought they were
25  supposed to stop, and is that why you were upset?
```

Page 21

```
 1  A  Yes.
 2  Q  All right. And you yell something. Do you remember
 3  what you yelled?
 4  A  I don't remember what I yelled. But I yelled. I
 5  remember that.
 6  Q  But you were upset?
 7  A  Yes.
 8  Q  And I understand, had you already had your conversation
 9  with your girlfriend prior to this time?
10  A  Yes, about ten minutes prior.
11  Q  Okay. So about ten minutes? Did you have a cell phone?
12  A  Yes.
13  Q  Okay. So you had a cell phone with you. You'd been on
14  the cell phone before you turned, at some point in time
15  before you turned off onto 8th Avenue. But my understanding
16  is you did not have a cell phone, you didn't use the cell
17  phone once you got on 8th Avenue; is that correct?
18  A  I didn't use it at all when I was driving.
19  Q  Okay. That's fair. But there wasn't any type of
20  collision on Evergreen and 8th Avenue at that point?
21  A  No.
22  Q  But you yelled, and I understand you honked your horn.
23  Do you recall doing that?
24  A  Yes.
25  Q  All right. Do you recall for how long you honked your
```



# EXHIBIT E

20

```
                                              FILED
                                           MAR 1 5 2004
                                          THOMAS R. FALLQUIST
                                         SPOKANE COUNTY CLERK
```

| Superior COURT OF WASHINGTON FOR Spokane County | |
|---|---|
| State of Washington, Plaintiff | NO. 03-1-03773-8 |
| vs. Steven D. Brodhead, Defendant. | STATEMENT OF DEFENDANT ON PLEA OF GUILTY |

1. ✓ My true name is __Steven D. Brodhead__.
2. ✓ My age is __18__.
3.    I went through the __11th__ grade. Graduation in June.
4.    I HAVE BEEN INFORMED AND FULLY UNDERSTAND THAT:

   (a) I have the right to representation by a lawyer and that if I cannot afford to pay for a lawyer, one will be provided at no expense to me.

   (b) I am charged with: ① Attempted 3rd Degree Assault ② Reckless Driving

   The elements are: ~~as described by reference contained in the Information~~ — amended —

5. I UNDERSTAND THAT I HAVE THE FOLLOWING IMPORTANT RIGHTS, AND I GIVE THEM ALL UP BY PLEADING GUILTY:

   (a) The right to a speedy and public trial by an impartial jury in the county where the crime is alleged to have been committed;

   (b) The right to remain silent before and during trial, and the right to refuse to testify against myself;

   (c) The right at trial to hear and question the witnesses who testify against me;

STATEMENT OF DEFENDANT ON PLEA OF GUILTY - Page 1 of 4
CrRLJ-04.0200 (08/2002) - CrRLJ 4.2(g)

21

    (d)    The right at trial to testify and to have witnesses testify for me. These witnesses can be made to appear at no expense to me;

    (e)    I am presumed innocent unless the charge is proven beyond a reasonable doubt or I enter a plea of guilty;

    (f)    The right to appeal a finding of guilt after a trial.

6. IN CONSIDERING THE CONSEQUENCES OF MY GUILTY PLEA, I UNDERSTAND THAT:

*on each count* (a) The crime with which I am charged carries a maximum sentence of __365__ days in jail and a $__5000__ fine.

    (b)    The prosecuting authority will make the following recommendation to the judge: __Reduction of charges, agreed recommendation of 2 days jail to be served.__

    (c)    The judge does not have to follow anyone's recommendation as to sentence. The judge can give me any sentence up to the maximum authorized by law no matter what the prosecuting authority or anyone else recommends.

    (d)    The judge may place me on probation for up to ~~five years if I am sentenced under RCW 46.61.5055 or up to~~ two years ~~for all other offenses~~ and impose conditions of probation. If the court orders me to appear at a hearing regarding my compliance with probation and I fail to attend the hearing, the term of probation will be tolled until I appear before the court on the record.

    (e)    The judge may require me to pay costs, fees and assessments authorized by law. The judge may also order me to make restitution to any victims who lost money or property as a result of crimes I committed. The maximum amount of restitution is double the amount of the loss of all victims or double the amount of my gain.

    (f)    If I am not a citizen of the United States, a plea of guilty to an offense punishable as a crime under state law is grounds for deportation, exclusion from admission to the United States, or denial of naturalization pursuant to the laws of the United States. *Defendant is a U.S. citizen.*

NOTIFICATION RELATING TO SPECIFIC CRIMES: IF ANY OF THE FOLLOWING PARAGRAPHS APPLY, THE BOX SHOULD BE CHECKED AND THE PARAGRAPH INITIALED BY THE DEFENDANT.

*SB*

[ ]g    The crime of _____ has a mandatory ~~minimum~~ sentence of _____ days in jail and $_____ fine plus costs and assessments. The law does not allow any reduction of this sentence.

[ ]h    If this crime involves a sexual offense, prostitution, or a drug offense associated with hypodermic needles, I will be required to undergo testing for the human immunodeficiency (AIDS) virus.

[X]i    This plea of guilty will result in suspension or revocation of my driving license or privilege by the Department of Licensing for a period of __at least 30 days__. This period may not include suspension or revocation based on other matters.

STATEMENT OF DEFENDANT ON PLEA OF GUILTY - Page 2 of 4
CrRLJ-04.0200 (08/2002) - CrRLJ 4.2(g)

**22**

[ ]j    I understand that I may not possess, own, or have under my control any firearm unless my right to do so is restored by a court of record and that I must immediately surrender any concealed pistol license. RCW 9.41.040.

[ ]k    If this crime involves a drug offense, my eligibility for state and federal education benefits will be affected. 20 U.S.C. § 1091(r).

[ ]l    If this case involves driving while under the influence of alcohol and/or being in actual physical control of a vehicle while under the influence of alcohol and/or drugs, I have been informed and understand that I will be subject to
[ ] the penalties described in the "DUI" Attachment.
OR
[ ] these penalties: The mandatory minimum sentence of _____ days in jail, _____ days of electronic home monitoring and $_____ monetary penalty. I will also be required to drive only motor vehicles equipped with an ignition interlock device for _____ years. My driving privilege will be suspended or revoked by the Department of Licensing for the period of time stated in paragraph 6(i). In lieu of the minimum jail term, the judge may order me to serve _____ days in electronic home monitoring. If I do not have a dwelling, telephone service, or any other necessity to operate electronic home monitoring; if I live out of state; or if the judge determines I would violate the terms of electronic home monitoring, the judge may waive electronic home monitoring and impose an alternative sentence which may include additional jail time, work crew or work camp.

[ ]m    I understand that if this crime involves sexual misconduct with a minor in the second degree, communication with a minor for immoral purposes, or attempt, solicitation or conspiracy to commit a sex offense, or a kidnapping offense involving a minor, as defined in RCW 9A.44.130, I will be required to register with the county sheriff as described in the "Offender Registration" Attachment.

[ ]n    If this crime involves stalking, harassment or communication with a minor for immoral purposes, I will be required to have a biological sample collected for purposes of DNA identification analysis. RCW 43.43.754.

SB

7. I plead guilty to the crime of **Attempted 3rd Degree Assault + Reckless Driving** as charged in the complaint or citation and notice. I have received a copy of that complaint or citation and notice.

8. I make this plea freely and voluntarily.

9. No one has threatened harm of any kind to me or to any other person to cause me to make this plea.

10. No person has made promises of any kind to cause me to enter this plea except as set forth in this statement.

11. The judge has asked me to state in my own words what I did that makes me guilty of this crime. This is my statement:
**Being agrivated, I drove at an excessive speed + hit a truck + injuries were then caused.**

[ ] Instead of making a statement, I agree that the court may review the police reports and/or a

STATEMENT OF DEFENDANT ON PLEA OF GUILTY - Page 3 of 4
CrRLJ-04.0200 (08/2002) - CrRLJ 4.2(g)

23


statement of probable cause supplied by the prosecution to establish a factual basis for the plea.

12. My lawyer has explained to me, and we have fully discussed, all of the above paragraphs. I understand them all. I have been given a copy of this "Statement of Defendant on Plea of Guilty." I have no further questions to ask the judge.

Date: 3/15/04

_Steve Brodhead_
Defendant

_[signature]_
Prosecuting Authority and Bar # 13246
Clint Francis
Print Name

I have read and discussed this statement with the defendant and believe that the defendant is competent and fully understands the statement.

_[signature]_ 11623
Defendant's Lawyer and Bar #
Steven A. Reich
Print name

The foregoing statement was signed by the defendant in open court in the presence of the defendant's lawyer and the undersigned judge. The defendant asserted that (check the appropriate box):

✓ [X] (a) The defendant had previously read; or
  [X] (b) The defendant's lawyer had previously read to him or her; or
  [ ] (c) An interpreter had previously read to the defendant the entire statement above and that the defendant understood it in full.

I find the defendant's plea of guilty to be knowingly, intelligently and voluntarily made. Defendant understands the charges and the consequences of the plea. There is a factual basis for the plea. The defendant is guilty as charged.

DATED: 3/15/04

_[signature]_
Judge
TARI EITZEN