# EXHIBIT F

UNITED STATES DISTRICT COURT FOR THE

EASTERN DISTRICT OF WASHINGTON

---

THOMAS A. WAITE,

        Plaintiff,

vs.                        No. CV-05-399-EFS

THE CHURCH OF JESUS CHRIST OF
LATTER DAY SAINTS d/b/a
CORPORATION OF THE PRESIDING
BISHOP OF THE CHURCH OF JESUS
CHRIST OF LATTER DAY SAINTS, a
Utah corporation, d/b/a CORPORATION
OF THE PRESIDENT OF THE CHURCH OF
JESUS CHRIST OF LATTER DAY SAINTS,
a Utah corporation; DONALD C. FOSSUM;
and STEVEN D. BRODHEAD,

        Defendants.

---

DEPOSITION OF STEVEN D. BRODHEAD

---

        BE IT REMEMBERED that on the 11th day of December 2006, at the hour of 5:08 p.m., the deposition of STEVEN D. BRODHEAD was taken at the request of the Plaintiff, before Caryn E. Winters, RPR, a notary public and court reporter, Washington CCR No. 2496, Idaho CSR No. 237, at 717 West Sprague Avenue, Suite 1200, Spokane, Washington, pursuant to the Washington Rules of Civil Procedure.

26

Page 18

Q That's fair.
A -- told me how to go.
Q All right. And I understand that they wanted you to avoid Sprague Avenue because of traffic; is that correct?
A They said not to take 16th.
Q 16th. And, well, explain to me why you ended up on 8th Avenue.
A We were driving back. We were going to go see one of Sheila's friends before Sheila left for Las Vegas. So I was going to take them there. And so I -- since I didn't know where this girl's house was, they were, you know, going to tell me how to get there.
I was just going to take 16th because Dallas lives off of 16th over by Evergreen, and so, you know, I was more familiar with that road. And they said to take 8th, so I took 8th.
Q Okay. So if I understand you correctly, someplace up on North Pines, North of Sprague, you picked up some school books for them?
A Dropped them off.
Q Dropped them off? And you had all three of the girls in the car at that time?
A Yes.
Q Sheila was in the shotgun passenger seat? Was that right?

Page 19

A Yes.
Q And where was Rochelle and where was Rebecca?
A I can't remember if Rochelle or Rebecca was in the back right.
Q Okay. But they were in the back, the twins?
A Yes, they were in the back.
Q Okay. The twins? And you had bucket seats in the Honda?
A Yes. It had -- well, there was a bench in the back.
Q Okay. Bench in the back, bucket seats in the front?
A Yes.
Q Stick or automatic?
A Automatic.
Q And then they told you to take 8th Avenue?
A Yes.
Q So you were on Pines Road and you turned east off onto 8th; is that correct?
A Yes.
Q My understanding, you'd never been on 8th Avenue before?
A Yes, it was the first time.
Q Okay. Not familiar with it at all?
A No.
Q All right. You drive over to Evergreen and --
A Yes.
Q And do you remember what the configuration of Evergreen

Page 20

is as far as stop signs?
A Later I figured out what the configuration was. When I got to the stop sign I thought it was a four-way stop for some reason. And that's why then I proceeded through the intersection.
Q You were upset at somebody?
A Yeah. Well, I -- a car came, you know, towards me, almost T-boned me. And so I got mad and yelled and floored it.
Q So that's why I was a little confused. So as you sit here today you remember, though, it was stop signs stopping you on 8th Avenue, correct?
A Yes.
Q But so the right-of-way without a stop sign was on Evergreen, correct?
A Yes.
Q And so you started after you -- did you stop at the stop sign at Evergreen?
A Yes.
Q All right. And you entered into the intersection, and you were almost hit by a car that was traveling north or south on Evergreen?
A North.
Q North? And almost got hit. And you thought they were supposed to stop, and is that why you were upset?

Page 21

A Yes.
Q All right. And you yell something. Do you remember what you yelled?
A I don't remember what I yelled. But I yelled. I remember that.
Q But you were upset?
A Yes.
Q And I understand, had you already had your conversation with your girlfriend prior to this time?
A Yes, about ten minutes prior.
Q Okay. So about ten minutes? Did you have a cell phone?
A Yes.
Q Okay. So you had a cell phone with you. You'd been on the cell phone before you turned, at some point in time before you turned off onto 8th Avenue. But my understanding is you did not have a cell phone, you didn't use the cell phone once you got on 8th Avenue; is that correct?
A I didn't use it at all when I was driving.
Q Okay. That's fair. But there wasn't any type of collision on Evergreen and 8th Avenue at that point?
A No.
Q But you yelled, and I understand you honked your horn. Do you recall doing that?
A Yes.
Q All right. Do you recall for how long you honked your

# EXHIBIT G

28

UNITED STATES DISTRICT COURT FOR THE

EASTERN DISTRICT OF WASHINGTON

---

THOMAS A. WAITE,

Plaintiff,

vs. No. CV-05-399-EFS

THE CHURCH OF JESUS CHRIST OF LATTER DAY SAINTS d/b/a CORPORATION OF THE PRESIDING BISHOP OF THE CHURCH OF JESUS CHRIST OF LATTER DAY SAINTS, a Utah corporation, d/b/a CORPORATION OF THE PRESIDENT OF THE CHURCH OF JESUS CHRIST OF LATTER DAY SAINTS, a Utah corporation; DONALD C. FOSSUM; and STEVEN D. BRODHEAD,

Defendants.

---

DEPOSITION OF STEVEN D. BRODHEAD

---

BE IT REMEMBERED that on the 11th day of December 2006, at the hour of 5:08 p.m., the deposition of STEVEN D. BRODHEAD was taken at the request of the Plaintiff, before Caryn E. Winters, RPR, a notary public and court reporter, Washington CCR No. 2496, Idaho CSR No. 237, at 717 West Sprague Avenue, Suite 1200, Spokane, Washington, pursuant to the Washington Rules of Civil Procedure.

29

b00248aa-bc5c-4384-a384-6b19c7899e70

horn?
A I don't.
Q All right. And at that point in time I also understand you floored the accelerator?
A Yes.
Q And you hadn't taken any medication that day?
A Yeah, I didn't take any.
Q Were you feeling pretty upset, or can you kind of give me a feel of how you were feeling at that point? I know you told the police officer frustrated, but can you tell me any other words that may describe how you felt?
A Well, with the Zoloft it -- you know, any medication, it takes awhile to cycle through your system and to actually start working. And, you know, I'm taking 250 milligrams now. So that's --
Q You were taking a hundred milligrams at that point in time, though?
A I was taking 50.
Q 50?
A That's what I started out at. And after that day of the accident is when I -- I bumped my medication up myself and talked to my doctor about it.
Q Okay. I just was reading -- it just had indicated -- in fact, maybe I can -- I don't need to mark this, but let me just show you, maybe if this will refresh your recollection.

And I'm not even sure if it's accurate. It's in this paragraph right here. It just indicates --
MR. REKOFKE: Is this page four?
MR. NORDSTROM: You should have it.
MR. REKOFKE: I'm there.
Q (By Mr. Nordstrom) "He said he was taking 100 milligrams a day, but did not take any on 8-2-03."
A Yeah, and I never caught that. And it should have been --
Q 50?
A -- 50.
Q Okay.
A Because that's the starting off.
Q You floor the Honda?
A Yes.
Q Does it have a four cylinder in it or six?
A Four cylinder.
Q Four cylinder? And you floored it, and you indicate that you actually saw the needle hit 70 miles per hour?
A Yes.
Q All right. And then it's your testimony -- or, is it your testimony then you let your foot off of the accelerator and started slowing down about halfway down the road?
A Yes.
Q Okay. Can you tell me, when you say about halfway down

the road, what are we talking? Are we talking about halfway between when you left Evergreen before the impact at McDonald -- or, I mean, Adams?
A At that time I don't -- since, you know, I don't really know that area, I can't really say what halfway is. Just a way to explain it. I don't know exactly, you know, halfway of that road.
Q Okay. So as we sit here today, when you told the police officer "slowing about halfway down the road" you're not sure what you meant?
A That was just the best I could explain it.
Q Okay. Now, when you had left Pines Road you did have to cross, first of all, McDonald Road where there was a stop sign. Do you remember that?
A Not vaguely.
Q Let me just ask a bit further. Between Pines and before you got to Evergreen, when you yelled at this guy, do you remember traveling between Pines Road and McDonald Road?
A Once again, I wasn't too familiar with the roads.
Q Okay.
A So I'm sure I came -- well, of course I came through it, you know.
Q Okay.
A If that's in between. But --
Q And then traveled down to Evergreen Road. But none of

that stands out in your mind as we sit here today, before you get to Evergreen when you yell at this guy that almost hit you?
A No, just Evergreen is the one that stands out.
Q Okay. That's fair. But you do recall at some point in time slowing down. Do you hit the brakes or do you just take your foot off the accelerator, do you remember?
A I took my foot off the accelerator and had my foot still over the accelerator, but I wasn't pressing that.
Q Okay. All right. And it indicates in the police report -- you indicated you looked at it -- it said that "He saw the stop sign at Adams and hit the brakes."
Do you recall at some point in time seeing stop signs, a stop sign at Adams Road?
A That was the first time I had been down towards Adams.
Q No. But, I mean, before the collision occurred, at some point in time you remember seeing a stop sign on this date as you're traveling -- now just talking about this date, so the very first time you've been on the road. But I'm talking about as you were approaching Adams Road on this occasion, at some point in time you do remember seeing a stop sign for you?
A Yes.
Q All right. And do you recall, I believe one of the girls in the car with you yelled something about a stop

30

braking or were you talking just when you were driving at 35 or 40 miles an hour?
A Just driving --
Q Okay.
A -- at 35. Not -- I don't believe that I was describing it when I was braking.
Q The next sentence, "He said the car had no brake problems."
A Yeah.
Q Okay.
A But --
Q You had never -- well, let me ask you this: Had you ever taken the car up between 65 and 70 miles an hour prior to that time and applied the brakes?
A On the freeway, yes.
Q Okay. I asked you two questions.
A Oh, sorry.
Q Let me break it down. You had driven the car on the freeway at 65 to 70 miles an hour prior to the accident?
A Yes.
Q Had you ever, while driving at 65 to 70 miles an hour, slammed the brakes on?
A Not slammed the brakes.
Q Okay. Let me go back to a couple of statements in the report from the accident.

And just so the record's clear, it's the Spokane County Sheriff's Office. It says, "Additional report, case number 03-274571." And it appears to be authored by Detective R. Miya, M-I-Y-A, from the Spokane County Sheriff's Office.

On page four of the document, I just want to read some statements to you. And if you have a copy maybe you can follow along.
A Yes, I have it.
Q Okay. Go to the last paragraph on page four about halfway down. And it says, "Brodhead said he saw the needle hit 70 MPH. Then he let off soon after."

Is that accurate?
A Yes.
Q Okay. "He said he knew he was going at least 70 miles per hour and started slowing about halfway down the road."

Is that accurate? I know you mentioned about whether it was halfway or not.
A Yes.
Q But you were going at least 70 miles an hour, took your foot off the accelerator but did not apply your brakes at that time; is that correct?
A Yes.
Q Okay. "Brodhead said he saw the stop sign at Adams and hit the brakes." Is that correct?

A Yes.
Q So is my understanding correct, that what made you hit the brakes was your realization there was a stop sign ahead?
A Yes.
Q Okay. Last, "He said he skidded and slammed into the truck." Is that accurate?
A Yes.
Q Okay. Now, were you -- there's some questions about the statements of, I guess, the Hamilton twins, and was it Sheila Brown?
A Yeah.
Q Were you present when they gave their statements to one of the officers?
A No, I wasn't.
Q Did they separate you out and everybody gave what they could recall?
A Yes.
Q Okay. I understand you were a little shook up?
A Yes. Very.
Q And how about the passengers, the Hamilton twins and Sheila Brown? Were they shook up?
A Yes, we were all crying pretty hard and --
Q That being said, do you have any idea how many number of seconds it was from the first time you saw the truck until impact?

A It seemed almost instantly. But you know how it happens fast. I -- but I can't -- I don't know if I can put a number on it.
Q Okay. That's all the questions I have. Thanks.
A (Nods head).

MR. NORDSTROM: We'll order it up.

MR. REKOFKE: Copy please.

MR. SMYTHE: We can waive signature.

(Deposition concluded at 6:15 p.m.)

(Signature is waived.)

31

# EXHIBIT H

32

UNITED STATES DISTRICT COURT FOR THE

EASTERN DISTRICT OF WASHINGTON

THOMAS A. WAITE,

Plaintiff,

vs. No. CV-05-399-EFS

THE CHURCH OF JESUS CHRIST OF LATTER DAY SAINTS d/b/a CORPORATION OF THE PRESIDING BISHOP OF THE CHURCH OF JESUS CHRIST OF LATTER DAY SAINTS, a Utah corporation, d/b/a CORPORATION OF THE PRESIDENT OF THE CHURCH OF JESUS CHRIST OF LATTER DAY SAINTS, a Utah corporation; DONALD C. FOSSUM; and STEVEN D. BRODHEAD,

Defendants.

DEPOSITION OF STEVEN D. BRODHEAD

BE IT REMEMBERED that on the 11th day of December 2006, at the hour of 5:08 p.m., the deposition of STEVEN D. BRODHEAD was taken at the request of the Plaintiff, before Caryn E. Winters, RPR, a notary public and court reporter, Washington CCR No. 2496, Idaho CSR No. 237, at 717 West Sprague Avenue, Suite 1200, Spokane, Washington, pursuant to the Washington Rules of Civil Procedure.

33

b00248aa-bc5c-4384-a384-6b19c7899e70

braking or were you talking just when you were driving at 35 or 40 miles an hour?
A Just driving --
Q Okay.
A -- at 35. Not -- I don't believe that I was describing it when I was braking.
Q The next sentence, "He said the car had no brake problems."
A Yeah.
Q Okay.
A But --
Q You had never -- well, let me ask you this: Had you ever taken the car up between 65 and 70 miles an hour prior to that time and applied the brakes?
A On the freeway, yes.
Q Okay. I asked you two questions.
A Oh, sorry.
Q Let me break it down. You had driven the car on the freeway at 65 to 70 miles an hour prior to the accident?
A Yes.
Q Had you ever, while driving at 65 to 70 miles an hour, slammed the brakes on?
A Not slammed the brakes.
Q Okay. Let me go back to a couple of statements in the report from the accident.

And just so the record's clear, it's the Spokane County Sheriff's Office. It says, "Additional report, case number 03-274571." And it appears to be authored by Detective R. Miya, M-I-Y-A, from the Spokane County Sheriff's Office.

On page four of the document, I just want to read some statements to you. And if you have a copy maybe you can follow along.
A Yes, I have it.
Q Okay. Go to the last paragraph on page four about halfway down. And it says, "Brodhead said he saw the needle hit 70 MPH. Then he let off soon after."
Is that accurate?
A Yes.
Q Okay. "He said he knew he was going at least 70 miles per hour and started slowing about halfway down the road."
Is that accurate? I know you mentioned about whether it was halfway or not.
A Yes.
Q But you were going at least 70 miles an hour, took your foot off the accelerator but did not apply your brakes at that time; is that correct?
A Yes.
Q Okay. "Brodhead said he saw the stop sign at Adams and hit the brakes." Is that correct?

A Yes.
Q So is my understanding correct, that what made you hit the brakes was your realization there was a stop sign ahead?
A Yes.
Q Okay. Last, "He said he skidded and slammed into the truck." Is that accurate?
A Yes.
Q Okay. Now, were you -- there's some questions about the statements of, I guess, the Hamilton twins, and was it Sheila Brown?
A Yeah.
Q Were you present when they gave their statements to one of the officers?
A No, I wasn't.
Q Did they separate you out and everybody gave what they could recall?
A Yes.
Q Okay. I understand you were a little shook up?
A Yes. Very.
Q And how about the passengers, the Hamilton twins and Sheila Brown? Were they shook up?
A Yes, we were all crying pretty hard and --
Q That being said, do you have any idea how many number of seconds it was from the first time you saw the truck until impact?

A It seemed almost instantly. But you know how it happens fast. I -- but I can't -- I don't know if I can put a number on it.
Q Okay. That's all the questions I have. Thanks.
A (Nods head).
MR. NORDSTROM: We'll order it up.
MR. REKOFKE: Copy please.
MR. SMYTHE: We can waive signature.
(Deposition concluded at 6:15 p.m.)
(Signature is waived.)

# EXHIBIT I

IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF WASHINGTON

THOMAS A. WAITE,
                Plaintiff,

vs.                Case No. CV-05-390 9-EFS

THE CHURCH OF JESUS CHRIST OF
LATTER DAY SAINTS D/B/A
CORPORATION OF THE PRESIDING
BISHOP OF THE CHURCH OF JESUS
CHRIST OF LATTER DAY SAINTS,
a Utah corporation, d/b/a
CORPORATION OF THE PRESIDENT OF
THE CHURCH OF JESUS CHRIST OF
LATTER DAY SAINTS, a Utah,
corporation, DONALD C. FOSSUM,
and STEPHEN D. BRODHEAD,
                Defendants.


DEPOSITION OF JOHN HUNTER

Deposition upon oral examination of JOHN HUNTER, taken at the request of the Defendant before David Storey, a Notary Public, CSR No. STORED*566QO, at the law offices of Eymann, Allison, Hunter & Jones, 2208 W. Second Avenue, Spokane, Washington, commencing at or about 11:00 a.m., on March 16, 2007, pursuant to the Washington Rules of Civil Procedure.

36

Page 18

Q. Okay. You would agree that depending on where Mr. Fossum stopped, a calculation could be done as to how far down the road he could see, based on the road design?
A. You could probably do it off the aerial too, yes, you can. You are talking about the view obstruction on the left and how far he can see depending on where he stopped?
Q. Yes.
A. Sure. The closer he gets to the intersection, the more his visibility increases.
Q. Okay. Do you have an opinion as to whether you believe Mr. Fossum should have stopped?
A. Well, yes, he should have stopped in a position where he can check for traffic in both directions.
Q. Okay. And do you know where that is on that road?
A. A specific point?
Q. Yes.
A. No. I know that he can stop and clear the sight obstruction before entering the intersection, but I don't know where his exact position would be, no.
Q. Okay. So at time of trial you are not going to render an opinion either as to where, in fact, where he stopped or where you believe he should have stopped?
MR. NORDSTROM: I'll object. I think he addressed that in his report that he would.
Q. (BY MR. REKOFKE) Then I'm asking where it is then. You

Page 19

can address anything you want, but I need to know what it is.
A. Well, what I'm stating is that had he pulled forward to look to the left, sufficient to clear traffic, he could have seen this approaching vehicle in a braking mode at high speed trying to reduce its speed. That's, and there is a point at which he can see beyond the view obstructions.
Q. Where is that spot? Can you mark it on Exhibit 1.
A. I cannot mark it on Exhibit 1, because that road, that drawing is not to scale. It would have to be done on a scale diagram or an aerial photograph, and I have not done that yet.
Q. Do you -- your report has an aerial photograph?
A. It does, yes.
Q. I assume that is a shrunken picture?
A. That is just a screen capture, yes.
Q. Do you have that aerial photograph with you today?
A. Well, I have a copy of it, yes.
Q. Okay. And I don't mean to direct your work effort in this case, but do you plan on testifying at time of trial where you are going to pinpoint a spot on a map, on a photo, on a diagram of where you believe Mr. Fossum should have stopped?
A. I wasn't asked to do that, no.
Q. Okay.

Page 20

MR. NORDSTROM: Well, I can tell you we'll be asking him to do that at trial.
Q. (BY MR. REKOFKE) Well, I guess we'll have to do that and we'll reconvene at some point in time.
Mr. Hunter, do you agree -- how many years were you involved as an officer in the State Patrol?
A. 25.
Q. 25? Do you agree based on that experience, and I guess other experience you have had since you left the WSP, that Mr. Brodhead violated various laws?
A. He did, yes.
Q. Okay. Had you investigated, when you were working with the WSP had you investigated accidents like this?
A. I've investigated lots of crashes. I don't know if I ever had one skidding 260 feet, though, that's a little unusual.
Q. You investigated crashes at four-way stops?
A. I have had a number of them. A lot of our crashes were on higher-speed roadways.
Q. Can you tell me or list for me the various laws, if you had been the investigating officer, what laws Mr. Brodhead violated, prior to the accident?
A. Obviously speed and failure to stop for the stop sign, because he didn't stop for it. And then if you could determine what his braking efficiency was on the truck, you

Page 21

could cite him for defective brakes as well. He has to be at least, I think it is 52.8 percent efficient if I remember right, under RCW 46.61.351, I think it is, he has a certain efficiency he has to meet, .48 is certainly below that efficiency.
Q. Anything else?
A. No, no, those are pretty much it.
Q. Okay. Are there recognized rules of the road for four-way intersections?
A. Yes, there are.
Q. Okay. Can you briefly describe them for me?
A. You're supposed to stop and yield to, as stated in the statute, to traffic that could pose a potential hazard.
Q. Is there a certain amount of time when you're the favored driver at four-way intersections? In other words, you have arrived first and there's nobody on your right to yield to, is there a certain period of time that you have to wait at the intersection before proceeding?
A. Not that I'm aware of.
Q. Is there any rules as far as how long you have to look in a certain direction?
A. Not that I'm aware of, no.
Q. When you're stopped as a favored driver at a four-way stop, it seems to me common sense would be that there is sort of three choices where to look?

# EXHIBIT J

38

IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF WASHINGTON

THOMAS A. WAITE,
                Plaintiff,

vs.               Case No. CV-05-390 9-EFS

THE CHURCH OF JESUS CHRIST OF
LATTER DAY SAINTS D/B/A
CORPORATION OF THE PRESIDING
BISHOP OF THE CHURCH OF JESUS
CHRIST OF LATTER DAY SAINTS,
a Utah corporation, d/b/a
CORPORATION OF THE PRESIDENT OF
THE CHURCH OF JESUS CHRIST OF
LATTER DAY SAINTS, a Utah,
corporation, DONALD C. FOSSUM,
and STEPHEN D. BRODHEAD,
                Defendants.

DEPOSITION OF JOHN HUNTER

Deposition upon oral examination of JOHN HUNTER, taken at the request of the Defendant before David Storey, a Notary Public, CSR No. STORED*566QO, at the law offices of Eymann, Allison, Hunter & Jones, 2208 W. Second Avenue, Spokane, Washington, commencing at or about 11:00 a.m., on March 16, 2007, pursuant to the Washington Rules of Civil Procedure.

39

violating the law?
A. Correct. If he has no opportunity to detect or identify the potential hazard, then how can he react to it?
Q. As the driver stopped at an intersection, do you agree Mr. Fossum does not have to assume Mr. Brodhead is going to go twice the speed limit and have bad brakes?
A. Oh, I would agree with that, yes.
Q. I think I saw this in your report, maybe I didn't, but do you agree that if Mr. Brodhead had been going 35 miles an hour he could have actually run the stop sign and there would have been no collision?
A. Well, it depends on where you are going to start the clock. I mean, he entered the intersection sliding through he stop sign to the point of impact in those speed ranges, so if you want to start at the time that he enters the intersection, they are going to crash. So it just depends on where you want to start your zero point.
Q. Let's just assume that instead of going 70 miles an hour Mr. Brodhead obeys the law and doesn't hit 70, he could have gone 35 miles an hour from, I guess, when he crossed Evergreen and gone through the stop sign, there would have been no accident?
MR. NORDSTROM: I'll object to the form.
A. Obviously if you start at different time frames, people aren't going to end up at the same spot at the same time

so --
Q. (BY MR. REKOFKE) You do agree if Mr. Brodhead had been going 35 miles an hour and still run the stop sign, there would have been no accident?
MR. NORDSTROM: Same objection.
A. No, the way you're phrasing the question, I can't agree with it, because there's the evidence that by the time he started to go through the intersection, he probably was doing somewhere around 35 miles an hour, and he still got involved in the crash. But if you're saying if you start back at a different time, they don't end up at the same spot at the same time, I'd agree with that.
Q. (BY MR. REKOFKE) That's all I'm asking.
A. Okay.
Q. I believe this was in your report, but let me ask, do you agree that if Mr. Brodhead's brakes had been working properly he could have done all the speeding that actually he did, in other words, gone twice the speed limit and had his brakes been working, he still could have stopped short of the crash?
A. You give him good brakes and the collision does not occur because he will in fact stop before he enters the intersection.
Q. So if the brakes were --
A. Working properly.

Q. -- were working properly, Mr. Brodhead could have gone 70 miles an hour, everything could have occurred that did in fact occur and if he would have had brakes that worked, that he would have stopped short of the collision?
A. I think I figured about 60 feet short or something like that.
Q. Okay. Will you be rendering an opinion at time of trial as to what made Mr. Brodhead slam on his brakes?
A. Well, if, the opinion I would render based on the information I have right now is that he either saw or was told of the stop sign and he stopped before the stop sign.
Q. So the cue or the clue was either an oral one from, I think one of the girls in the car screaming or that he actually saw the stop sign?
A. Correct. Based on the data I've seen so far is what it seems to be.
Q. Okay. Will you be rendering an opinion at time of trial as to how far Mr. Brodhead was from the intersection when he first saw Mr. Fossum's truck?
A. I can't give you the specifics because I don't know. We know that he saw it stopped there at some time, but I don't know the exact point in time. So at this point, no, I can't tell you.
Q. You mention in your report that you believe 410 feet is the soonest that Mr. Brodhead could see the stop sign?

A. No, I didn't think I said that. I said, what I analyzed was his speed at the beginning of the tire mark, and then I backed him up assuming a one and a second perception/ reaction time. Obviously if you change that you will change distance. And I added the reaction distance to the skidding distance, and that's where you get the 410 feet.
So that would be approximate point of notice, if you assume a one and a half second detection/ identification/reaction period.
Q. Whatever that number is, you've done it by working backwards?
A. Correct, off the end of the skid marks.
Q. Have you gone out and done a site visit?
A. I did go out there, yes.
Q. Did you do measurements?
A. I did not.
Q. Okay. When did you go out and visit the site?
A. This morning, before the deposition.
Q. Okay. I want to ask some of the numbers that are in your report, make sure I understand them.
What in your opinion was the minimum speed that Mr. Brodhead achieved just prior to applying the brakes?
A. At time that he --
MR. NORDSTROM: Just, are you referring to a specific figure? You said within the report.

# EXHIBIT K



UNITED STATES DISTRICT COURT FOR THE

EASTERN DISTRICT OF WASHINGTON

THOMAS A. WAITE,

Plaintiff,

vs. No. CV-05-399-EFS

THE CHURCH OF JESUS CHRIST OF LATTER DAY SAINTS d/b/a CORPORATION OF THE PRESIDING BISHOP OF THE CHURCH OF JESUS CHRIST OF LATTER DAY SAINTS, a Utah corporation, d/b/a CORPORATION OF THE PRESIDENT OF THE CHURCH OF JESUS CHRIST OF LATTER DAY SAINTS, a Utah corporation; DONALD C. FOSSUM; and STEVEN D. BRODHEAD,

Defendants.

DEPOSITION OF STEVEN D. BRODHEAD

BE IT REMEMBERED that on the 11th day of December 2006, at the hour of 5:08 p.m., the deposition of STEVEN D. BRODHEAD was taken at the request of the Plaintiff, before Caryn E. Winters, RPR, a notary public and court reporter, Washington CCR No. 2496, Idaho CSR No. 237, at 717 West Sprague Avenue, Suite 1200, Spokane, Washington, pursuant to the Washington Rules of Civil Procedure.

42

b00248aa-bc5c-4384-a384-6b19c7899e70

Page 38

A USAA.
Q The insurance company that you had insurance on this vehicle?
A Yes.
Q With about either one of the other occupants, those three girls, were any of them injured?
A I believe there was a settlement for Rochelle and Rebecca.
Q Okay. For both of them?
A But -- I believe so. I didn't hear much about that. But I know that they had to go to the doctor a couple of times at least.
Q Okay. But you don't -- as you sit here today, you don't know whether there was a settlement or not?
A I don't know exactly what, you know, what happened with that.
Q Okay. And just finally, you mentioned the public defender. Were you represented by a public defender in this case?
A Yes.
Q And I shouldn't say finally. I've got a couple follow-up questions. Who was that?
A Now I can't remember.
Q All right.
A I know it's written down somewhere or in some of the

Page 39

records. But I can't remember his name.
Q How was that resolved?
A Do you mean --
Q Did you make a plea?
A Yes.
Q And what was the plea?
A To attempted assault and reckless driving.
Q Okay. Was there anything called vehicular assault?
A No.
Q Okay. So it was called reckless driving?
A And attempted assault.
Q And attempted assault?
A Yes.
Q And what was the -- any type of punishment associated with that?
A It was three days in jail with 362 days that I would have had to serve if I broke probation violation. You know.
Q Okay. So you had 365 days, three days served, 362 suspended?
A Two years -- I had 30 days license suspension, two years probation. And so if I did anything against my probation I would have had to serve the other 362 days.
Q Okay. Any specific terms with your suspension or with your probation? Community service, anything like that?
A I had a 760 dollar fine. That was -- that was it. I

Page 40

didn't have any community service.
Q Was that fine paid?
A Yes.
Q All right. Let me just make sure, after the collision you said -- just at the scene itself, did you talk with -- well, let me start all over again.
Do you remember the impact itself?
A Yes.
Q Okay. What do you recall about the impact?
A Just slamming into the back of the truck. And I saw -- I can't remember if I saw both individuals, but I know I saw at least one fly out of the back of the truck.
Q What about the canopy on the pickup?
A That flew off as well.
Q All right.
A I saw that fly off as well.
Q Okay. And did you go over to see anyone that was -- any of the individuals that had been in the pickup?
A I'd gotten out of my car right after it happened. I was really dizzy. Just about fell over. And I -- I just kind of -- I looked around and just broke down. I didn't know what to do.
Q Sure.
A I called 911 and someone was already --
Q Had called it?

Page 41

A Called it in.
Q All right.
A So but besides that, I didn't know what to do. I was scared.
Q Do you remember having a conversation with anyone there at the scene?
A Well, there was a guy that came up and started yelling at me, you know, asking what -- you know, what I was thinking and stuff. And I started yelling at him. I can't remember all that I said, but something to the effect of, you know, "You don't know what -- you know, how I'm feeling right now" or something. And he apologized later because he realized, you know, that I was -- you know, I wasn't just some punk kid just, you know, --
Q When you say "apologized later," that same afternoon?
A Like ten minutes later.
Q Okay. Do you recall a conversation with anyone else?
A Well, Rochelle and Rebecca's mom drove over. And she was just comforting me. I didn't -- yeah, I was just crying. I didn't have any conversations.
Q All right. Do you know who called her?
A I believe -- well, it was either Rochelle or Rebecca. I think it might have been Rebecca. I don't know.
Q Did you realize there were seven Mormon missionaries in that truck?

43

b00248aa-bc5c-4384-a384-6b19c7899e70