# EXHIBIT L

**44**

**FILED**

MAR 1 5 2004

THOMAS R. FALLQUIST
SPOKANE COUNTY CLERK

SUPERIOR COURT OF WASHINGTON
FOR SPOKANE COUNTY

State of Washington,

Plaintiff

vs. Steven D. Brodhead

Defendant.

NO. 03-1-03773-8

STATEMENT OF DEFENDANT ON
PLEA OF GUILTY

1. My true name is _Steven D. Brodhead_.
2. My age is _18_.
3. I went through the _11th_ grade. Graduation in June,
4. I HAVE BEEN INFORMED AND FULLY UNDERSTAND THAT:

   (a) I have the right to representation by a lawyer and that if I cannot afford to pay for a lawyer, one will be provided at no expense to me.

   (b) I am charged with: ① Attempted 3rd Degree Assault ② Reckless Driving

   The elements are: _as interpreted by attorney contacted is_ _____ Typed X the 1st notation_ _amended_

5. I UNDERSTAND THAT I HAVE THE FOLLOWING IMPORTANT RIGHTS, AND I GIVE THEM ALL UP BY PLEADING GUILTY:

   (a) The right to a speedy and public trial by an impartial jury in the county where the crime is alleged to have been committed;

   (b) The right to remain silent before and during trial, and the right to refuse to testify against myself;

   (c) The right at trial to hear and question the witnesses who testify against me;

STATEMENT OF DEFENDANT ON PLEA OF GUILTY - Page 1 of 4
CrRLJ-04.0200 (08/2002) - CrRLJ 4.2(g)

45

(d) The right at trial to testify and to have witnesses testify for me. These witnesses can be made to appear at no expense to me;

(e) I am presumed innocent unless the charge is proven beyond a reasonable doubt or I enter a plea of guilty;

(f) The right to appeal a finding of guilt after a trial.

6. IN CONSIDERING THE CONSEQUENCES OF MY GUILTY PLEA, I UNDERSTAND THAT:

(a) The crime with which I am charged carries a maximum sentence of __365__ days in jail and a $ __5000__ fine.

(b) The prosecuting authority will make the following recommendation to the judge: _Reduction of charges agreed recommended of 2 days jail to be served._

(c) The judge does not have to follow anyone's recommendation as to sentence. The judge can give me any sentence up to the maximum authorized by law no matter what the prosecuting authority or anyone else recommends.

(d) The judge may place me on probation for up to ~~five years if I am sentenced under RCW 46.61.5055 or up to~~ two years ~~for all other offenses~~ and impose conditions of probation. If the court orders me to appear at a hearing regarding my compliance with probation and I fail to attend the hearing, the term of probation will be tolled until I appear before the court on the record.

(e) The judge may require me to pay costs, fees and assessments authorized by law. The judge may also order me to make restitution to any victims who lost money or property as a result of crimes I committed. The maximum amount of restitution is double the amount of the loss of all victims or double the amount of my gain.

(f) If I am not a citizen of the United States, a plea of guilty to an offense punishable as a crime under state law is grounds for deportation, exclusion from admission to the United States, or denial of naturalization pursuant to the laws of the United States. _Defendant is a U.S. citizen._

NOTIFICATION RELATING TO SPECIFIC CRIMES: IF ANY OF THE FOLLOWING PARAGRAPHS APPLY, THE BOX SHOULD BE CHECKED AND THE PARAGRAPH INITIALED BY THE DEFENDANT.

[ ]g The crime of _____ has a mandatory ~~minimum~~ sentence of _____ days in jail and $_____ fine plus costs and assessments. The law does not allow any reduction of this sentence.

[ ]h If this crime involves a sexual offense, prostitution, or a drug offense associated with hypodermic needles, I will be required to undergo testing for the human immunodeficiency (AIDS) virus.

[X]i This plea of guilty will result in suspension or revocation of my driving license or privilege by the Department of Licensing for a period of _at least 30 days_. This period may not include suspension or revocation based on other matters.

[ ]j    I understand that I may not possess, own, or have under my control any firearm unless my right to do so is restored by a court of record and that I must immediately surrender any concealed pistol license. RCW 9.41.040.

[ ]k    If this crime involves a drug offense, my eligibility for state and federal education benefits will be affected. 20 U.S.C. § 1091(r).

[ ]l    If this case involves driving while under the influence of alcohol and/or being in actual physical control of a vehicle while under the influence of alcohol and/or drugs, I have been informed and understand that I will be subject to
[ ] the penalties described in the "DUI" Attachment.
OR
[ ] these penalties: The mandatory minimum sentence of _____ days in jail, _____ days of electronic home monitoring and $_____ monetary penalty. I will also be required to drive only motor vehicles equipped with an ignition interlock device for _____ years. My driving privilege will be suspended or revoked by the Department of Licensing for the period of time stated in paragraph 6(i). In lieu of the minimum jail term, the judge may order me to serve _____ days in electronic home monitoring. If I do not have a dwelling, telephone service, or any other necessity to operate electronic home monitoring; if I live out of state; or if the judge determines I would violate the terms of electronic home monitoring, the judge may waive electronic home monitoring and impose an alternative sentence which may include additional jail time, work crew or work camp.

[ ]m    I understand that if this crime involves sexual misconduct with a minor in the second degree, communication with a minor for immoral purposes, or attempt, solicitation or conspiracy to commit a sex offense, or a kidnapping offense involving a minor, as defined in RCW 9A.44.130, I will be required to register with the county sheriff as described in the "Offender Registration" Attachment.

[ ]n    If this crime involves stalking, harassment or communication with a minor for immoral purposes, I will be required to have a biological sample collected for purposes of DNA identification analysis. RCW 43.43.754.

7.    I plead guilty to the crime of _Attempted 3rd Degree Assault + Reckless Driving_ as charged in the complaint or citation and notice. I have received a copy of that complaint or citation and notice.

8.    I make this plea freely and voluntarily.

9.    No one has threatened harm of any kind to me or to any other person to cause me to make this plea.

10.    No person has made promises of any kind to cause me to enter this plea except as set forth in this statement.

11.    The judge has asked me to state in my own words what I did that makes me guilty of this crime. This is my statement:
_Being agrivated, I drove at an excessive speed + hit a truck + injuries were then caused._

[ ] Instead of making a statement, I agree that the court may review the police reports and/or a

STATEMENT OF DEFENDANT ON PLEA OF GUILTY - Page 3 of 4
CrRLJ-04.0200 (08/2002) - CrRLJ 4.2(g)

SB

A7

statement of probable cause supplied by the prosecution to establish a factual basis for the plea.

12.     My lawyer has explained to me, and we have fully discussed, all of the above paragraphs. I
        understand them all. I have been given a copy of this "Statement of Defendant on Plea of Guilty."
        I have no further questions to ask the judge.

Date:  _____3/15/04_____          _Steve Brodhead_ ✓
                                   Defendant

                                   I have read and discussed this statement with the
                                   defendant and believe that the defendant is competent
                                   and fully understands the statement.
_____            _____ 11628  ✓
Prosecuting Authority and Bar # 13246   Defendant's Lawyer and Bar # Rick
_Clint Francis_                         _Steven A. Rick_
Print Name                         Print name

The foregoing statement was signed by the defendant in open court in the presence of the defendant's
lawyer and the undersigned judge. The defendant asserted that (check the appropriate box):

✓  [x] (a)  The defendant had previously read; or
   [x] (b)  The defendant's lawyer had previously read to him or her; or
   [ ] (c)  An interpreter had previously read to the defendant the entire statement above and that the
            defendant understood it in full.

I find the defendant's plea of guilty to be knowingly, intelligently and voluntarily made. Defendant
understands the charges and the consequences of the plea. There is a factual basis for the plea. The
defendant is guilty as charged.

DATED:  ____3/15/04____          _____
                                Judge
                                TARI EITZEN

48

# EXHIBIT M

49.

Page 1

UNITED STATES DISTRICT COURT FOR THE
EASTERN DISTRICT OF WASHINGTON

THOMAS A. WAITE,                    :  No. CF-05-399-EFS
                                    :
        Plaintiff,                  :  Videotaped Deposition of:
                                    :
vs.                                 :  DONALD C. FOSSUM
                                    :
THE CHURCH OF JESUS CHRIST          :
OF LATTER-DAY SAINTS dba            :
CORPORATION OF THE PRESIDING        :
BISHOP OF THE CHURCH OF             :
JESUS CHRIST OF LATTER-DAY          :
SAINTS, a Utah corporation,         :
dba CORPORATION OF THE              :
PRESIDENT OF THE CHURCH OF          :
JESUS CHRIST OF LATTER-DAY          :
SAINTS, a Utah corporation;         :
DONALD C. FOSSUM; and STEVEN        :
D. BRODHEAD,                        :
                                    :
        Defendants.                 :


November 9, 2006 - 1:08 p.m.


Location:   Kirton & McConkie
            1800 Eagle Gate Tower
            60 East South Temple
            Salt Lake City, Utah  84111


Reporter:   Teri Hansen Cronenwett
Certified Realtime Reporter, Registered Merit Reporter
Notary Public in and for the State of Utah

Page 54

1    Q. You leave the district meeting. You don't remember
2  how many are in the truck or the pickup when you got over to
3  the Subway, correct?
4    A. Correct.
5    Q. All right. But you go to Subway. Is there a
6  drive-through there?
7    A. No, sir.
8    Q. So you have to go in?
9    A. Yes, sir.
10   Q. Do all the missionaries go in?
11   A. Yes, sir.
12   Q. Okay. When they come out, eight missionaries get
13 in the pickup; is that correct?
14   A. That's correct.
15   Q. You got four in the back of the pickup; is that
16 correct?
17   A. That's correct.
18   Q. When I say the back, I mean the bed of the pickup.
19   A. That's correct.
20   Q. There's a canopy on the pickup; is that correct?
21   A. Yes, sir.
22   Q. Do they say anything to you about getting into the
23 bed of the pickup, or do they jump into the back?
24   A. They just jumped in the back.
25   Q. Okay. Was there any discussion on your part about

Page 55

1  not being able to ride in the bed of the pickup?
2    A. I don't know if there was a discussion. I got out
3  and told them it didn't make sense for them to get in the
4  back of the pickup when the other car wasn't full.
5    Q. Okay. So you got -- you asked two of them to
6  leave, correct?
7    A. That's correct.
8    Q. And you still have now two in the bed of the pickup
9  and four in the cab?
10   A. Yes, sir.
11   Q. All right. And then you leave, and where are you
12 going now?
13   A. Going to drop off Elder Waite and Elder Ross.
14   Q. Okay. And is that traveling down Adams Road?
15   A. I believe that's the road. I don't recall. I
16 believe it is.
17   Q. Okay. How well did you know Elder Waite?
18   A. Not very well. I -- he was a little more than an
19 acquaintance.
20   Q. And what does that mean?
21   A. I have had interactions with him. I considered him
22 a friend.
23   Q. In the mission field?
24   A. Yes, sir.
25   Q. Had you known him before he came into the district?

Page 56

1    A. No, sir.
2    Q. Okay. Do you know how long he had been there at --
3  in the district before this collision?
4    A. Whatever that transfer was, I believe, the start of
5  the transfer, so however long it was from the start of the
6  transfer until the accident.
7    Q. But as we sit here, do you know how long that was?
8    A. Not exactly, sir.
9    Q. Would it have been longer than, say, a month?
10   A. I do not believe so, sir.
11   Q. Okay. Longer than two weeks?
12   A. Again, I don't recall.
13   Q. But you do recall him being to a district meeting
14 before this date when the collision occurred?
15   A. I don't recall if he was there -- how long we were
16 there, this transfer, before the accident. It could have
17 been, you know, a week. It could have been five weeks. All
18 I know is that he was there. The accident happened.
19   Q. Okay. Did he -- was he assigned any type of a
20 pickup or car? Do you know?
21   A. Who is he?
22   Q. Elder Waite.
23   A. No.
24   Q. Okay. In that district then, again, you're the
25 only one with a car or a pickup; is that correct?

Page 57

1    A. In the district?
2    Q. Yes.
3    A. Well, obviously not if two of them showed up in a
4  car and four of them left in a car.
5    Q. Okay. I didn't know they were in your same
6  district, but so you have got a pickup, and you have a car in
7  your district?
8    A. Yes, sir.
9    Q. All right. And at this point in time you're
10 traveling down Adams Road. Tell me what happened then the
11 next thing you remember as far as -- or do you remember
12 anything before the collision as you're traveling down Adams
13 Road?
14   A. I remember going down Adams Road, driving, and then
15 I remember coming to the four-way stop. And we stopped,
16 looked left, didn't see anybody, looked right. I believe
17 there was a car or something over there. I don't recall
18 exactly.
19   Q. I'm not sure when you say over there.
20   A. To the right.
21   Q. Okay. So you are traveling north on Adams Road?
22   A. I believe that's correct.
23   Q. Is that correct? Maybe this will be easier. Let
24 me just give you a piece of paper. Maybe you could draw a
25 little diagram for me. Here. Let me get you a --



# EXHIBIT N

52

IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF WASHINGTON

THOMAS A. WAITE,

                    Plaintiff,

vs.                           Case No. CV-05-390 9-EFS

THE CHURCH OF JESUS CHRIST OF
LATTER DAY SAINTS D/B/A
CORPORATION OF THE PRESIDING
BISHOP OF THE CHURCH OF JESUS
CHRIST OF LATTER DAY SAINTS,
a Utah corporation, d/b/a
CORPORATION OF THE PRESIDENT OF
THE CHURCH OF JESUS CHRIST OF
LATTER DAY SAINTS, a Utah,
corporation, DONALD C. FOSSUM,
and STEPHEN D. BRODHEAD,
                    Defendants.


DEPOSITION OF JOHN HUNTER

Deposition upon oral examination of JOHN HUNTER, taken at

the request of the Defendant before David Storey, a Notary

Public, CSR No. STORED*566QO, at the law offices of Eymann,

Allison, Hunter & Jones, 2208 W. Second Avenue, Spokane,

Washington, commencing at or about 11:00 a.m., on March 16,

2007, pursuant to the Washington Rules of Civil Procedure.

53

fcaba926-bef5-41ea-8883-efb99058092a


Page 2

1      APPEARANCES
2
3
4   FOR THE PLAINTIFF:
         NORDSTROM & NEES
5        By: Stephen L. Nordstrom
         Attorney at Law
6        323 South Pines
         Spokane, Washington 99206
7        and
         EYMANN ALLISON FENNESSY HUNTER
8        & JONES, PS
         By: Richard Eymann
9        2208 W. 2nd Avenue
         Spokane, Washington 99204
10
11  FOR THE DEFENDANT LDS:
         WITHERSPOON KELLEY DAVENPORT &
12       TOOLE
         By: Brian T. Rekofke
13       Attorney at Law
         1100 U.S. Bank Building
14       422 W. Riverside Avenue
         Spokane, Washington 99201-0302
15
16  FOR THE DEFENDANT BRODHEAD:
         PAINE, HAMBLEN, COFFIN,
17       BROOKE & MILLER
         By: Andrew Smythe
18       Attorney at Law
         Washington Trust Financial
19       Center
         717 W. Sprague Avenue
20       Ste. 1200
         Spokane, Washington 99201-3505
21
22
23
24
25

Page 3

1              JOHN HUNTER
        Called as a witness at the request of
2        the Defendant, having been first duly
        sworn according to law, did testify as
3        follows herein:
4
5              EXAMINATION
6   BY MR. REKOFKE:
7   Q.  Could you state your name for the record.
8   A.  John Hunter.
9   Q.  And you've been retained by Mr. Nordstrom and/or
10  Mr. Eymann to do an accident investigation of the accident
11  involving Thomas Waite?
12  A.  Yes.
13  Q.  Okay.  And I want to ask you, Mr. Hunter, a couple
14  points here to see if we can agree on some things.
15      No. 1, do you agree that prior to the accident, Donald
16  Fossum came to a complete stop at the intersection?
17  A.  That's my understanding, yes.
18  Q.  And when he came to a complete stop, Mr. Fossum would
19  have been the favored driver vis-a-vis Mr. Brodhead?
20  A.  Yes.
21  Q.  Okay.  In other words, as Mr. Brodhead was traveling
22  down the road, Mr. Fossum would have been on his right?
23  A.  Well, that too, but Mr. Brodhead is further down the
24  road, too.  I mean, he is further away from the
25  intersection.

Page 4

1   Q.  So he is on, Mr. Fossum is on Mr. Brodhead's right, and
2   he gets, he arrives at the intersection first?
3   A.  Mr. Fossum does?
4   Q.  Yes.
5   A.  Yes.
6   Q.  Okay.  And as the favored driver, can Mr. Fossum assume
7   that Mr. Brodhead will reduce speed and yield and allow
8   Mr. Fossum to cross?
9   A.  Well, whether it is Mr. Brodhead or another vehicle, he
10  has an expectancy that people can stop at the stop sign, if
11  that's your question.
12  Q.  Yes.  So as a general matter, Donald Fossum or any
13  driver who is a favored driver at an intersection can assume
14  that any approaching driver to the four-way intersection
15  will reduce speed and yield?
16  A.  They have that expectancy, yes.
17  Q.  And Mr. Fossum and other drivers, if they are the
18  favored driver, are they allowed a reasonable reaction time
19  once they realize that the other driver will not yield and
20  slow down?
21  A.  Well, yes, in that, I'm assuming by reaction time you
22  are including the detection-identification phase that goes
23  along with that?
24  Q.  Sure.
25  A.  Yes.

Page 5

1   Q.  Do you agree that after coming to a complete stop at the
2   intersection, Mr. Fossum looked left once and looked right
3   twice?
4   A.  I don't know.  I have no idea what his actual phase of
5   looking left or right was unless it was in the material that
6   I was provided.  I don't believe it was.
7   Q.  Have you been provided Mr. Fossum's deposition?
8   A.  I have not.
9   Q.  Okay.  I think you just said this, but Mr. Fossum and
10  any favored driver can assume other drivers will obey the
11  law?
12  A.  Well, they have an expectancy.  I don't know about
13  assume.  You have to assume that people are going to not do
14  things that you think perhaps they are, that is called
15  defensive driving, but he has an expectation that people are
16  going to attempt to obey the rules of the road.
17  Q.  And the applicable law here, at least two of the
18  applicable rules here, was that Mr., the speed limit
19  applicable to Mr. Brodhead was 35 miles an hour?
20  A.  It was, yes.
21  Q.  And the other law that would be applicable here is that
22  this was a four-way stop?
23  A.  It is a controlled intersection, that's correct.
24  Q.  If assuming Mr. Fossum could not see Mr. Brodhead, you
25  would agree he would have no notice that Mr. Brodhead was


54

# EXHIBIT O

55

IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF WASHINGTON

THOMAS A. WAITE,

                    Plaintiff,

vs.                          Case No. CV-05-390 9-EFS

THE CHURCH OF JESUS CHRIST OF
LATTER DAY SAINTS D/B/A
CORPORATION OF THE PRESIDING
BISHOP OF THE CHURCH OF JESUS
CHRIST OF LATTER DAY SAINTS,
a Utah corporation, d/b/a
CORPORATION OF THE PRESIDENT OF
THE CHURCH OF JESUS CHRIST OF
LATTER DAY SAINTS, a Utah,
corporation, DONALD C. FOSSUM,
and STEPHEN D. BRODHEAD,

                    Defendants.


                DEPOSITION OF JOHN HUNTER

Deposition upon oral examination of JOHN HUNTER, taken at

the request of the Defendant before David Storey, a Notary

Public, CSR No. STORED*566QO, at the law offices of Eymann,

Allison, Hunter & Jones, 2208 W. Second Avenue, Spokane,

Washington, commencing at or about 11:00 a.m., on March 16,

2007, pursuant to the Washington Rules of Civil Procedure.



56

Page 18

1  Q.  Okay. You would agree that depending on where
2  Mr. Fossum stopped, a calculation could be done as to how
3  far down the road he could see, based on the road design?
4  A.  You could probably do it off the aerial too, yes, you
5  can. You are talking about the view obstruction on the left
6  and how far he can see depending on where he stopped?
7  Q.  Yes.
8  A.  Sure. The closer he gets to the intersection, the more
9  his visibility increases.
10  Q.  Okay. Do you have an opinion as to whether you believe
11  Mr. Fossum should have stopped?
12  A.  Well, yes, he should have stopped in a position where he
13  can check for traffic in both directions.
14  Q.  Okay. And do you know where that is on that road?
15  A.  A specific point?
16  Q.  Yes.
17  A.  No. I know that he can stop and clear the sight
18  obstruction before entering the intersection, but I don't
19  know where his exact position would be, no.
20  Q.  Okay. So at time of trial you are not going to render
21  an opinion either as to where, in fact, where he stopped or
22  where you believe he should have stopped?
23       MR. NORDSTROM: I'll object. I think he addressed that
24  in his report that he would.
25  Q.  (BY MR. REKOFKE) Then I'm asking where it is then. You

Page 19

1  can address anything you want, but I need to know what it
2  is.
3  A.  Well, what I'm stating is that had he pulled forward to
4  look to the left, sufficient to clear traffic, he could have
5  seen this approaching vehicle in a braking mode at high
6  speed trying to reduce its speed. That's, and there is a
7  point at which he can see beyond the view obstructions.
8  Q.  Where is that spot? Can you mark it on Exhibit 1.
9  A.  I cannot mark it on Exhibit 1, because that road, that
10  drawing is not to scale. It would have to be done on a
11  scale diagram or an aerial photograph, and I have not done
12  that yet.
13  Q.  Do you -- your report has an aerial photograph?
14  A.  It does, yes.
15  Q.  I assume that is a shrunken picture?
16  A.  That is just a screen capture, yes.
17  Q.  Do you have that aerial photograph with you today?
18  A.  Well, I have a copy of it, yes.
19  Q.  Okay. And I don't mean to direct your work effort in
20  this case, but do you plan on testifying at time of trial
21  where you are going to pinpoint a spot on a map, on a photo,
22  on a diagram of where you believe Mr. Fossum should have
23  stopped?
24  A.  I wasn't asked to do that, no.
25  Q.  Okay.

Page 20

1       MR. NORDSTROM: Well, I can tell you we'll be asking him
2  to do that at trial.
3  Q.  (BY MR. REKOFKE) Well, I guess we'll have to do that
4  and we'll reconvene at some point in time.
5       Mr. Hunter, do you agree -- how many years were you
6  involved as an officer in the State Patrol?
7  A.  25.
8  Q.  25? Do you agree based on that experience, and I guess
9  other experience you have had since you left the WSP, that
10  Mr. Brodhead violated various laws?
11  A.  He did, yes.
12  Q.  Okay. Had you investigated, when you were working with
13  the WSP had you investigated accidents like this?
14  A.  I've investigated lots of crashes. I don't know if I
15  ever had one skidding 260 feet, though, that's a little
16  unusual.
17  Q.  You investigated crashes at four-way stops?
18  A.  I have had a number of them. A lot of our crashes were
19  on higher-speed roadways.
20  Q.  Can you tell me or list for me the various laws, if you
21  had been the investigating officer, what laws Mr. Brodhead
22  violated, prior to the accident?
23  A.  Obviously speed and failure to stop for the stop sign,
24  because he didn't stop for it. And then if you could
25  determine what his braking efficiency was on the truck, you

Page 21

1  could cite him for defective brakes as well. He has to be
2  at least, I think it is 52.8 percent efficient if I remember
3  right, under RCW 46.61.351, I think it is, he has a certain
4  efficiency he has to meet, .48 is certainly below that
5  efficiency.
6  Q.  Anything else?
7  A.  No, no, those are pretty much it.
8  Q.  Okay. Are there recognized rules of the road for
9  four-way intersections?
10  A.  Yes, there are.
11  Q.  Okay. Can you briefly describe them for me?
12  A.  You're supposed to stop and yield to, as stated in the
13  statute, to traffic that could pose a potential hazard.
14  Q.  Is there a certain amount of time when you're the
15  favored driver at four-way intersections? In other words,
16  you have arrived first and there's nobody on your right to
17  yield to, is there a certain period of time that you have to
18  wait at the intersection before proceeding?
19  A.  Not that I'm aware of.
20  Q.  Is there any rules as far as how long you have to look
21  in a certain direction?
22  A.  Not that I'm aware of, no.
23  Q.  When you're stopped as a favored driver at a four-way
24  stop, it seems to me common sense would be that there is
25  sort of three choices where to look?

# EXHIBIT P

58

IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF WASHINGTON

THOMAS A. WAITE,

                    Plaintiff,

vs.                         Case No. CV-05-390 9-EFS

THE CHURCH OF JESUS CHRIST OF
LATTER DAY SAINTS D/B/A
CORPORATION OF THE PRESIDING
BISHOP OF THE CHURCH OF JESUS
CHRIST OF LATTER DAY SAINTS,
a Utah corporation, d/b/a
CORPORATION OF THE PRESIDENT OF
THE CHURCH OF JESUS CHRIST OF
LATTER DAY SAINTS, a Utah,
corporation, DONALD C. FOSSUM,
and STEPHEN D. BRODHEAD,
                    Defendants.


DEPOSITION OF JOHN HUNTER

Deposition upon oral examination of JOHN HUNTER, taken at

the request of the Defendant before David Storey, a Notary

Public, CSR No. STORED*566QO, at the law offices of Eymann,

Allison, Hunter & Jones, 2208 W. Second Avenue, Spokane,

Washington, commencing at or about 11:00 a.m., on March 16,

2007, pursuant to the Washington Rules of Civil Procedure.

**59**

---

Page 2

```
 1            APPEARANCES
 2
 3
 4   FOR THE PLAINTIFF:
              NORDSTROM & NEES
 5            By: Stephen L. Nordstrom
              Attorney at Law
 6            323 South Pines
              Spokane, Washington 99206
 7            and
              EYMANN ALLISON FENNESSY HUNTER
 8            & JONES, PS
              By: Richard Eymann
 9            2208 W. 2nd Avenue
              Spokane, Washington 99204
10
11   FOR THE DEFENDANT LDS:
              WITHERSPOON KELLEY DAVENPORT &
12            TOOLE
              By: Brian T. Rekofke
13            Attorney at Law
              1100 U.S. Bank Building
14            422 W. Riverside Avenue
              Spokane, Washington 99201-0302
15
16   FOR THE DEFENDANT BRODHEAD:
              PAINE, HAMBLEN, COFFIN,
17            BROOKE & MILLER
              By: Andrew Smythe
18            Attorney at Law
              Washington Trust Financial
19            Center
              717 W. Sprague Avenue
20            Ste. 1200
              Spokane, Washington 99201-3505
21
22
23
24
25
```

---

Page 3

```
 1            JOHN HUNTER
        Called as a witness at the request of
 2      the Defendant, having been first duly
        sworn according to law, did testify as
 3      follows herein:
 4
 5            EXAMINATION
 6   BY MR. REKOFKE:
 7   Q.  Could you state your name for the record.
 8   A.  John Hunter.
 9   Q.  And you've been retained by Mr. Nordstrom and/or
10   Mr. Eymann to do an accident investigation of the accident
11   involving Thomas Waite?
12   A.  Yes.
13   Q.  Okay. And I want to ask you, Mr. Hunter, a couple
14   points here to see if we can agree on some things.
15       No. 1, do you agree that prior to the accident, Donald
16   Fossum came to a complete stop at the intersection?
17   A.  That's my understanding, yes.
18   Q.  And when he came to a complete stop, Mr. Fossum would
19   have been the favored driver vis-a-vis Mr. Brodhead?
20   A.  Yes.
21   Q.  Okay. In other words, as Mr. Brodhead was traveling
22   down the road, Mr. Fossum would have been on his right?
23   A.  Well, that too, but Mr. Brodhead is further down the
24   road, too. I mean, he is further away from the
25   intersection.
```

---

Page 4

```
 1   Q.  So he is on, Mr. Fossum is on Mr. Brodhead's right, and
 2   he gets, he arrives at the intersection first?
 3   A.  Mr. Fossum does?
 4   Q.  Yes.
 5   A.  Yes.
 6   Q.  Okay. And as the favored driver, can Mr. Fossum assume
 7   that Mr. Brodhead will reduce speed and yield and allow
 8   Mr. Fossum to cross?
 9   A.  Well, whether it is Mr. Brodhead or another vehicle, he
10   has an expectancy that people can stop at the stop sign, if
11   that's your question.
12   Q.  Yes. So as a general matter, Donald Fossum or any
13   driver who is a favored driver at an intersection can assume
14   that any approaching driver to the four-way intersection
15   will reduce speed and yield?
16   A.  They have that expectancy, yes.
17   Q.  And Mr. Fossum and other drivers, if they are the
18   favored driver, are they allowed a reasonable reaction time
19   once they realize that the other driver will not yield and
20   slow down?
21   A.  Well, yes, in that, I'm assuming by reaction time you
22   are including the detection-identification phase that goes
23   along with that?
24   Q.  Sure.
25   A.  Yes.
```

---

Page 5

```
 1   Q.  Do you agree that after coming to a complete stop at the
 2   intersection, Mr. Fossum looked left once and looked right
 3   twice?
 4   A.  I don't know. I have no idea what his actual phase of
 5   looking left or right was unless it was in the material that
 6   I was provided. I don't believe it was.
 7   Q.  Have you been provided Mr. Fossum's deposition?
 8   A.  I have not.
 9   Q.  Okay. I think you just said this, but Mr. Fossum and
10   any favored driver can assume other drivers will obey the
11   law?
12   A.  Well, they have an expectancy. I don't know about
13   assume. You have to assume that people are going to not do
14   things that you think perhaps they are, that is called
15   defensive driving, but he has an expectation that people are
16   going to attempt to obey the rules of the road.
17   Q.  And the applicable law here, at least two of the
18   applicable rules here, was that Mr., the speed limit
19   applicable to Mr. Brodhead was 35 miles an hour?
20   A.  It was, yes.
21   Q.  And the other law that would be applicable here is that
22   this was a four-way stop?
23   A.  It is a controlled intersection, that's correct.
24   Q.  If assuming Mr. Fossum could not see Mr. Brodhead, you
25   would agree he would have no notice that Mr. Brodhead was
```

---



# EXHIBIT Q

61

Page 6

1  violating the law?
2  A. Correct. If he has no opportunity to detect or identify
3  the potential hazard, then how can he react to it?
4  Q. As the driver stopped at an intersection, do you agree
5  Mr. Fossum does not have to assume Mr. Brodhead is going to
6  go twice the speed limit and have bad brakes?
7  A. Oh, I would agree with that, yes.
8  Q. I think I saw this in your report, maybe I didn't, but
9  do you agree that if Mr. Brodhead had been going 35 miles an
10 hour he could have actually run the stop sign and there
11 would have been no collision?
12 A. Well, it depends on where you are going to start the
13 clock. I mean, he entered the intersection sliding through
14 the stop sign to the point of impact in those speed ranges,
15 so if you want to start at the time that he enters the
16 intersection, they are going to crash. So it just depends
17 on where you want to start your zero point.
18 Q. Let's just assume that instead of going 70 miles an hour
19 Mr. Brodhead obeys the law and doesn't hit 70, he could have
20 gone 35 miles an hour from, I guess, when he crossed
21 Evergreen and gone through the stop sign, there would have
22 been no accident?
23    MR. NORDSTROM: I'll object to the form.
24 A. Obviously if you start at different time frames, people
25 aren't going to end up at the same spot at the same time

Page 7

1  so --
2  Q. (BY MR. REKOFKE) You do agree if Mr. Brodhead had been
3  going 35 miles an hour and still run the stop sign, there
4  would have been no accident?
5    MR. NORDSTROM: Same objection.
6  A. No, the way you're phrasing the question, I can't agree
7  with it, because there's the evidence that by the time he
8  started to go through the intersection, he probably was
9  doing somewhere around 35 miles an hour, and he still got
10 involved in the crash. But if you're saying if you start
11 back at a different time, they don't end up at the same spot
12 at the same time, I'd agree with that.
13 Q. (BY MR. REKOFKE) That's all I'm asking.
14 A. Okay.
15 Q. I believe this was in your report, but let me ask, do
16 you agree that if Mr. Brodhead's brakes had been working
17 properly he could have done all the speeding that actually
18 he did, in other words, gone twice the speed limit and had
19 his brakes been working, he still could have stopped short
20 of the crash?
21 A. You give him good brakes and the collision does not
22 occur because he will in fact stop before he enters the
23 intersection.
24 Q. So if the brakes were --
25 A. Working properly.

Page 8

1  Q. -- were working properly, Mr. Brodhead could have gone
2  70 miles an hour, everything could have occurred that did in
3  fact occur and if he would have had brakes that worked, that
4  he would have stopped short of the collision?
5  A. I think I figured about 60 feet short or something like
6  that.
7  Q. Okay. Will you be rendering an opinion at time of trial
8  as to what made Mr. Brodhead slam on his brakes?
9  A. Well, if, the opinion I would render based on the
10 information I have right now is that he either saw or was
11 told of the stop sign and he stopped before the stop sign.
12 Q. So the cue or the clue was either an oral one from, I
13 think one of the girls in the car screaming or that he
14 actually saw the stop sign?
15 A. Correct. Based on the data I've seen so far is what it
16 seems to be.
17 Q. Okay. Will you be rendering an opinion at time of trial
18 as to how far Mr. Brodhead was from the intersection when he
19 first saw Mr. Fossum's truck?
20 A. I can't give you the specifics because I don't know. We
21 know that he saw it stopped there at some time, but I don't
22 know the exact point in time. So at this point, no, I can't
23 tell you.
24 Q. You mention in your report that you believe 410 feet is
25 the soonest that Mr. Brodhead could see the stop sign?

Page 9

1  A. No, I didn't think I said that. I said, what I analyzed
2  was his speed at the beginning of the tire mark, and then I
3  backed him up assuming a one and a second perception/
4  reaction time. Obviously if you change that you will change
5  distance. And I added the reaction distance to the skidding
6  distance, and that's where you get the 410 feet.
7    So that would be approximate point of notice, if you
8  assume a one and a half second detection/
9  identification/reaction period.
10 Q. Whatever that number is, you've done it by working
11 backwards?
12 A. Correct, off the end of the skid marks.
13 Q. Have you gone out and done a site visit?
14 A. I did go out there, yes.
15 Q. Did you do measurements?
16 A. I did not.
17 Q. Okay. When did you go out and visit the site?
18 A. This morning, before the deposition.
19 Q. Okay. I want to ask some of the numbers that are in
20 your report, make sure I understand them.
21    What in your opinion was the minimum speed that
22 Mr. Brodhead achieved just prior to applying the brakes?
23 A. At time that he --
24    MR. NORDSTROM: Just, are you referring to a specific
25 figure? You said within the report.



3  (Pages 6 to 9)

# EXHIBIT R

63

IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF WASHINGTON

THOMAS A. WAITE,

               Plaintiff,

vs.                              Case No. CV-05-390 9-EFS

THE CHURCH OF JESUS CHRIST OF
LATTER DAY SAINTS D/B/A
CORPORATION OF THE PRESIDING
BISHOP OF THE CHURCH OF JESUS
CHRIST OF LATTER DAY SAINTS,
a Utah corporation, d/b/a
CORPORATION OF THE PRESIDENT OF
THE CHURCH OF JESUS CHRIST OF
LATTER DAY SAINTS, a Utah,
corporation, DONALD C. FOSSUM,
and STEPHEN D. BRODHEAD,

               Defendants.

DEPOSITION OF JOHN HUNTER

Deposition upon oral examination of JOHN HUNTER, taken at

the request of the Defendant before David Storey, a Notary

Public, CSR No. STORED*566QO, at the law offices of Eymann,

Allison, Hunter & Jones, 2208 W. Second Avenue, Spokane,

Washington, commencing at or about 11:00 a.m., on March 16,

2007, pursuant to the Washington Rules of Civil Procedure.

64

Page 2

1    APPEARANCES
2
3
4    FOR THE PLAINTIFF:
             NORDSTROM & NEES
5        By: Stephen L. Nordstrom
             Attorney at Law
6        323 South Pines
             Spokane, Washington 99206
7        and
             EYMANN ALLISON FENNESSY HUNTER
8        & JONES, PS
         By: Richard Eymann
9        2208 W. 2nd Avenue
             Spokane, Washington 99204
10
11   FOR THE DEFENDANT LDS:
             WITHERSPOON KELLEY DAVENPORT &
12       TOOLE
         By: Brian T. Rekofke
13       Attorney at Law
             1100 U.S. Bank Building
14       422 W. Riverside Avenue
             Spokane, Washington 99201-0302
15
16   FOR THE DEFENDANT BRODHEAD:
             PAINE, HAMBLEN, COFFIN,
17       BROOKE & MILLER
         By: Andrew Smythe
18       Attorney at Law
             Washington Trust Financial
19       Center
             717 W. Sprague Avenue
20       Ste. 1200
             Spokane, Washington 99201-3505
21
22
23
24
25

Page 3

1              JOHN HUNTER
          Called as a witness at the request of
2          the Defendant, having been first duly
          sworn according to law, did testify as
3          follows herein:
4
5              EXAMINATION
6    BY MR. REKOFKE:
7    Q.  Could you state your name for the record.
8    A.  John Hunter.
9    Q.  And you've been retained by Mr. Nordstrom and/or
10   Mr. Eymann to do an accident investigation of the accident
11   involving Thomas Waite?
12   A.  Yes.
13   Q.  Okay. And I want to ask you, Mr. Hunter, a couple
14   points here to see if we can agree on some things.
15       No. 1, do you agree that prior to the accident, Donald
16   Fossum came to a complete stop at the intersection?
17   A.  That's my understanding, yes.
18   Q.  And when he came to a complete stop, Mr. Fossum would
19   have been the favored driver vis-a-vis Mr. Brodhead?
20   A.  Yes.
21   Q.  Okay. In other words, as Mr. Brodhead was traveling-
22   down the road, Mr. Fossum would have been on his right?
23   A.  Well, that too, but Mr. Brodhead is further down the
24   road, too. I mean, he is further away from the
25   intersection.

Page 4

1    Q.  So he is on, Mr. Fossum is on Mr. Brodhead's right, and
2    he gets, he arrives at the intersection first?
3    A.  Mr. Fossum does?
4    Q.  Yes.
5    A.  Yes.
6    Q.  Okay. And as the favored driver, can Mr. Fossum assume
7    that Mr. Brodhead will reduce speed and yield and allow
8    Mr. Fossum to cross?
9    A.  Well, whether it is Mr. Brodhead or another vehicle, he
10   has an expectancy that people can stop at the stop sign, if
11   that's your question.
12   Q.  Yes. So as a general matter, Donald Fossum or any
13   driver who is a favored driver at an intersection can assume
14   that any approaching driver to the four-way intersection
15   will reduce speed and yield?
16   A.  They have that expectancy, yes.
17   Q.  And Mr. Fossum and other drivers, if they are the
18   favored driver, are they allowed a reasonable reaction time
19   once they realize that the other driver will not yield and
20   slow down?
21   A.  Well, yes, in that, I'm assuming by reaction time you
22   are including the detection-identification phase that goes
23   along with that?
24   Q.  Sure.
25   A.  Yes.

Page 5

1    Q.  Do you agree that after coming to a complete stop at the
2    intersection, Mr. Fossum looked left once and looked right
3    twice?
4    A.  I don't know. I have no idea what his actual phase of
5    looking left or right was unless it was in the material that
6    I was provided. I don't believe it was.
7    Q.  Have you been provided Mr. Fossum's deposition?
8    A.  I have not.
9    Q.  Okay. I think you just said this, but Mr. Fossum and
10   any favored driver can assume other drivers will obey the
11   law?
12   A.  Well, they have an expectancy. I don't know about
13   assume. You have to assume that people are going to not do
14   things that you think perhaps they are, that is called
15   defensive driving, but he has an expectation that people are
16   going to attempt to obey the rules of the road.
17   Q.  And the applicable law here, at least two of the
18   applicable rules here, was that Mr., the speed limit
19   applicable to Mr. Brodhead was 35 miles an hour?
20   A.  It was, yes.
21   Q.  And the other law that would be applicable here is that
22   this was a four-way stop?
23   A.  It is a controlled intersection, that's correct.
24   Q.  If assuming Mr. Fossum could not see Mr. Brodhead, you
25   would agree he would have no notice that Mr. Brodhead was

65

Page 6

1  violating the law?
2  A.  Correct.  If he has no opportunity to detect or identify
3  the potential hazard, then how can he react to it?
4  Q.  As the driver stopped at an intersection, do you agree
5  Mr. Fossum does not have to assume Mr. Brodhead is going to
6  go twice the speed limit and have bad brakes?
7  A.  Oh, I would agree with that, yes.
8  Q.  I think I saw this in your report, maybe I didn't, but
9  do you agree that if Mr. Brodhead had been going 35 miles an
10 hour he could have actually run the stop sign and there
11 would have been no collision?
12 A.  Well, it depends on where you are going to start the
13 clock.  I mean, he entered the intersection sliding through
14 he stop sign to the point of impact in those speed ranges,
15 so if you want to start at the time he enters the
16 intersection, they are going to crash.  So it just depends
17 on where you want to start your zero point.
18 Q.  Let's just assume that instead of going 70 miles an hour
19 Mr. Brodhead obeys the law and doesn't hit 70, he could have
20 gone 35 miles an hour from, I guess, when he crossed
21 Evergreen and gone through the stop sign, there would have
22 been no accident?
23     MR. NORDSTROM:  I'll object to the form.
24 A.  Obviously if you start at different time frames, people
25 aren't going to end up at the same spot at the same time

Page 7

1  so --
2  Q.  (BY MR. REKOFKE)  You do agree if Mr. Brodhead had been
3  going 35 miles an hour and still run the stop sign, there
4  would have been no accident?
5     MR. NORDSTROM:  Same objection.
6  A.  No, the way you're phrasing the question, I can't agree
7  with it, because there's the evidence that by the time he
8  started to go through the intersection, he probably was
9  doing somewhere around 35 miles an hour, and he still got
10 involved in the crash.  But if you're saying if you start
11 back at a different time, they don't end up at the same spot
12 at the same time, I'd agree with that.
13 Q.  (BY MR. REKOFKE)  That's all I'm asking.
14 A.  Okay.
15 Q.  I believe this was in your report, but let me ask, do
16 you agree that if Mr. Brodhead's brakes had been working
17 properly he could have done all the speeding that actually
18 he did, in other words, gone twice the speed limit and had
19 his brakes been working, he still could have stopped short
20 of the crash?
21 A.  You give him good brakes and the collision does not
22 occur because he will in fact stop before he enters the
23 intersection.
24 Q.  So if the brakes were --
25 A.  Working properly.

Page 8

1  Q.  -- were working properly, Mr. Brodhead could have gone
2  70 miles an hour, everything could have occurred that did in
3  fact occur and if he would have had brakes that worked, that
4  he would have stopped short of the collision?
5  A.  I think I figured about 60 feet short or something like
6  that.
7  Q.  Okay.  Will you be rendering an opinion at time of trial
8  as to what made Mr. Brodhead slam on his brakes?
9  A.  Well, if, the opinion I would render based on the
10 information I have right now is that he either saw or was
11 told of the stop sign and he stopped before the stop sign.
12 Q.  So the cue or the clue was either an oral one from, I
13 think one of the girls in the car screaming or that he
14 actually saw the stop sign?
15 A.  Correct.  Based on the data I've seen so far is what it
16 seems to be.
17 Q.  Okay.  Will you be rendering an opinion at time of trial
18 as to how far Mr. Brodhead was from the intersection when he
19 first saw Mr. Fossum's truck?
20 A.  I can't give you the specifics because I don't know.  We
21 know that he saw it stopped there at some time, but I don't
22 know the exact point in time.  So at this point, no, I can't
23 tell you.
24 Q.  You mention in your report that you believe 410 feet is
25 the soonest that Mr. Brodhead could see the stop sign?

Page 9

1  A.  No, I didn't think I said that.  I said, what I analyzed
2  was his speed at the beginning of the tire mark, and then I
3  backed him up assuming a one and a second perception/
4  reaction time.  Obviously if you change that you will change
5  distance.  And I added the reaction distance to the skidding
6  distance, and that's where you get the 410 feet.
7     So that would be approximate point of notice, if you
8  assume a one and a half second detection/
9  identification/reaction period.
10 Q.  Whatever that number is, you've done it by working
11 backwards?
12 A.  Correct, off the end of the skid marks.
13 Q.  Have you gone out and done a site visit?
14 A.  I did go out there, yes.
15 Q.  Did you do measurements?
16 A.  I did not.
17 Q.  Okay.  When did you go out and visit the site?
18 A.  This morning, before the deposition.
19 Q.  Okay.  I want to ask some of the numbers that are in
20 your report, make sure I understand them.
21    What in your opinion was the minimum speed that
22 Mr. Brodhead achieved just prior to applying the brakes?
23 A.  At time that he --
24    MR. NORDSTROM:  Just, are you referring to a specific
25 figure?  You said within the report.



# EXHIBIT S

67

THE LAW OFFICE OF
# PAINE HAMBLEN LLP

717 WEST SPRAGUE AVENUE
SUITE 1200
SPOKANE, WASHINGTON 99201-3505
(509) 455-6000
FAX: (509) 838-0007
www.painehamblen.com

Andrew C. Smythe

**RECEIVED**

APR 3 0 2007

WITHERSPOON, KELLEY
DAVENPORT, TOOLE, P.S

April 24, 2007

Mr. Steven Nordstrom
Ford, Nees & Nordstrom
323 South Pines Road
Spokane, WA 99206-0495

Brian T. Rekofke
Ross White
Witherspoon, Kelley, Davenport & Toole, P.S.
422 W. Riverside Avenue
Spokane, WA 99201-0302

Mr. Richard C. Eymann
Eymann, Allison, et al
2208 W. Second Avenue
Spokane, WA 99204

> Re:    **Waite v. The Church of Latter Day Saints, et al.**
>        **Motion to Allow Amended Answer by Steven Brodhead**

Dear Sirs:

Please find enclosed a proposed Stipulated Motion allowing Steven Brodhead to amend his Answer. This would allow him to fully admit negligence in this case. Mr. Brodhead is also admitting that his negligence caused injuries though the nature and extent of those injuries are not specified. I would hope that all of you would be agreeable to this.

Please communicate your willingness to consent to this matter by phone, email or letter.

I appreciate your cooperation.

Very truly yours,

ANDREW C. SMYTHE

I:\Spodocs\00016\00437\ltr\00499913.DOC:lg
Enclosure

