1  RICHARD C. EYMANN

2  Eymann Allison Hunter Jones, P.S.

3  2208 West Second Avenue
   Spokane, WA  99201-5417

4  (509) 747-0101

5  STEPHEN L. NORDSTROM

6  Nordstrom Law Firm, PLLC
   323 South Pines Road

7  Spokane, WA  99206
   (509) 924-9800

8

9  Attorneys for the Plaintiff

10              UNITED STATES DISTRICT COURT
        FOR THE EASTERN DISTRICT OF WASHINGTON

11

12  THOMAS A. WAITE,                      )
                                          )  **Case No.: CV-05-399-EFS**
13          Plaintiff,                    )
                                          )
14  vs.                                   )
                                          )  **PLAINTIFF'S LR 56**
15                                        )  **STATEMENT OF FACTS**
    CORPORATION OF THE PRESIDING          )
16  BISHOP OF THE CHURCH OF JESUS         )
    CHRIST OF LATTER DAY SAINTS, a        )
17  Utah corporation; CORPORATION OF      )
    THE PRESIDENT OF THE CHURCH OF        )
18  JESUS CHRIST OF LATTER DAY            )
    SAINTS,  a Utah corporation; DONALD C. )
19  FOSSUM; and STEVEN D. BRODHEAD,       )
                                          )
20                                        )
            Defendants.                   )
21                                        )
                                          )
22                                        )
                                          )
23

24

25

26

27  **PLAINTIFF'S LR 56 STATEMENT OF FACTS** - 1

NORDSTROM LAW FIRM, PLLC
STEPHEN L. NORDSTROM
323 South Pines Road
Spokane, Washington 99206
(509) 924-9800

Dockets.Justia.com

Plaintiff, by and through his attorneys, STEPHEN L. NORDSTROM and RICHARD C. EYMANN, hereby sets forth his Statement of Facts:

1.     The collision at issue occurred at the intersection of 8th Avenue and Adams Road, which is a four-way stop intersection marked with four stop signs.  Detective Miya's report, dated August 22, 2003, reflects the investigation by Detective Miya. (Declaration of Stephen L. Nordstrom, Ex. A, Detective Miya report, p. 1).

2.     The posted speed limit on 8th Avenue was 35 miles per hour.  The posted speed limit on Adams Road was 25 miles per hour. (*Id.,* p. 2).

3.     On August 21, 2003, Defendant Donald C. Fossum, was driving a church-owned pickup north on Adams Road when he brought the pickup to a complete stop at the 8th Avenue and Adams Road intersection.  (Ex. 1, Deposition of Donald C. Fossum, p. 57: 9-18).

4.     Mr. Fossum was acting within the scope and duty as a missionary at the time of the collision.  (Ex. 1, Deposition of Donald C. Fossum, p. 22: 1-6)

5.     On the southwest corner of 8th Avenue and Adams Road is a large evergreen tree which makes it difficult to see eastbound traffic on 8th Avenue.  (Declaration of Stephen L. Nordstrom, Ex. A, Detective Miya report, p. 2).

6.     Mr. Fossum was aware that the pine tree partially blocked his view of 8th Avenue.  (Ex. 1, Deposition of Donald C. Fossum, p. 63: 15-20).

**PLAINTIFF'S LR 56 STATEMENT OF FACTS** - 2

NORDSTROM LAW FIRM, PLLC
STEPHEN L. NORDSTROM
323 South Pines Road
Spokane, Washington 99206
(509) 924-9800

7.     Mr. Fossum looked to his left and then to his right.  (Ex. 1, Deposition of Donald C. Fossum, p. 61: 24-62:3).

8.     It is undisputed that while Mr. Fossum was stopped at the stop sign, Mr. Brodhead was traveling east on 8th Avenue.  (Ex. 2, Deposition of Steven D. Brodhead, p. 23: 21-24).

9.     After accelerating to approximately 70 miles per hour, Mr. Brodhead took his foot off the accelerator and started slowing down about half way down the road.  (*Id.*)

10.     Rochelle Hamilton was a passenger in the middle of the rear seat of Mr. Brodhead's vehicle, while Rebecca Hamilton was a passenger in the right side of the rear seat of the vehicle.  (Declaration of Stephen L. Nordstrom, Ex. A, Detective Miya report, p. 5).

11.     Rochelle Hamilton saw the intersection stop sign and yelled, "Stop Sign." Mr. Brodhead responded by slamming on his brakes.  (*Id.*)

12.     While Mr. Brodhead was braking, Rebecca Hamilton saw the church pickup completely stopped at the stop sign, and then start to cross the intersection.  (*Id.*, p. 6).

13.     Mr. Brodhead also saw the pickup at a full stop at the stop sign at 8th Avenue and Adams Road, and then watched it pull forward.  (*Id.*, p. 4).

14.     Mr. Fossum did not see any vehicles approaching the intersection from any direction so he proceeded.  (Declaration of Stephen L. Nordstrom, Ex. B, Report of Officer Walter Loucks, p. 1).

**PLAINTIFF'S LR 56 STATEMENT OF FACTS** - 3

NORDSTROM LAW FIRM, PLLC
STEPHEN L. NORDSTROM
323 South Pines Road
Spokane, Washington 99206
(509) 924-9800

15.   Because the "big pine tree" blocked his view to the west, the front seat passenger, James T. Ross, did not see the Brodhead vehicle until Mr. Fossum began moving forward past the stop sign.  (Ex. 3, Declaration of James T. Ross, p. 2: 12-14).

16.   Mr. Ross heard the screeching of tires and saw smoke coming from the Brodhead vehicle.  (*Id.*, p. 2, lines 15-17; Declaration of Stephen L. Nordstrom, Ex. A, Detective Miya report, p. 7).

17.   Mr. Fossum also heard a high pitched squeal and asked the question, "What is that?"  (Ex. 1, Deposition of Donald C. Fossum, p. 65: 13-21).

18.   Mr. Ross pointed his finger towards the Brodhead vehicle to get Mr. Fossum's attention and yelled, "Oh crap."  (Ex. 3, Declaration of James T. Ross, p. 2: 18-19).

19.   Mr. Fossum heard Mr. Ross yell, "Oh crap."  (Ex. 1, Deposition of Donald C. Fossum, p. 64: 10-17.)

20.   Mr. Fossum looked to his right and saw Mr. Ross pressed up against the passenger door looking west out the driver's side window.  (*Id.*)

21.   For the first time since leaving the stop sign, Mr. Fossum looked to his left and saw smoke and Mr. Brodhead's vehicle.  (Ex. 1, Deposition of Donald C. Fossum, 63: 15-64:19; Declaration of Stephen L. Nordstrom, Ex. B, Report of Officer Walter Loucks, p. 1).

**PLAINTIFF'S LR 56 STATEMENT OF FACTS** - 4

NORDSTROM LAW FIRM, PLLC
STEPHEN L. NORDSTROM
323 South Pines Road
Spokane, Washington 99206
(509) 924-9800

22.     Mr. Fossum pushed the accelerator to the floor. (Ex. 3, Declaration of James T. Ross, p. 2: 19-20).

23.     At the time of the collision, Mr. Brodhead was traveling below the 35 mile an hour speed limit. (Declaration of Stephen L. Nordstrom, Ex. C, Office of the Sheriff, Spokane County Additional Report, Deputy David C. Thornburg, pp. 1-2).

24.     Mr. Brodhead's vehicle left two distinct skid marks which were straight and dark, the longest (driver's side) skid mark was 260 feet long, and the shorter (passenger side) skid mark was 207 feet. (Declaration of Stephen L. Nordstrom, Ex. A, Detective Miya report, p. 2).

25.     Mr. Fossum was aware there was a sight obstruction and had he pulled forward and looked left, he could have cleared that obstruction before entering the intersection. (Ex. 4, Deposition of John E. Hunter, p. 18: 5-19).

26.     If Mr. Fossum had looked left when he cleared the sight obstruction, he would have seen the Brodhead vehicle in a braking mode with skidding tires, smoke coming from the tires, and front end down, depicting the speed of the vehicle. (*Id.*, p. 28: 1-5).

27.     The LDS church produced a video titled, "Safe Intersection Driving." (Declaration of Stephen L. Nordstrom, ¶ 5).

28.     Defendants produced the video in response to Plaintiff's request for production. (*Id.*)

**PLAINTIFF'S LR 56 STATEMENT OF FACTS** - 5

29.    It was intended by the LDS Church that the video, "Safe Intersection Driving" be shown to its missionaries. (*Id.*)

30.    Mr. Fossum does not recall whether he was shown the video. (Ex. 1, Deposition of Donald C. Fossum, 66: 8-14).

31.    Mr. Fossum does not recall taking a written test that was associated with the video. (*Id.,* 66: 8-18).

32.    The video provided instruction to its missionaries which included the following:

    A.    Accidents at intersections claim a significant number of missionary lives each year, as well as causing injury.

    B.    Two major factors that contribute to missionary accidents are inattention and speed.

    C.    Common choices that lead to trouble at intersections include failing to check traffic in all directions and failing to see approaching vehicles.

    D.    Missionaries are to scan the intersection ahead for potential hazards including hazards that are in or near the roadway.

    E.    Missionaries are to anticipate that other drivers may not stop at a stop sign.

(Declaration of Stephen L. Nordstrom, ¶ 6).

**PLAINTIFF'S LR 56 STATEMENT OF FACTS** - 6

NORDSTROM LAW FIRM, PLLC
STEPHEN L. NORDSTROM
323 South Pines Road
Spokane, Washington 99206
(509) 924-9800

33.    The LDS Church owned the vehicle Mr. Fossum was driving. (Defendants' Answer, 3.1).

34.    A personal relationship existed between Mr. Waite and the LDS Church. (Defendants' Answer, 7.2).

DATED this 5th day of June, 2007.

NORDSTROM LAW FIRM, PLLC

By:    s/Stephen L. Nordstrom
          STEPHEN L. NORDSTROM, WSBA #11267
          Co-Counsel for Plaintiff

EYMANN ALLISON HUNTER JONES, P.S.

By:    *Telephonically Approved 6/5/07*
          RICHARD C. EYMANN, WSBA #7470
          Co-Counsel for Plaintiff

NORDSTROM LAW FIRM, PLLC
STEPHEN L. NORDSTROM
323 South Pines Road
Spokane, Washington 99206
(509) 924-9800

## CERTIFICATE OF SERVICE

I, Stephen L. Nordstrom, hereby certify that on the 5th day of June, 2007, I electronically filed the foregoing with the Clerk of the Court using the CM/ECF System which will send notification of such filing to the following participants:

Brian T. Rekofke
Witherspoon Kelley Davenport & Toole
422 W. Riverside Avenue, Suite 1100
Spokane, WA  99201-0302

Andrew C. Smythe
Paine Hamblen Coffin Brooke & Miller
717 W. Sprague Avenue, Suite 1200
Spokane, WA  99201-3503

s/Stephen L. Nordstrom
STEPHEN L. NORDSTROM

**PLAINTIFF'S LR 56 STATEMENT OF FACTS** - 8

# EXHIBIT 1
## Videotaped Deposition of
## Donald C. Fossum

9

# CONDENSED TRANSCRIPT

## UNITED STATES DISTRICT COURT FOR THE
### EASTERN DISTRICT OF WASHINGTON

THOMAS A. WAITE,                                  :    No. CF-05-399-EFS

        Plaintiff,                          :

                                                :    Videotaped Deposition of:

vs.                                               :    DONALD C. FOSSUM

THE CHURCH OF JESUS CHRIST                        :
OF LATTER-DAY SAINTS dba
CORPORATION OF THE PRESIDING                      :
BISHOP OF THE CHURCH OF
JESUS CHRIST OF LATTER-DAY                        :
SAINTS, a Utah corporation,
dba CORPORATION OF THE                            :
PRESIDENT OF THE CHURCH OF
JESUS CHRIST OF LATTER-DAY                        :
SAINTS, a Utah corporation;
DONALD C. FOSSUM; and STEVEN                      :
D. BRODHEAD,                                      :

        Defendants.                         :



November 9, 2006 - 1:08 p.m.

Location:  Kirton & McConkie
1800 Eagle Gate Tower
60 East South Temple
Salt Lake City, Utah 84111

Reporter:  Teri Hansen Cronenwett
Certified Realtime Reporter, Registered Merit Reporter
Notary Public in and for the State of Utah



## GARCIA & LOVE
### COURT REPORTING AND VIDEOGRAPHY

36 South State Street • Suite 1220 • Salt Lake City, UT 84111 • 801.538.2333 • Fax 801.538.2334

10

1  or so after the accident until I was transferred out of the
2  area.
3      Q.  And were you transferred -- where did you -- where
4  were you transferred?
5      A.  Warden, Washington.
6      Q.  And did you have a car or a pickup there?
7      A.  Yes.  We had access to one.
8      Q.  All right.  Who was your first companion?
9      A.  Elder Crewse.
10     Q.  And he was your senior companion?
11     A.  Yes, sir.
12     Q.  Why don't you tell me the positions you held in the
13  mission.  You came in as a greenie?
14     A.  Yes, sir.
15     Q.  And where did you go from there?
16         MR. REKOFKE:  Excuse me.  I'm not familiar with a
17  greenie.
18     Q.  (By Mr. Nordstrom)  What's the position you held
19  when you first came to the mission field?
20     A.  Just a brand-new missionary.
21         MR. REKOFKE:  Okay.  And that's a greenie?
22     Q.  (By Mr. Nordstrom)  Sometimes referred to as a
23  greenie.
24     A.  Yes.
25         MR. REKOFKE:  Okay.  That's fine.

21

1      Q.  (By Mr. Nordstrom)  And then after that?
2      A.  After that I trained a missionary.  I was a
3  district leader and senior companion.  That's about it.
4      Q.  Okay.  What position did you have in August of
5  2003?
6      A.  I was a senior companion.
7      Q.  And when were you the district leader?
8      A.  Before I went to Spokane.
9      Q.  Okay.  So what was the first area you were assigned
10  to?
11     A.  Brewster, Washington.
12     Q.  Brewster, and when did you come to, to Spokane?
13     A.  I want to say June-ish.  I'm not sure specifically
14  when I went in.  Whatever the transfer was before the one
15  when Elder Waite came into the mission, into the area, not
16  the mission.
17     Q.  Okay.  So you first went to Brewster?
18     A.  Yes.
19     Q.  Did you have a car or a pickup there?
20     A.  We had a car.
21     Q.  A car.  And you know what type of car?
22     A.  Chevy Malibu, I believe.
23     Q.  Four door?
24     A.  Yes, sir.
25     Q.  And your companion was who?

22

1      A.  Elder Crewse.
2      Q.  Crewse.  Okay.  Did you drive the car at any time
3  while you were with Elder Crewse?
4      A.  I don't recall.
5      Q.  Okay.  Then did he leave the area or did you?
6      A.  He left the area.
7      Q.  Okay.  And who was your next companion?
8      A.  Elder Thorstad.
9      Q.  How do you spell that?
10     A.  T -- that's a good question.  T-H-O-R-S-T-A-D or
11  something like that.
12     Q.  Okay.  Did you still have the same car then?
13     A.  Yes, sir.
14     Q.  And did you drive the car at that point?
15     A.  I may have.  I am not sure.
16     Q.  When is the first time you remember driving a car
17  or a truck in the mission, pickup?
18     A.  I don't recall when the first time was, sir.
19     Q.  Do you remember which area you were in?
20     A.  No, sir.
21     Q.  Do you remember driving a car or a pickup prior to
22  arriving in Spokane?
23     A.  Yes, sir.
24     Q.  Okay.  And where -- and where were you when you
25  remember driving that car or pickup?

23

1      A.  I was in Cashmere, Washington.
2      Q.  Okay.  Cashmere.  Do you remember whether it was a
3  car or a pickup?
4      A.  It was a car.
5      Q.  Okay.  Do you remember any other car or pickup
6  before that time?
7      A.  I don't understand the question.
8      Q.  Do you remember -- well, you remember driving a car
9  at Cashmere.  I am just -- and that was before Spokane?
10     A.  Correct.
11     Q.  I am just trying to remember if before Spokane you
12  remember any other time that you drove a car or pickup other
13  than at Cashmere.
14     A.  I don't recall.
15     Q.  Okay.  So you don't recall being assigned a pickup
16  at any time prior to Spokane?
17     A.  Not a pickup, sir.
18     Q.  Okay.  At any time prior to Spokane did anyone in
19  your district have a pickup?
20     A.  No, sir.
21     Q.  Did anyone in your zone have a pickup?
22     A.  No, sir, not that I know.
23     Q.  So in your experience in the Spokane mission, until
24  you got to Spokane you never saw a pickup in the mission
25  being driven by a missionary.  Is that correct?

24

1    A.  In the district?
2    Q.  Yes.
3    A.  Well, obviously not if two of them showed up in a
4  car and four of them left in a car.
5    Q.  Okay.  I didn't know they were in your same
6  district, but so you have got a pickup, and you have a car in
7  your district?
8    A.  Yes, sir.
9    Q.  All right.  And at this point in time you're
10  traveling down Adams Road.  Tell me what happened then the
11  next thing you remember as far as -- or do you remember
12  anything before the collision as you're traveling down Adams
13  Road?
14    A.  I remember going down Adams Road, driving, and then
15  I remember coming to the four-way stop.  And we stopped, we
16  looked left, didn't see anybody, looked right.  I believe
17  there was a car or something over there.  I don't recall
18  exactly.
19    Q.  I'm not sure when you say over there.
20    A.  To the right.
21    Q.  Okay.  So you are traveling north on Adams Road?
22    A.  I believe that's correct.
23    Q.  Is that correct?  Maybe this will be easier.  Let
24  me just give you a piece of paper.  Maybe you could draw a
25  little diagram for me.  Here.  Let me get you a --

                                                         57

1  and I've seen it blown up the size of a house at trial and
2  then cross-examination lead from it.
3         So I'm happy to have my client do this to
4  illustrate his testimony, but I want to use it for this
5  purpose and this purpose only.
6         MR. NORDSTROM:  Well, I understand it's for
7  illustrative purposes.  I would like it obviously attached to
8  the deposition.  Otherwise, it won't make much sense as we're
9  having this discussion.
10         MR. EYMANN:  You can make it an exhibit.
11         MR. NORDSTROM:  Yeah, true.  And we're going to
12  attach it, but I understand what you're saying.
13         MR. REKOFKE:  Okay.  Well, if we agree on that,
14  then we'll proceed.
15         THE WITNESS:  Okay.
16         MR. REKOFKE:  So do we agree on that, gentlemen?
17         MR. NORDSTROM:  Yeah, I don't have any problem with
18  that.
19         MR. REKOFKE:  Okay.  Richard?
20         MR. EYMANN:  I have no problem.
21         MR. REKOFKE:  Okay.  Go ahead.
22    A.  Okay.  So you want where I stopped?
23         MR. EYMANN:  But he can be asked about it.  Let's
24  say, if he were to come to trial and be asked about it, and
25  he draws a completely different picture, the two can be

                                                         59

1    A.  I have a pen, sir.
2    Q.  You got a pen.  Maybe you could just draw the
3  four-way stop intersection for me.  And then put north, which
4  is the direction I guess you were traveling.  Okay.  And can
5  you draw in where your pickup was -- you say you stopped at
6  the stop sign?
7    A.  Yes, sir.
8    Q.  Can you draw in where you were stopped?
9    A.  I can, but as far as legality goes, I don't want it
10  to be used against and say, well, this is where you say you
11  were, and you were three feet ahead of where all this, so --
12         MR. REKOFKE:  Let's do this.  Why don't we just say
13  this will be illustrative of his testimony today, but we're
14  not going to see it attached to your accident reconstruction
15  expert's report as somehow some fundamental basis for his
16  opinions.
17         MR. NORDSTROM:  Well, obviously, you are doing it
18  for illustrative purposes.  Probably mark it as an exhibit,
19  at least for the deposition, so we've got it.  I just want to
20  get an idea where we're going here.  Just go ahead and --
21         MR. REKOFKE:  Well, but we're not going to see this
22  as far as some kind of cross-examination about where he was
23  and that type of thing.  I won't let him draw it if we're
24  going to do that.  I've been down that road, and it's not
25  anything you have ever done.  I have had this happen before,

                                                         58

1  compared, right?
2         MR. REKOFKE:  Sure.
3         MR. NORDSTROM:  It can always be used for
4  impeachment purposes.  We know that, but let's just -- let's
5  come up with it.  We've already got an agreement.  Let's say
6  we move on.
7    Q.  (By Mr. Nordstrom)  Draw me where the vehicle was
8  that you remember, the pickup you're driving.  Okay.  Why
9  don't you just put M in it for missionaries.  Okay.  And you
10  said that there was -- you thought there was another vehicle
11  that you say.  Where was that?
12    A.  Over to my right.
13    Q.  Okay.  Was that a car or pickup do you remember?
14    A.  I don't recall.
15    Q.  Okay.  Just put -- kind of draw where you remember
16  and put C for car.  And again, how many times had you driven
17  down this road?  Do you remember?
18    A.  Several times.
19    Q.  Okay.  Taking missionaries, whether it be Elder
20  Waite and his companion or other missionaries back to their
21  apartment?
22    A.  This is the road we would take to take Elder Waite
23  and Elder Ross home.
24    Q.  Okay.  You said you came to the stop sign.  As you
25  are driving down Adams Road, do you have any type of radio or

                                                         60

1  CD in the pickup?
2     A.  I believe there was a CD in the pickup.
3     Q.  Okay.
4     A.  I don't recall whether it was music or whether it
5  was a talk.  I know it was in there.
6     Q.  All right.  Is there any mission rules against
7  having music when you are traveling in the -- in a car or a
8  pickup?
9     A.  We can't listen to the radio.  It has to be church
10  music, hymns, or talks from general authorities of the
11  church.
12     Q.  Okay.  So you can listen to music as long as it's
13  hymns?
14     A.  Or books on tape, that kind of stuff.
15     Q.  All right.
16     A.  Just as long as it's not the radio music, etc.
17     Q.  All right.  But you remember -- you don't remember
18  whether that was on at the time or not?
19     A.  It -- there was something.  I don't recall if it
20  was music or a talk.
21     Q.  Okay.  And then you stop at the stop sign, and you
22  said something about you looked and you didn't see anybody
23  coming?
24     A.  I looked left, didn't see anybody coming, looked
25  right, and thought I saw the car.  But they were a ways back

61

1  from the stop sign, and because it was a four-way stop and
2  everything else was clear, I proceeded through the
3  intersection.
4     Q.  Okay.  And this is the car you have drawn that's
5  traveling west.  Is that correct?
6     A.  Yes, sir.
7     Q.  Okay.  This is Adams Road.  Is this intersection at
8  8th Avenue?  Do you remember?  Is that correct?
9     A.  I believe that's correct.
10     Q.  Have you been back to this intersection after this
11  collision to look at it?
12     A.  I went back before I came home from my mission.
13     Q.  Did you go back with anyone?  Probably a companion?
14     A.  It was another missionary.
15     Q.  That you went back to this and looked at it?
16     A.  Yeah, just to see what was there.
17     Q.  Not for part of the litigation, just to see what --
18     A.  Yes, sir.
19     Q.  -- was there, okay.  And okay.  So you said you
20  looked left?
21     A.  Yes, sir.
22     Q.  Do you remember how far you could see down the
23  roadway?
24     A.  No, sir.
25     Q.  Do you recall whether there was any type of

62

1  obstruction to your view?
2     A.  I remember there was a tree.  I don't know if it
3  was a pine tree or whatever kind of hanging over.
4     Q.  Hanging over what?
5     A.  Well, over the person's yard kind of into the road
6  area.
7     Q.  Have you seen any photographs of this intersection
8  since the collision?
9     A.  Of the intersection?
10     Q.  Yes.
11     A.  No, I have not.
12     Q.  Any that depict this scene at all?  The streets,
13  the trees, anything?
14     A.  No, sir.
15     Q.  All right.  So as you looked to the left, you say
16  there's a pine tree that's kind of hanging over?
17     A.  Yes, sir.
18     Q.  Okay.  Did that block your view of the roadway in
19  any way?
20     A.  Partially, yes.
21     Q.  Okay.  So did you receive any safety training at
22  all that -- what your obligation is when you come to a stop
23  sign?
24     A.  From the church or from getting my license, sir?
25     Q.  Initially from the church, anything?

63

1     A.  We were told to obey the traffic safety laws, and
2  at a stop sign you stop, so --
3     Q.  Okay.  Any other responsibility you have, other
4  than stopping at a stop sign?
5     A.  Looking both ways.
6     Q.  Okay.  Anything else?
7     A.  Proceeding safely through.
8     Q.  Okay.  Is that what you did here?
9     A.  Yes, sir.
10     Q.  When you proceeded safely, did you look again at
11  all in either direction, left or right?
12     A.  I looked --- I believe I looked to my right again,
13  and then I looked forward, and then I looked to my right
14  again because Elder Ross said something to the effect of,
15  "Oh, crap" or whatever.  And so then I looked at him.  This
16  is the second time, and he was pressed up against the door
17  looking out my window.
18        So that caused me to look left in the middle of the
19  intersection, and I saw smoke and a car, and car disappeared.
20  And it seemed like it was a few minutes before the car hit
21  us, but in all actuality I know it wasn't.  I thought they
22  had missed us.  Obviously, they didn't.
23        And the next thing I remember is looking out of my
24  window after the -- after we had been hit and seeing Elder
25  Waite going across the ground and then Elder Ryan hitting the

64

13

1   ground.
2       Q.  Okay.  So after leaving the stop sign, you remember
3   looking right?
4       A.  Yes, sir.
5       Q.  And then you looked right again when you heard
6   Elder Ross yell something like, "Oh, crap"?
7       A.  Yes, sir.
8       Q.  Do you remember hearing anything other than perhaps
9   something with the CD?
10      A.  Yes, sir.
11      Q.  And other than, "Oh, crap"?
12      A.  Yes, sir.
13      Q.  What do you remember?
14      A.  I remember hearing a strange noise, kind of a
15  high-pitched squeal.  Wasn't sure what it was, and I believe
16  I asked, you know, what, what is that?  What's going on, and
17  then all of that happened.
18      Q.  Okay.  So you ask anybody in particular?
19      A.  No.  I just said it, sir.
20      Q.  What did you say?
21      A.  Something to the effect of, "What is that?"
22      Q.  Okay.
23      A.  Referring to the noise.
24      Q.  And those things happened before the impact?
25      A.  Yes, sir.
                                              65

1       Q.  All right.  Do you remember sitting at the stop
2   sign and hearing any kind of --
3       A.  No, sir.
4       Q.  -- noise like that?  You need to wait until I'm
5   done.  Do you remember sitting at the stop sign and hearing
6   any noise like that?
7       A.  No, sir.
8       MR. NORDSTROM:  What are we exhibit on two?  Or
9   three?
10      (Deposition Exhibit No. 3 was marked.)
11      Q.  (By Mr. Nordstrom) Showing you what's been marked
12  as Plaintiff's Exhibit 3, remember seeing this document
13  before?
14      A.  I'm not sure if I have or have not seen it before.
15      Q.  So would I be correct in assuming that if you
16  received a test like this following a video at a zone
17  conference, you don't recall taking this test?
18      A.  That's correct.
19      Q.  I'm just looking up in the top right, first
20  paragraph after the initial paragraph but on the right side.
21  You see where it says, "Safe drivers anticipate"?
22      A.  Uh-huh.
23      Q.  Is that a yes?
24      A.  Yes.
25      Q.  Safe drivers anticipate that the other driver may
                                              66

1   not stop.  Is that something -- do you recall ever receiving
2   any kind of training regarding that issue?
3       A.  No, sir, I don't.
4       Q.  Okay.  Do you -- if you were going to respond to
5   this test -- let me put you on the spot here again.  It says,
6   "Remember, you can't always trust the other driver to do what
7   is -- what he is supposed to do.  The principle is, never
8   blank on the blank of blank."  Do you know how to answer or
9   fill in those blanks?
10      A.  Never rely on the driver of the other car.
11      Q.  Okay.  That's how you would answer that?
12      A.  Without seeing the video and just guessing, yes.
13      Q.  Okay.  Thank you.  Do you remember seeing the car
14  that hit you prior to impact?
15      A.  Like I said, when Elder Ross said that, I looked to
16  my left.  Before I saw it then, I did not see a car to my
17  left.
18      Q.  Okay.  So it was a passenger that saw it happening
19  first?
20      A.  That's correct.
21      Q.  Okay.  Did you ever play basketball down at the
22  stake center?
23      A.  Yes, sir.
24      Q.  Did you play early morning?
25      A.  I am not exactly sure on the number of times.  I
                                              67

1   think I played once or twice on a preparation day.
2       Q.  President Ludlow ever play with you?
3       A.  Yes, sir.
4       Q.  Did you see Elder Waite after this collision?  Did
5   you see him at any other time?
6       A.  Yes, sir.
7       Q.  When did you see him next?
8       A.  I saw him when I was coming home from my mission.
9       Q.  And was that in Spokane?
10      A.  Yes.
11      Q.  Was he back to the mission at that point in time?
12      A.  Yes, he was.
13      Q.  And what do you recall?  Did you have a
14  conversation with him?
15      A.  I did because I was worried about his health.  I
16  asked how he was doing.
17      Q.  Sure.
18      A.  He told me he was fine, and I said, you know, "You
19  don't have anything wrong?"  And he said, "No.  You know, I'm
20  doing good, just a little tired, kind of feel like a new
21  missionary type deal."
22      And that's basically the conversation I had with
23  him.  Told him -- I believe I may have told him I was glad
24  that he was doing okay or something, something to that
25  effect, and I believe that's the meat of the conversation.
                                              68

14

# EXHIBIT 2
# Deposition of Steven D. Brodhead

15

1            UNITED STATES DISTRICT COURT FOR THE

2              EASTERN DISTRICT OF WASHINGTON

3

4   THOMAS A. WAITE,

5               Plaintiff,

6      vs.                 No.  CV-05-399-EFS

7   THE CHURCH OF JESUS CHRIST OF
     LATTER DAY SAINTS d/b/a
8   CORPORATION OF THE PRESIDING
     BISHOP OF THE CHURCH OF JESUS
9   CHRIST OF LATTER DAY SAINTS, a
     Utah corporation, d/b/a CORPORATION
10  OF THE PRESIDENT OF THE CHURCH OF
     JESUS CHRIST OF LATTER DAY SAINTS,
11  a Utah corporation; DONALD C. FOSSUM;
     and STEVEN D. BRODHEAD,
12

13               Defendants.

14          DEPOSITION OF STEVEN D. BRODHEAD

15

16         BE IT REMEMBERED that on the 11th day of

17  December 2006, at the hour of 5:08 p.m., the deposition

18  of STEVEN D. BRODHEAD was taken at the request of the

19  Plaintiff, before Caryn E. Winters, RPR, a notary public and

20  court reporter, Washington CCR No. 2496, Idaho CSR No. 237,

21  at 717 West Sprague Avenue, Suite 1200, Spokane, Washington,

22  pursuant to the Washington Rules of Civil Procedure.

23

24

25

Page 22

```
1   horn?
2   A  I don't.
3   Q  All right.  And at that point in time I also understand
    you floored the accelerator?
5   A  Yes.
6   Q  And you hadn't taken any medication that day?
7   A  Yeah, I didn't take any.
8   Q  Were you feeling pretty upset, or can you kind of give
9   me a feel of how you were feeling at that point?  I know you
10  told the police officer frustrated, but can you tell me any
11  other words that may describe how you felt?
12  A  Well, with the Zoloft it -- you know, any medication, it
13  takes awhile to cycle through your system and to actually
14  start working.  And, you know, I'm taking 250 milligrams
15  now.  So that's --
16  Q  You were taking a hundred milligrams at that point in
17  time, though?
18  A  I was taking 50.
19  Q  50?
20  A  That's what I started out at.  And after that day of the
21  accident is when I -- I bumped my medication up myself and
22  talked to my doctor about it.
23  Q  Okay.  I just was reading -- it just had indicated -- in
24  fact, maybe I can -- I don't need to mark this, but let me
25  just show you, maybe if this will refresh your recollection.
```

Page 23

```
1   And I'm not even sure if it's accurate.  It's in this
2   paragraph right here.  It just indicates --
3          MR. REKOFKE:  Is this page four?
4          MR. NORDSTROM:  You should have it.
5          MR. REKOFKE:  I'm there.
6   Q  (By Mr. Nordstrom)  "He said he was taking 100
7   milligrams a day, but did not take any on 8-2-03."
8   A  Yeah, and I never caught that.  And it should have been
9   --
10  Q  50?
11  A  -- 50.
12  Q  Okay.
13  A  Because that's the starting off.
14  Q  You floor the Honda?
15  A  Yes.
16  Q  Does it have a four cylinder in it or six?
17  A  Four cylinder.
18  Q  Four cylinder?  And you floored it, and you indicate
19  that you actually saw the needle hit 70 miles per hour?
20  A  Yes.
21  Q  All right.  And then it's your testimony -- or, is it
22  your testimony then you let your foot off of the accelerator
23  and started slowing down about halfway down the road?
24  A  Yes.
25  Q  Okay.  Can you tell me, when you say about halfway down
```

Page 24

```
1   the road, what are we talking?  Are we talking about halfway
2   between when you left Evergreen before the impact at
3   McDonald -- or, I mean, Adams?
4   A  At that time I don't -- since, you know, I don't really
5   know that area, I can't really say what halfway is.  Just a
6   way to explain it.  I don't know exactly, you know, halfway
7   of that road.
8   Q  Okay.  So as we sit here today, when you told the police
9   officer "slowing about halfway down the road" you're not
10  sure what you meant?
11  A  That was just the best I could explain it.
12  Q  Now, when you had left Pines Road you did have to
13  cross, first of all, McDonald Road where there was a stop
14  sign.  Do you remember that?
15  A  Not vaguely.
16  Q  Let me just ask a bit further.  Between Pines and before
17  you got to Evergreen, when you yelled at this guy, do you
18  remember traveling between Pines Road and McDonald Road?
19  A  Once again, I wasn't too familiar with the roads.
20  Q  Okay.
21  A  So I'm sure I came -- well, of course I came through it,
22  you know.
23  Q  Okay.
24  A  If that's in between.  But --
25  Q  And then traveled down to Evergreen Road.  But none of
```

Page 25

```
1   that stands out in your mind as we sit here today, before
2   you get to Evergreen when you yell at this guy that almost
3   hit you?
4   A  No, just Evergreen is the one that stands out.
5   Q  Okay.  That's fair.  But you do recall at some point in
6   time slowing down.  Do you hit the brakes or do you just
7   take your foot off the accelerator, do you remember?
8   A  I took my foot off the accelerator and had my foot still
9   over the accelerator, but I wasn't pressing that.
10  Q  Okay.  All right.  And it indicates in the police report
11  -- you indicated you looked at it -- it said that "He saw
12  the stop sign at Adams and hit the brakes."
13         Do you recall at some point in time seeing stop
14  signs, a stop sign at Adams Road?
15  A  That was the first time I had been down towards Adams.
16  Q  No.  But, I mean, before the collision occurred, at some
17  point in time you remember seeing a stop sign on this date
18  as you're traveling -- now just talking about this date, so
19  the very first time you've been on the road.  But I'm
20  talking about as you were approaching Adams Road on this
21  occasion, at some point in time you do remember seeing a
22  stop sign for you?
23  A  Yes.
24  Q  All right.  And do you recall, I believe one of the
25  girls in the car with you yelled something about a stop
```

17

# EXHIBIT 3
# Declaration of James T. Ross

18

1
2
3
4
5
6
7
8
9
10
11                                  )
12                                  )
13                                  )
14                                  )        DECLARATION OF
15                                  )        JAMES T. ROSS
16                                  )
17                                  )
18                                  )
19
20        I, James T. Ross, under the penalty of perjury of the laws of the State of Washington,
21
22  hereby declare and state:
23        That I was a missionary for the Church of Jesus Christ of Latter Day Saints from May of
24  2002 to May of 2004 at which time I received a honorable release. I served in the Spokane,
25  Washington mission and held the positions of Senior Companion, Trainer, District Leader, Zone
26  Leader, and Assistant to the President.
27
28        On or about August 21, 2003 I was involved in a motor vehicle collision with six other
29  Elders including my companion, Elder Thomas Waite. At that time I was also a Zone Leader as
30  well as Elder Waite's Senior Companion. Elder Waite and I had been companions for
31  approximately two weeks. That morning Elder Donald Fossum and Elder Cesar Porras, the
32  Elders to which the 2003 Dakota pickup was assigned, picked us up for either a zone or district

DECLARATION OF JAMES T. ROSS - 1

NORDSTROM & NEES, P.S.
ATTORNEYS AT LAW
323 South Pines Road
Spokane Valley, Washington 99206
(509) 924-9800
Fax (509) 924-9923

*19*

meeting. We were the last Elders to be picked up and since there were already four Elders sitting inside the cab of the pickup (two in the front seat, two in the extended cab seats), Elder Waite and I climbed into the bed of the canopied pickup. I, as well as other Elders had frequently ridden in the bed of the pickup and did so to most weekly district meetings unless another ride was available. Following the meeting we stopped off at the Subway restaurant on 32nd Avenue. After lunch Elder Fossum, Elder Porras, Elder Hansen and I got into the cab of the pickup, and Elder Ryan and Elder Waite who came out of the restaurant last, climbed into the bed.

I had been in this particular area for approximately eight weeks, living at the same apartment and was familiar with the route down Adams Road and the four-way stop at the intersection of 8th Avenue. On the day of the collision I was in the front passenger seat and Elder Fossum was driving the pickup. Elders Porras and Hansen were in the back seat. I recall specifically that Elder Fossum stopped at the stop sign on Adams Road. There is a big pine tree which blocks our view to the west on 8th and I was unable to see any car approaching from that direction until we began moving forward pass the stop sign. I am not sure exactly where the pickup was in relation to the intersection but the next thing I recall is hearing the screeching of tires. I then looked and saw a vehicle traveling at a high rate of speed coming towards us down 8th Avenue. I then pointed my finger toward the speeding car to get Elder Fossum's attention and yelled "oh crap". Elder Fossum looked and saw the car coming and responded by pushing the accelerator to the floor. The next thing I knew the car hit the side of the pickup knocking us approximately 180 degrees.

After the pickup stopped I looked in the rear and saw that the canopy and both Elder Ryan and Elder Waite were missing. I exited the pickup and found both Elder Ryan and Elder Waite lying on the pavement. Elder Waite was not only unconscious but he was not breathing. He also had blood coming from his nose and ears. Elder Waite finally began to breathe and at some point in time I recall the ambulance arriving.

I do not recall any actual conversations with anyone although I know that I did talk with the other Elders. We did kneel down and say a prayer for Elder Waite and Elder Ryan and also called President Ludlow to inform him what had happened.

DECLARATION OF JAMES T. ROSS - 2

NORDSTROM & NEES, P.S.
ATTORNEYS AT LAW
323 South Pines Road
Spokane Valley, Washington 99206
(509) 924-9800
Fax (509) 924-9923


20

During a telephone conversation with Mr. Nordstrom I was asked the following questions and provided the following truthful answers:

Question:   Prior to August 21, 2003, were you ever advised of a rule either verbal or written that missionaries were not allowed to ride in the bed of a pickup?

Answer:   No.

Question:   Was it your practice even before you were a Zone Leader to follow mission rules?

Answer:   Yes.

Question:   As a Zone Leader if you had understood that there was a rule that missionaries could not ride in the bed of a pickup would you have followed that rule?

Answer:   Yes.

Question:   As a Zone Leader would you have encouraged other missionaries to follow such a rule?

Answer:   Yes.

Question:   Do you recall the first day arriving in the Washington Spokane mission and having an orientation?

Answer:   Yes, a little bit.

Question:   Do you remember signing a Driving Contract that indicated that being allowed to drive or ride in a mission owned car was a privilege and that you would wear a seatbelt whenever the vehicle was moving?

Answer:   It was a very busy day and we had people from the mission office and others coming in to us and giving us all sorts of papers and having us sign various things and I guess I could have signed something like that but I really cannot recall signing that kind of paper.

Question:   Do you recall whether there were seatbelts in the bed of the pickup?

Answer:   There were no seatbelts.

Question:   Prior to the collision do you recall ever being advised either verbally or in writing that being required to wear a seatbelt whenever a vehicle was moving applied to the bed of a pickup?

DECLARATION OF JAMES T. ROSS - 3

NORDSTROM & NEES, P.S.
ATTORNEYS AT LAW
323 South Pines Road
Spokane Valley, Washington 99206
(509) 924-9800
Fax (509) 924-9823

21

| | | |
|---|---|---|
| Answer: | No. I was never told that or given anything in writing. | |
| Question: | At that time, as a missionary and a Zone Leader if you had known or understood that riding or allowing missionaries to ride in the bed of a pickup was a violation of any mission rule would you have allowed it? | |
| Answer: | No. If I had known it was a rule I not only would have followed it myself but encouraged each of the missionaries to follow it as well. | |

For approximately the last six months of my mission I served as an Assistant to President Ludlow. I was serving in this capacity when Elder Waite returned to the mission field after his hospitalization. He spent the night with us before going to his own area and I recall we talked a little bit about the accident but I do not recall any specifics. I do remember that Elder Waite was indicating he was having short term memory problems but that is about all I recall.

As previously indicated I was honorably released from my mission in May of 2004 after serving for two years.

DATED this _27_ day of November, 2006.

_____
JAMES T. ROSS

DECLARATION OF JAMES T. ROSS - 4

NORDSTROM & NEES, P.S.
ATTORNEYS AT LAW
329 South Pines Road
Spokane Valley, Washington 99206
(509) 924-9800
Fax (509) 924-9223

22

Case 2:05-cv-00399-EFS     Document 128     Filed 06/05/2007

# EXHIBIT 4
## Deposition of John Hunter

23

1

2

3

4

5

6

7               IN THE UNITED STATES DISTRICT COURT
            FOR THE EASTERN DISTRICT OF WASHINGTON
8

9    THOMAS A. WAITE,
                              Plaintiff,
10
     vs.                         Case No. CV-05-390 9-EFS
11
     THE CHURCH OF JESUS CHRIST OF
12   LATTER DAY SAINTS D/B/A
     CORPORATION OF THE PRESIDING
13   BISHOP OF THE CHURCH OF JESUS
     CHRIST OF LATTER DAY SAINTS,
14   a Utah corporation, d/b/a
     CORPORATION OF THE PRESIDENT OF
15   THE CHURCH OF JESUS CHRIST OF
     LATTER DAY SAINTS, a Utah,
16   corporation, DONALD C. FOSSUM,
     and STEPHEN D. BRODHEAD,
17                            Defendants.

18

19               DEPOSITION OF JOHN HUNTER

20   Deposition upon oral examination of JOHN HUNTER, taken at

21   the request of the Defendant before David Storey, a Notary

22   Public, CSR No. STORED*566QO, at the law offices of Eymann,

23   Allison, Hunter & Jones, 2208 W. Second Avenue, Spokane,

24   Washington, commencing at or about 11:00 a.m., on March 16,

25   2007, pursuant to the Washington Rules of Civil Procedure.

1  Q.   Okay.  You would agree that depending on where

2  Mr. Fossum stopped, a calculation could be done as to how

3  far down the road he could see, based on the road design?

4  A.   You could probably do it off the aerial too, yes, you

5  can.  You are talking about the view obstruction on the left

6  and how far he can see depending on where he stopped?

7  Q.   Yes.

8  A.   Sure.  The closer he gets to the intersection, the more

9  his visibility increases.

10  Q.   Okay.  Do you have an opinion as to whether you believe

11  Mr. Fossum should have stopped?

12  A.   Well, yes, he should have stopped in a position where he

13  can check for traffic in both directions.

14  Q.   Okay.  And do you know where that is on that road?

15  A.   A specific point?

16  Q.   Yes.

17  A.   No.  I know that he can stop and clear the sight

18  obstruction before entering the intersection, but I don't

19  know where his exact position would be, no.

20  Q.   Okay.  So at time of trial you are not going to render

21  an opinion either as to where, in fact, where he stopped or

22  where you believe he should have stopped?

23      MR. NORDSTROM:  I'll object.  I think he addressed that

24  in his report that he would.

25  Q.   (BY MR. REKOFKE)  Then I'm asking where it is then.  You

25

Page 28

1   A.     I kind of lump it all together, the fact that the

2   vehicle's, if he were to have looked to the left he would

3   have seen the vehicle in a braking mode, and that includes

4   the skidding tires, the smoke, the front end down and being

5   able to detect the speed of the vehicle.  I'm not going to

6   sit here and tell you if his window's down he can hear this

7   audible signal from so far away, that is not my field of

8   expertise, I would leave that to somebody else.

9   Q.     (BY MR. REKOFKE)  So what your kind of bottom line

10  conclusion, I think, to maybe head toward a conclusion on

11  this is basically the clues for, or the clue for Mr. Fossum

12  would have been a visual clue?

13  A.     Right, and possibly audible, but I, I can't say for sure

14  on that, but he, there is a position in which, as I state in

15  my report, that he had a flaw in his driving strategy.  If

16  a, had he looked prior to pulling out to the left he would

17  have seen that it wasn't safe to do so.

18  Q.     And apparently, at least at some point in time, you now

19  know that you're tasked with trying to pinpoint where either

20  Mr. Fossum was or where he should have been?

21  A.     Well, I can't tell you where he was.  I mean, I don't

22  know that anybody can, other than Mr. Fossum, tell you where

23  he was, or maybe Mr. Brodhead, if he knows.  But I would say

24  Fossum would probably be the more reliable person as to

25  where he was.

26